# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | |
|---|---|
| IN RE REVANCE THERAPEUTICS, INC. SECURITIES LITIGATION | C.A. No. 3:25-cv-0018-EJR<br><br>District Judge Eli J. Richardson<br>Mag. Judge Jeffery S. Frensley<br><br><br>JURY TRIAL DEMANDED |

# CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

## TABLE OF CONTENTS

I.  INTRODUCTION ........................................................................................................... 2

II.  JURISDICTION AND VENUE ................................................................................... 11

III.  PARTIES ....................................................................................................................... 11

    A.  Lead Plaintiffs ................................................................................................... 11

    B.  Defendants ......................................................................................................... 12

IV.  RELEVANT NONPARTIES ........................................................................................ 12

V.  OVERVIEW OF THE FRAUD ................................................................................... 13

    A.  Revance Transitions to a Commercial-Stage Pharmaceutical Company and Enters into a Long-Term Distribution Agreement with Teoxane ........................ 13

    B.  Revance's Commercialization Efforts Falter and the Teoxane Agreement Emerges as the Most Important Aspect of the Company's Business ................... 14

    C.  Defendants Tout Success with the "Teoxane Partnership" and the Continued Sales of RHA Fillers ........................................................................ 16

    D.  On The Strength of RHA Growth, Revance Announces a Tender Offer with Crown and Assures that the Company is Fully Compliant with the Teoxane Agreement .......................................................................................................... 19

    E.  Defendants' Statements Were False: Just Four Days After the Tender Offer was Announced, Teoxane Asserted a Breach of Contract as Revance Had Failed to Abide by the Teoxane Agreement Throughout 2024 ........................... 21

    F.  Defendants Failed to Disclose Teoxane's Notice and Its Impact on the Tender Offer for More Than Five Weeks ............................................................ 24

    G.  The Truth Begins to Emerge: The Tender Offer Does Not Commence on September 13, 2023, Prompting Revance to Disclose Teoxane's Notice ............ 25

    H.  Crown Warns Defendants that the Tender Offer was "Dependent" on Crown's "Approval" of Any Concession with Teoxane ...................................... 27

    I.  Over Crown's Objection, Revance Resolves the Teoxane Dispute by Entering into Agreements Harmful to Revance's Future Operations, Thereby Foreclosing the Tender Offer at the Announced Price ........................... 28

    J.  The Fraud Continues: Defendants Announce a Settlement with Teoxane but Misleadingly Conceal that Crown Repudiated the Tender Offer ........................ 33

K.    Defendants Reveal the Damaging Terms of the Amended Teoxane Agreement on November 7, 2024, Yet Continue to Suggest that the Tender Offer Was Moving Forward at the Original Price ................................................. 36

L.    Defendants Continue to Conceal Crown's Repudiation of the Tender Offer Price ..................................................................................................................... 37

M.    The Full Truth is Revealed: Defendants Disclose the New Tender Offer That Values the Company at Less Than Half Crown's Prior Tender Offer.................. 40

N.    Defendants Make Post-Class Period Admissions Confirming the Fraud ............ 41

O.    Former Revance Employees Confirm That Revance Was in Breach of the Teoxane Agreement and Teoxane Had Expressed Dissatisfaction with the Relationship ........................................................................................................ 43

        1.    Improper Promotional Activity ................................................................. 44

        2.    Violations of Brand Guidelines................................................................. 48

        3.    Bare-Bones Marketing and Sales Teams Could Not Hit RHA Sales Figures........................................................................................................ 50

VI.    FALSE AND MISLEADING STATEMENTS ................................................... 54

A.    False And Misleading Statements Before the Tender Offer Was Announced....... 55

B.    False and Misleading Statements During the Pendency of the Tender Offer and Before Teoxane's Notice was Disclosed ..................................................... 60

C.    False and Misleading Statements After Teoxane's Notice Was Disclosed ........... 65

D.    False and Misleading Statements After the Teoxane Dispute Was Resolved ....... 69

VII.    ADDITIONAL ALLEGATIONS OF SCIENTER .......................................... 74

VIII.    LOSS CAUSATION .......................................................................................... 77

IX.    INAPPLICABILITY OF STATUTORY SAFE HARBOR................................ 80

X.    CLASS ACTION ALLEGATIONS ................................................................. 81

XI.    PRESUMPTION OF RELIANCE .................................................................... 82

COUNT I Against All Defendants for Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder ................................................................. 84

COUNT II Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act ............................................................................................................ 85

XII.   PRAYER FOR RELIEF ................................................................................. 87

XIII.   JURY DEMAND ......................................................................................... 87

Lead Plaintiffs The Arbitrage Fund, AltShares Merger Arbitrage ETF, AltShares Event-Driven ETF, and iMGP Alternative Strategies Fund (collectively, the "Water Island Funds"), and Chicago Capital Management, LP ("Chicago Capital," and together with the Water Island Funds, "Lead Plaintiffs"), by their undersigned counsel, bring this action for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5, against Revance Therapeutics, Inc. ("Revance" or the "Company"), Mark J. Foley ("Foley"), and Tobin C. Schilke ("Schilke") (collectively, "Defendants"). Lead Plaintiffs bring this class action on behalf of a class ("Class") consisting of themselves and all other persons and entities, other than Excluded Persons,[1] that purchased or otherwise acquired Revance securities during the period of February 29, 2024 through December 6, 2024, inclusive (the "Class Period").

Lead Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters based on the investigation conducted by and through counsel, which included, among other things, review and analysis of: (i) the filings with the SEC; (ii) press releases and other public statements of Revance, including transcripts of Revance's conference calls with analysts and investors; (iii) news, media, and analyst reports about Revance; (iv) data reflecting the price of Revance stock; (v) information provided by former Revance employees; and (vi) other public information regarding the Company, as identified herein.

Counsel's investigation into the facts supporting the claims alleged herein continues, and many of the relevant facts are known only to Defendants or are exclusively within Defendants'

---

[1] The "Excluded Persons" are Defendants, Crown, and Teoxane, as defined below, and any person, firm, trust, corporation, or other entity related to, or affiliated with, any of the Defendants, Crown, or Teoxane.

custody or control. Lead Plaintiffs believe that substantial additional evidentiary support for the allegations set forth herein will be uncovered after a reasonable opportunity for further investigation and discovery of Defendants.

## I. INTRODUCTION

1. This securities fraud case is premised upon serious misconduct by Revance and its senior executives, who misled investors about the extent of the Company's significant operational difficulties as they pursued a sale to a private buyer, Crown Laboratories, Inc. ("Crown"). Their efforts to conceal the true condition of the Company unraveled as, shortly after the proposed transaction was announced in August 2024, Revance's key strategic partner, Teoxane SA ("Teoxane"), served a formal notice of breach of agreement on Revance. Defendants concealed that extraordinarily material fact for more than five weeks, and then compounded their misconduct by publicly issuing a series of statements that concealed the true facts about the notice of breach, the extent of the breach, and the negative implications thereof (including doubts about the Company's ability to continue as a going concern and Crown's willingness to proceed with the transaction). As the true facts were revealed in a series of disclosures over the course of several months—culminating with a December 2024 announcement that the transaction price would be reduced by more than 50%—Revance's stock price cratered, and investors collectively lost hundreds of millions of dollars.

2. The deceptive scheme arose after Revance, a once-promising producer and distributor of injectable pharmaceutical products, suffered setbacks in 2022 and 2023. Its main product, Daxxify, failed to deliver the expected results, medically or financially, and other Revance projects fizzled as well. As a result, Revance was forced to rely heavily on its strategic partnership with Teoxane, a Swiss manufacturer of Resilient Hyaluronic Acid ("RHA") fillers used for aesthetic purposes. Specifically, under a January 2020 distribution agreement (the "Teoxane

Agreement"), Revance was granted exclusive rights to market and sell Teoxane's RHA collection of fillers ("RHA Collection") in the United States through the end of 2029. Revance publicly relied heavily on the prospect that its partnership with Teoxane would provide it with necessary capital while it launched Daxxify and would thereafter supplement the revenue from its blockbuster drug. But Revance struggled to launch Daxxify, and by the start of the Class Period in February 2024, with Revance's other prospects stalled and failing, sales of Teoxane's products accounted for more than 60% of Revance's revenue. As a result, investors closely scrutinized the RHA Collection sales and Revance's relationship with Teoxane.

3.      Under this intense pressure, throughout Q1 and Q2 2024, Revance and its senior management, including Chief Executive Officer, Defendant Mark Foley, and Chief Financial Officer, Defendant Tobin Schilke, repeatedly assured investors that the RHA filler business was thriving. They praised the "***Teoxane partnership***" and touted the RHA Collection as "***the fastest growing filler in the market***" that would keep the Company afloat as Revance's self-produced drug, Daxxify, was repositioned for success. Indeed, Defendants touted that since the RHA launch, Revance "methodically add[ed] 500 or so accounts a quarter," which provided Revance with a "***stable foundation***" for continued growth. Defendants attributed the RHA success to the "***commercial team's ability to execute***" and claimed the Company was achieving "***good healthy growth across the portfolio of the RHA product line***," which in turn generated "***really healthy revenue***."

4.      But reality stood in stark contrast to Defendants' public statements. As Revance and its senior management well knew, Revance was in crisis, barely able to sell products, and barely maintaining its critical relationship with Teoxane. In an effort to make up for the shortfall caused by Daxxify's poor sales, Revance had made draconian cuts to its sales and marketing budget

3

in late 2023, which prevented it from growing its share in the filler market and infuriated Teoxane. Revance went from about 150 sales representatives in late 2023 to about 50 at the start of 2024. And Revance incompetently produced a shoddy and ineffective 2024 RHA ad campaign in-house in January 2024, rather than paying an agency to produce one, then resorted to illegal sales practices and shady accounting practices to sell RHA at deep, unauthorized discounts. Revance's conduct was so egregious and improper that it breached the Teoxane Agreement and drew Teoxane's ire, causing Teoxane to threaten to pull out of the relationship in February of 2024 and then to demand that Revance's cure period under the Teoxane Agreement be shortened.

5.      Meanwhile, Revance and its senior management pursued discussions with Crown about a potential sale of the Company. As Defendants knew, if Revance could keep up the appearance of running a successful RHA filler business and having a lucrative, stable relationship with Teoxane long enough to be sold to Crown, their problems would be solved.

6.      On August 12, 2024, buoyed by the purported success of RHA filler, Revance announced a tender offer agreement in which Crown would acquire Revance's stock at $6.66 per share—nearly a 90% premium over its trading price—valuing the enterprise at $924 million (the "Tender Offer"). A critical element of the deal was Defendants' affirmations in the merger agreement (the "Merger Agreement") that the Teoxane Agreement remained "valid and binding" and "*no event ha[d] occurred*" or "*circumstances exist[ed]*" that could result in the Agreement's "termination" or "modification." However, unknown to investors, Revance's lackluster performance and improper and insufficient sales and marketing activities constituted material breaches of the Teoxane Agreement that placed the Tender Offer in jeopardy from the outset.

7.      Accordingly, on August 16, 2024—*just four days after Revance announced the Tender Offer*—Teoxane served Revance with a formal notice asserting material breaches of the

Teoxane Agreement (the "Notice"). Given the improper marketing tactics and the faltering sales, the Notice asserted that Revance failed to abide by its "requirements surrounding the promotion and sale of Teoxane products." Furthermore, the poor sales of Teoxane products left Revance with too much RHA inventory, or "buffer stock," on hand in—violation of the strict inventory management provisions set forth in the Teoxane Agreement. The Notice therefore also asserted "material breaches of provisions governing the maximum level of buffer stock."

8.      Recognizing the grave implications of Teoxane's Notice, which threatened the termination of both the Teoxane Agreement and Crown's Tender Offer, Defendants, together with Crown representatives, traveled to Switzerland to negotiate a resolution with Teoxane. However, despite the highly material fact that the Company's largest revenue source was at risk and the consequential implications for the Tender Offer, Defendants withheld disclosure of Teoxane's Notice from the market for *over five weeks*. Instead, Defendants issued a merger "update" that highlighted the "important work" and "several meetings between Revance and Crown" regarding the integration of the companies that made no reference to the massive hazards behind the scenes. And even though Revance and Crown explicitly agreed to postpone the Tender Offer "in light of the ongoing communications with Teoxane," Defendants merely announced minor, non-alarming "extensions" to the Tender Offer that hid the true reasons for the delay.

9.      The truth partially surfaced when Crown failed to launch the Tender Offer by the extended September 13, 2024 deadline, causing Revance's stock to drop nearly 9% to close at $5.97. After an additional week's delay, Defendants finally disclosed on September 23, 2024 that Revance had received Teoxane's Notice back in mid-August, was "engaged in discussions" to resolve the dispute and "in light of the discussions," had agreed to further extend the Tender Offer deadline to October 4, 2024. This disclosure led to a further 8% decline in Revance's stock price.

5

However, Defendants reassured investors by staunchly "den[ying] the alleged material breaches" and vowing that Revance would "defend itself vigorously."

10.     Even with the existence of the Notice now public, Defendants continued to mislead the market about the status of the Teoxane dispute and its repercussions on the Tender Offer. Internally, in October 2024, Crown informed Defendants that it would not "move forward with the Merger" unless Crown "approv[ed] any material amendments to the [Teoxane] Agreement." However, when Revance presented Crown with a proposed amended agreement between Revance and Teoxane (the "Amended Teoxane Agreement") that would resolve the dispute, Crown flatly withheld such approval because it contained terms harmful to Revance that greatly devalued the Company.  Indeed, the Amended Teoxane Agreement required Revance to purchase ***over $388 million*** of Teoxane Products over the following four years—a staggering amount that represented 90% growth in Teoxane sales over that period—and onerous operating terms that greatly increased Revance's operating expenses.  In fact, as Defendants themselves later admitted, the increased purchase obligations in the Amended Teoxane Agreement were so deleterious to Revance that they were expected to have a "***material impact on Revance's future profitability and cash flow***" and caused "***substantial doubt***" as to the Company's "***ability to continue as a going concern***." Accordingly, Crown told Defendants on October 24, 2024 that it would not consent to the Amended Teoxane Agreement specifically because it "***increased the minimum payments due to Teoxane***, ***beyond projected sales level for the Teoxane products***."

11.     However, due to the magnitude of Revance's breach and Teoxane's resulting ability to terminate the relationship, Defendants' only course was to capitulate to Teoxane's demands over Crown's clear objections.  Revance entered into the Amended Teoxane Agreement on October 24, 2024.  At that point, the Tender Offer price of $6.66 per share was dead in the water: Crown

informed Revance that it would not be moving forward under the original Merger Agreement terms, including the Tender Offer price of $6.66. Nevertheless, on October 28, 2024, Defendants publicly announced that the Teoxane dispute had been resolved and that Revance and Crown had agreed to "further extend" the start of the Tender Offer but—remarkably—failed to inform investors about the oppressive new purchase commitments in the Amended Teoxane Agreement and Crown's resulting explicit repudiation of the Tender Offer.

12. As a result of Defendants' continuing falsehoods and omissions, the market believed the Tender Offer was back on. For example, Needham & Company LLC ("Needham") believed there were "no other hurdles for Crown Labs to proceed with their tender offer" and highlighted the fact that "*[t]here [was] no indication of a change in the bid offer of $6.66.*" Similarly, the Mizuho Financial Group, Inc. ("Mizuho") "*viewed the development positively*" and suggested that, at most, there could be a "***small reduction*** to the $6.66 offer price." Given the seemingly positive news, Revance shares spiked more than 25% on October 28, 2024 to close at $5.90.

13. It was not until November 7, 2024, that Defendants revealed the negative consequences stemming from its undisclosed breaches of the Teoxane Agreement. On that day, Revance's Q3 2024 quarterly filing disclosed that the Amended Teoxane Agreement materially increased Revance's minimum purchase commitments by requiring Revance to acquire RHA products totaling: "(i) $60 million in 2025; (ii) $67.8 million in 2026; (iii) $76.7 million in 2027; (iv) $86.6 million in 2028; and (v) $97.8 million in 2029," which were significantly larger than the $52 million commitment for 2024. Defendants also revealed that these new purchase commitments contributed to the Company's "substantial doubt about [Revance's] ability to continue as a going concern." Thus, the market finally learned that Revance was in material breach

of the original Teoxane Agreement and, as a result of the breaches, had been forced to make extraordinary concessions that were harmful to the Company to appease Teoxane and avoid complete termination. Furthermore, while withholding the highly material fact that Crown had fully retracted the $6.66 offer price, Defendants instead told the market that Crown "expressed dissatisfaction" with the Amended Teoxane Agreement. The next day, Revance's stock crashed 36%, declining from a close of $5.78 on November 7, 2024 to a close of $3.70 on November 8, 2024.

14.     However, even at this late stage, Defendants continued to mislead the market. On October 30, 2024, Crown sent Revance a revised term sheet that offered a mere $2.25 per share in cash, reflecting the dramatically reduced value of the Company as a result of its breaches of the Teoxane Agreement. However, in Revance's November 7 quarterly filing of Form 10-Q, Defendants included a section titled "Third Quarter Highlights" which represented that "***Crown will commence a tender offer…at a price of $6.66 per share, in cash***." Thereafter, despite Crown's clear disavowal of the Tender Offer price and ongoing negotiations between Crown and Revance at levels ***more than 50% below*** the $6.66 indication, Defendants repeatedly announced mere "extensions" of the Tender Offer that warned only that Crown "***could***" seek a price modification—concealing the fact that Crown had already done just that.

15.     Furthermore, unbeknownst to investors, a key negotiating point during these final stages was Defendants' demand for a "a full release of claims based in common law, tort, [and] fraud," that in any way arose "out of Revance's relationship with Teoxane" and related to the Tender Offer. In fact, in mid-November when Crown submitted a revised offer that only included a limited release for Defendants, Revance's counsel explained that "***anything less than a full waiver of claims***" by Crown against Revance or its directors and officers "***would not be acceptable***

*to the Revance Board*."  These material facts about what was actually causing the delays and affecting the merger price were left undisclosed.

16.     The full truth emerged on December 9, 2024, when Revance announced that it had agreed to a revised Tender Offer at just *$3.10 per share—a reduction of over 53% from the original offer price*.  Significantly, Defendants admitted that the reduced valuation was directly attributable to the "*notice from Teoxane alleging breach*" which resulted in the Amended Teoxane Agreement that was "*expected to have a material impact on Revance's future profitability and cash flows*."  Defendants also disclosed that in exchange for the reduced purchase price, Defendants secured a release from Crown that absolved Revance and its directors and officers—including both Individual Defendants (defined below)—from any claims of "fraud" relating to the "representations" regarding "the Company's relationship with Teoxane."  This news caused Revance's stock to drop an additional 21%, from a close of $3.82 on December 6, 2024 to a close of $3.03 per share on December 9, 2024.

17.     In addition to the damning implications of Defendants' decision to enter into the Amended Teoxane Agreement that they knew was highly detrimental to Revance's interests, the reports of multiple high-ranking former employees confirm that Revance was in breach of the Teoxane Agreement throughout the Class Period, necessitating complete acquiescence to Teoxane's demands.  For example, these former employees revealed that, in violation of the U.S. Food and Drug Administration ("FDA") regulations governing sample drugs, Revance instituted a sales promotion dubbed the "Big Swing," which provided hundreds of RHA vials as "free samples" in exchange for purchases of Teoxane products and Daxxify, masking an effective deep discount.  The former employees considered these actions "100% illegal" and were "so far from what" was done by other pharmaceutical distributors.  These promotions also hurt sales as Revance

9

"ended up giving the doctors so many samples, we never made any money." Indeed, by the spring of 2024, RHA sales were significantly underperforming, reaching only 70% to 75% of expected sales nationwide. Accordingly, Revance "missed [its] RHA numbers" and therefore did not live up to its end of the agreement with Teoxane.

18. The former employees also revealed that Revance was "very frustrated" by Revance's significantly reduced sales and marketing teams that were not adequately promoting the RHA Collection. After Revance stripped down its marketing and sales departments in early 2024, the commercial organization was left with just a "handful of people" that "no longer included anybody to do any marketing on behalf of RHA." Furthermore, the remaining salespeople "weren't even experienced" at selling aesthetic products and were incapable of "training" new accounts on how to properly administer Teoxane's products. According to former employees, the inability to train new injectors precluded "growth and share grabs in the U.S." filler market. Compounding the issue, Teoxane was "livid with Revance" over an unauthorized 2024 marketing campaign that adopted a stark "black and white" aesthetic that failed to highlight RHA's capabilities. The campaign "strayed away from the global branding" efforts established in Teoxane's brand guidelines and undercut Teoxane's global messaging—thereby constituting another breach of the Teoxane Agreement.

19. As a result of Defendants' blatant misrepresentations and omissions, investors who purchased Revance securities during the Class Period suffered substantial losses. In total, Revance shares dropped nearly 60% from their Class Period high of $6.98 on February 29, 2024 to just $3.03 on December 9, 2024, causing significant financial harm to Lead Plaintiffs and other investors. This action seeks redress on their behalf.

## II.    JURISDICTION AND VENUE

20.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 2401.10b-5.  This Court has jurisdiction over the subject matter of those claims pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

21.    Personal jurisdiction exists over each Defendant either because the Defendant: (i) conducts business in or maintains operations in this District; or (ii) is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

22.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c) and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  At all relevant times, Revance was incorporated in this District, and many of the acts and conduct that constitute the violations of law complained of herein occurred in this District, including the dissemination of false and misleading statements in and from this District.

23.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mail, interstate telephone communications and the facilities of the national securities markets.

## III.    PARTIES

### A.    Lead Plaintiffs

24.    Lead Plaintiffs the Water Island Funds are four related private investment funds: The Arbitrage Fund, AltShares Event-Driven ETF, AltShares Merger Arbitrage ETF, and iMGP

Alternative Strategies Fund. At all relevant times, the Water Island Funds were advised by Water Island Capital, LLC, an SEC registered entity.

25. Lead Plaintiff Chicago Capital is an investment fund advised by Chicago Capital Management LLC, a registered investment advisor.

26. As set forth in the previously filed certifications in this Action (ECF No. 29-1), Lead Plaintiffs purchased Revance securities during the Class Period and have been damaged thereby.

**B.     Defendants**

27. Defendant Revance Therapeutics, Inc. is a publicly traded Delaware corporation headquartered in Nashville, Tennessee. Revance is focused on developing and commercializing innovative aesthetic and therapeutic offerings.

28. Defendant Mark J. Foley was at all relevant times the Chief Executive Officer and a director of Revance.

29. Defendant Tobin C. Schilke was at all relevant times the Chief Financial Officer of Revance.

30. Defendants Foley and Schilke are referred to herein as the "Individual Defendants."

## IV.     RELEVANT NONPARTIES

31. Nonparty Crown Laboratories, Inc. is a privately held Delaware Corporation focused on the skincare industry. After the Class Period, on February 6, 2025, Crown purchased all issued and outstanding common stock of Revance, through its wholly owned subsidiary Reba Merger Sub, Inc., a Delaware Corporation. Herein, Crown Laboratories, Inc. and Reba Merger Sub, Inc. are collectively referred to as "Crown."

32. Nonparty Teoxane SA, a Swiss share corporation, is, and was at all relevant times, an important, but unaffiliated, strategic collaborator of Revance.

## V.    OVERVIEW OF THE FRAUD

### A.    Revance Transitions to a Commercial-Stage Pharmaceutical Company and Enters into a Long-Term Distribution Agreement with Teoxane

33.    Revance is a pharmaceutical company whose shares began trading on the NASDAQ under the ticker "RVNC" in December 2014.  Revance did not generate any significant revenue until 2020 as it was solely focused on developing and bringing its lead drug candidate "Daxxify" to market.  Similar to the more widely known Botox, Daxxify is an injectable neuromodulator used to temporarily reduce the appearance of wrinkles.  Daxxify's effects were expected to last two months longer than those of Botox, which, it was hoped, would allow patients to achieve the same results with fewer injections.  By 2020, Daxxify was on the cusp of FDA regulatory approval and Revance accordingly began building out its commercial capabilities.

34.    To complement the expected sale of Daxxify, Revance entered into a distribution agreement in January 2020 with Teoxane, a Switzerland-based manufacturer of aesthetic RHA dermal fillers.  RHA fillers are primarily used to restore volume to areas like cheeks, temples, and under the eyes and are often used as companion products to anti-wrinkle toxins, such as Daxxify, by patients who utilize aesthetic injectors.  Accordingly, it was a natural fit for Revance to sell Daxxify and RHA fillers side-by-side.

35.    The Teoxane Agreement had an initial term for ten years (until January 2030) and gave Revance the right to import, market, promote, sell, and distribute Teoxane's line of RHA fillers in the United States.  The Teoxane Agreement required Revance to expend specified amounts on the marketing and promotion of the RHA fillers, which the agreement referred to as the "Minimum Commercialisation Effort."  It also mandated that Revance make a "Minimum Purchase Commitment" to buy a specific amount of Teoxane products and keep a specified percentage of inventory, or "buffer stock," on hand.  The buffer stock requirement included both a

13

minimum and maximum amount of RHA inventory that Revance could store. The "Minimum Commercialisation" requirement and Minimum Purchase Commitment were delineated as specific dollar amounts through 2025 but thereafter were to be calculated based on industry growth and business forecasts.

36.     The Teoxane Agreement also explicitly required that Revance comply with all "applicable laws and regulations" when marketing and selling Teoxane's products. Under the terms of the Agreement, Revance could not "pay, promise to pay or authorize the payment of any money or anything of value… for the purpose of illegally or improperly inducing a decision or obtaining or retaining business." The Teoxane Agreement also mandated that Revance obtain written consent from Teoxane to bundle or promote the RHA products and that, in all cases, any such promotion or bundling abide by the appropriate regulations.

37.     In addition to legal marketing requirements, the Teoxane Agreement required Revance to "adhere" to Teoxane's "Brand Guidelines" and "master brand," which were a set of standards dictating how Revance was allowed to market, promote, and sell RHA products. Brand guidelines are essential in international supplier-distributor relationships so that the supplier can monitor and control the brand's image and reputation across the globe.

**B.     Revance's Commercialization Efforts Falter and the Teoxane Agreement Emerges as the Most Important Aspect of the Company's Business**

38.     By 2023, Revance came to rely almost exclusively on the sale of Teoxane's RHA fillers to keep it afloat and out of bankruptcy.

39.     Daxxify's expected FDA approval was significantly delayed by COVID-19 restrictions, and the drug was not approved until September 2022, nearly two years behind schedule. Revance thereafter conducted a broad product launch in March 2023. However, it quickly became apparent that Daxxify's long-lasting effects were not widely experienced by

14

patients and that the drug's limited advantages to Botox did not justify its premium pricing over Botox. Consequently, on September 1, 2023, just six months after Daxxify's market-wide launch, Revance announced a new discounted pricing program for Daxxify that "position[ed] the product to be priced competitively to Botox," which it expressly instituted to "accelerate market expansion." As a result of the setbacks, Daxxify only generated $84 million in revenue in 2023— well below market expectations. Moreover, the Company's other revenue stream, a financial technology platform designed for the aesthetics industry called "Opul," also failed. After launching in October 2021, the Company only generated $7 million in revenue from Opul in 2022, forcing Revance to report a $69.8 million goodwill impairment on February 28, 2023. After disclosing another $77.2 million goodwill impairment for Opul in Q3 2023, Revance announced on September 19, 2023 that it was cutting the cord on Opul entirely and firing its entire Opul-related staff to "free up approximately $20 million a year for reinvestment in Daxxify."

40. By contrast, throughout this time, Revance's sales of Teoxane products thrived. Within the first three years of launch, Revance onboarded over 6,000 accounts purchasing RHA fillers, steadily growing by approximately 500 accounts per quarter. The RHA Collection captured nearly 9% of the total U.S. filler market and generated more than $310 million in revenue for Revance. Thus, despite failing in every other aspect of its business, Revance touted that it turned RHA fillers into "the #1 brand in terms of year-over-year growth, #1, in terms of profitability for the practice and #1 relationship with the sales rep."

41. As a result, heading into 2024, the relationship with Teoxane and the continued success of the RHA Collection was vitally important to Revance, its executives, and the market. Indeed, Defendants announced on January 8, 2024, that Revance expected to bring in "at least

"$280 million" in revenue in 2024—a 20% increase over 2023—with the RHA Collection providing ***more than half of all the revenue***.

42.     After Defendants revealed the 2024 guidance, William Blair & Company gave Revance an "Outperform" rating and Piper Sandler Companies gave Revance an "Overweight" rating.  Because the RHA Collection was the biggest revenue source for the Company, Barclays reported that it was pleased with the continued "[s]trength in RHA," which "has yet to show signs of weakening."

### C.     Defendants Tout Success with the "Teoxane Partnership" and the Continued Sales of RHA Fillers

43.     The Class Period begins on February 29, 2024, the day after Revance issued a press release announcing its Q4 2023 results.  In the release, Defendant Foley praised Teoxane's RHA Collection as "***the fastest growing filler in the market***."  On the strength of RHA sales, the press release confirmed that Revance was recommitting to its full year 2024 revenue guidance of "more than $280 million," with the majority coming from Teoxane's products.

44.     During the associated Q4 2023 earnings call, Defendants continued to praise the RHA Collection and the Company's ongoing relationship with Teoxane.  For example, Foley expressly praised "***the Teoxane partnership***" that allowed Revance "to bring in the market sort of the latest innovation in filler technology" and which allowed the Company to grow while Revance was recalibrating its Daxxify strategy.  Foley in no way suggested that the Teoxane partnership was on uneasy footing and instead asserted that "***[t]hree years into launch, the RHA Collection is still the fastest-growing HA filler in the U.S***., sitting at about 10% market share."  Defendant Schilke likewise praised Revance's ability to sell Teoxane products, noting that the RHA filler success was "driven by deeper and broader account penetration."

45. The positive RHA news indicated to the market that Revance would easily comply with its obligations under the Teoxane Agreement. As set forth in the Company's annual report filed on Form 10-K, also filed on February 28, 2024, Revance was required make minimum purchases of $52 million of Teoxane products in 2024 and had to expend $36 million "in connection with commercialization and promotion of RHA."

46. The market was pleased to learn that the RHA filler sales persevered through the Company's other blunders. Indeed, it was Revance's apparent ability to succeed with the RHA Collection that provided any belief that Revance could turn around its Daxxify sales. As Barclays noted on February 29, 2024, it awarded Revance an "Overweight" designation specifically because the Company's "commercial capabilities continue to be demonstrated through the strong traction achieved with RHA Fillers."

47. Defendants continued touting the success of the RHA Collection—and Revance's execution under the Teoxane Agreement—throughout the first half of 2024. For example, on March 12, 2024, Foley presented at Barclay's Annual Global Healthcare Conference, where he praised Revance's operations in bringing Teoxane's product to market, stating Revance "*continue[s] to execute well on the filler side*" of the business. Then, during the Company's Q1 2024 earnings call on May 9, 2024, Foley again claimed Revance's success came from the Company's "ability to execute" under the Teoxane Agreement. Foley highlighted that Revance saw "*healthy share growth*" in the filler market such that Teoxane's products would "be a tailwind for [Revance] as [the Company] continue[s] to take share with RHA." Foley explained that the growth was attributable to the quality of the Teoxane products "*combined with our commercial team's ability to execute*," evidencing that the partnership was flourishing.

48.     During the May 9 call, Foley not only discussed the historical results but touted the Company's purported success selling RHA.  In response to analysts' questions about how Revance could "meaningly grow beyond 2023 RHA sales," Foley confirmed that the RHA filler growth projection was not conjecture but was based on "what we're already seeing in April" and was a direct result of Revance's salespeople "spending more time" selling Teoxane's products than they did in the past.  Indeed, Foley explained that Revance's salespeople had been focused on pushing Daxxify due to the poor drug launch, but now that Revance had weathered the storm, its sales reps were now returning to a more "balanced selling approach" that was "not just more Daxxify-focused."  Thus, even though Revance had a historically solid record of selling Teoxane's products, the sales would do even better with the sales representatives now "turning their focus to the broader portfolio."

49.     Analysts were again comforted by Revance's performance with RHA fillers.  H.C. Wainwright & Co. gushed on May 10, 2024 that "**RHA remains a star**" and that the fillers' "relative stability despite Daxxify's initial struggles, in our view, reflects the strength of the portfolio" (emphasis in original).  In discussing the RHA segment, Morgan Stanley also highlighted that management was "already seeing positive sights thus far in 2Q."

50.     Defendants continued the same messaging when presenting at investor conferences in June 2024.  First, at the William Blair Annual Growth Stock Conference on June 4, 2024, Defendant Schilke stated that, more than halfway through 2024, Revance expected growth in the "double digits" for RHA fillers in 2024.  Next, Foley boasted at the June 11, 2024 Goldman Sachs Annual Global Healthcare Conference that Revance now obtained "almost 10%" of the U.S. filler market share as the Company was "off to a great start" in 2024.  Foley further praised the Company's performance under the Teoxane Agreement, stating "We did a pretty good job of

methodically adding 500 or so accounts a quarter, delivering results in line with kind of Wall Street expectations and laying that overall foundation" for continued RHA growth.

51. On August 8, 2024, Revance again publicly hyped that its success selling the RHA Collection laid a strong "foundation" to continue Revance's growth.  In a press release addressing Revance's Q2 2024 results, Defendants touted that the "RHA Collection continued to outpace the competition" as, during the quarter, the "RHA Collection, manufactured by Teoxane SA, generated net product revenue of $36.6 million; a YoY increase of 15%."  Moreover, the press release quoted Foley as "reiterat[ing] [Revance's] revenue guidance of at least $280 million in 2024."  During the earnings call held that day, Foley again praised the Company's execution under the Teoxane Agreement as providing the basis for Revance's purportedly bright future.  According to Foley, Revance had a "*stable foundation*" due to the "*RHA portfolio, combined with **our commercial team's ability to execute*.*"  Foley again mentioned that Revance's salespeople were "focus[ed] more now on the….[RHA] portfolio" providing Revance with a "*a very good foundation of RHA*."  Foley also raved that Revance "saw *good healthy growth across the portfolio of the RHA product line*" and confirmed in "*in Q2, we drove really healthy revenue*" for Teoxane's products.  In short, Foley conveyed that Revance "feel[s] good about the sort of metrics that we're putting up" within the filler category.

**D.      On The Strength of RHA Growth, Revance Announces a Tender Offer with Crown and Assures that the Company is Fully Compliant with the Teoxane Agreement**

52. Supported by the RHA growth, on August 12, 2024, Revance announced that it had entered into the Merger Agreement with Crown, under which Crown would make a Tender Offer to acquire Revance's outstanding common stock at a price of $6.66 per share, representing "a total enterprise value of $924 million."  The offer was welcome news to Revance investors, as it came at a premium of nearly 90% over the market price of Revance's common stock prior to the

19

announcement and 111% over the 60-day volume-weighted average price. The "Business Rationale" for the merger was to create "one of the leading global aesthetics and skincare companies and encompass one of the most **comprehensive portfolios** of aesthetic skincare brands," including "the RHA Collection of dermal fillers." According to a press release announcing the deal and the accompanying Form 8-K filed with the SEC, the Tender Offer was expected to "commence on August 30, 2024"—less than three weeks after the announcement—and the full transaction was "expected to close by year end."

53.     The Form 8-K announcing the Tender Offer attached and "incorporated by reference" the "full text of" the Merger Agreement between Crown and Revance. The press release announcing the Tender Offer stressed in block letters that "INVESTORS AND SECURITY HOLDERS" should review the "DOCUMENTS RELATING TO THE TENDER OFFER AND THE MERGER THAT ARE FILED WITH THE SEC, CAREFULLY AND IN THEIR ENTIRETY."

54.     The Merger Agreement stated that Revance had complied with its obligations under the Teoxane Agreement. Section 5.12(a) of the Merger Agreement stated that each "Material Contract" of Revance—which included the Teoxane Agreement—"is valid and binding" and that neither the Company nor any of its subsidiaries "**is in breach of or default pursuant to any such Material Contract**."

55.     The Merger Agreement did not stop there. Not only did Revance disclaim any known breach of the Teoxane Agreement, but the Merger Agreement also represented that "no circumstances exist[ed]" that could even constitute a breach or could lead to a "modification" of the contract. According to the Defendants' representations: "**No event has occurred or circumstances that exist that, with notice or lapse of time or both, would constitute such a breach**

*or default pursuant to any Material Contract, or permit the termination or modification thereof or permit the acceleration or maturity of performance thereof, by the Company Group, or, to the Knowledge of the Company, any other party thereto*." Accordingly, Defendants represented in no uncertain terms that Revance had abided by its obligations under the Teoxane Agreement and that even "with notice" nothing would allow Teoxane to terminate the agreement or obtain significant modifications of its terms.

56. Following the announcement of the Merger Agreement and Defendants' representations therein, shares of Revance common stock shot up more than 85% and began trading above $6.50, as investors took Defendants at their word that Revance abided by its Teoxane obligations and that the Tender Offer would commence in the near future.

E. **Defendants' Statements Were False: Just Four Days After the Tender Offer was Announced, Teoxane Asserted a Breach of Contract as Revance Had Failed to Abide by the Teoxane Agreement Throughout 2024**

57. Defendants' representations were false. Notwithstanding Defendants' claims that Revance abided by its Teoxane obligations, the exact opposite was true: Revance violated the Teoxane Agreement, prompting Teoxane to declare a breach on August 16, 2024, *just four days after the Tender Offer was announced*. Unbeknownst to investors, in early 2024 Revance employed improper marketing and sales tactics that breached the Teoxane Agreement and violated FDA regulations. Despite prohibitions on pharmaceutical distributors diverting "sample" products—meant for training and promotional purposes—into regular inventory, Revance directed its sales team to distribute hundreds of free RHA vials as "free samples" to doctors' offices in exchange for RHA and Daxxify purchases. This practice allowed doctors to keep their costs low by selling the samples. The excess sample distribution not only contravened FDA rules but also infuriated Teoxane by significantly reducing the per-vial price of RHA products and reducing sales.

58.     Furthermore, by mid-2024, Revance drastically reduced its marketing and sales teams, critically constraining Revance's required promotion of Teoxane products. The sales force plummeted from 150 representatives in late 2023 to just 50 by the spring of 2024—a two-thirds reduction—while the marketing team was cut to a mere handful of staff. Additionally, the employee managing the daily Teoxane relationship departed, leaving Revance without a single employee that had been responsible for RHA's prior U.S. success and incapable of adequately promoting Teoxane's products. Consequently, by spring 2024, Revance was achieving only 70–75% of its projected RHA sales, frustrating Teoxane and making it clear that Revance was no longer investing sufficiently in Teoxane promotions and would not meet its RHA Collection sales targets.

59.     Other marketing practices implemented by Revance similarly violated the Teoxane Agreement. In January 2024, without consulting Teoxane, Revance launched a year-long black-and-white ad campaign for the RHA Collection, disregarding Teoxane's Brand Guidelines. Upon discovering the advertisements in February 2024, Teoxane was outraged, as the campaign undermined Teoxane's global brand messaging by obscuring RHA product capabilities and deviating from the established color scheme used worldwide.

60.     Revance's failures under the Teoxane Agreement came to a head in the summer of 2024. First, Teoxane amended the Teoxane Agreement in late July to keep Revance on a tighter leash. On July 29, 2024, Revance and Teoxane entered into the Fifth Amendment to the Teoxane Agreement whose exclusive modification was to dramatically reduce the "cure period"—the timeframe in which Revance could address issues identified in a formal notice of breach— "from ninety (90) days to sixty (60) days." Under the Fifth Amendment, Teoxane could validly terminate the agreement a mere two months after formally asserting a breach.

61.     Then, on August 16, 2024—*just four days after Defendants publicly proclaimed that they were in full compliance with the Teoxane Agreement*—Teoxane sent its formal Notice asserting a breach of the Teoxane Agreement.  Based on Revance's multiple failures under the Teoxane Agreement, including the inappropriate marketing and promotional activities and the failure to meet monthly and quarterly sales numbers, the Notice asserted a material breach of the provisions requiring Revance to adequately promote and sell Teoxane products.  Furthermore, the lagging sales meant that Revance had too much RHA inventory on hand, in violation of the Teoxane Agreement's provisions governing the maximum level of buffer stock.  Under the Fifth Amendment, Revance had only until October 15, 2024 to "cure" the purported breaches or face termination.

62.     Defendants immediately understood that Revance's breaches of the Teoxane Agreement and Teoxane's resulting ability to terminate the Company's RHA distribution rights not only threatened Revance's ability to execute on its business plans—more than half of Revance's expected 2024 revenue came from Teoxane—but also endangered Crown's willingness to proceed with the Tender Offer.  As a result, Revance and Crown representatives immediately flew to Switzerland to secretly attempt to negotiate a settlement with Teoxane.  As Defendants would eventually disclose, "[b]etween August 20, 2024 and October 24, 2024," while investors were unaware that Revance was in breach of the Agreement, "Revance and certain of its advisors, communicated with Teoxane regarding the Teoxane Notice and negotiated modified terms to the [Teoxane] Agreement."  Moreover, given the monumental impact the Teoxane dispute would have on the Tender Offer, Defendants admittedly "communicated regularly" with Crown about the Notice, included Crown in tri-party meetings with Teoxane in Geneva, and factored in Crown's "input" throughout the saga.

**F.** **Defendants Failed to Disclose Teoxane's Notice and Its Impact on the Tender Offer for More Than Five Weeks**

63.     Rather than disclose the highly material fact that Teoxane had sent a Notice that threatened the Company's largest revenue source and jeopardized the Tender Offer, Defendants kept it secret from investors for well over a month.  Instead, Defendants provided the market with benign "updates" to the Tender Offer that misleadingly indicated the merger was advancing.

64.     For example, on August 27, 2024, Crown and Revance internally agreed that they would extend the commencement of the Tender Offer specifically "in light of the ongoing communications with Teoxane."  However, when publicly announcing the deferment the very next day on August 28, 2024, Defendants merely stated in a Form 8-K that the parties "***agreed to extend***" the start of the Tender Offer by roughly two weeks to Friday, September 13, 2024.  The Form 8-K provided no explanation for the extension and made no mention of Teoxane's Notice regarding breaches of contract, let alone that the Notice was the reason for the delay or that the undisclosed breach threatened to undermine the Tender Offer and decimate the Company.  Defendants undoubtedly knew the import of Teoxane's Notice and its effects on the pending Merger because, as Defendants would eventually admit, the very day that Defendants filed the August 28 Form 8-K, Revance representatives were in Geneva, Switzerland for a tri-party meeting with Revance, Crown, and Teoxane to resolve the dispute and salvage the Tender Offer.  Yet, they disclosed none of this to the public.

65.     Then, on September 5, 2024, in a further public signal that the Merger Agreement was advancing, Revance filed an "update" to the Tender Offer with the SEC that again failed to inform investors that Teoxane asserted a breach that had stalled the Tender Offer.  The SEC filing included a memo from Defendant Foley titled "CEO Business Update" which provided an "update on important work that has been underway" in regard to the Merger Agreement.  Foley explained

24

that Revance established an "Integration Management Office" tasked with "planning and leading the successful integration of our two companies" and highlighted that "*[s]everal meetings between Revance and Crown leaders have taken place and are continuing*." Notably, the memo failed to disclose that there had been numerous meetings between Crown, Revance, **and Teoxane**, or alert investors that Teoxane had asserted a breach. Nor did the memo explain that the Teoxane dispute and the ongoing discussions between Revance and Teoxane were the actual reason for the delay of the Tender Offer. Investors were therefore left unaware that the Tender Offer was meaningfully at risk.

### G. The Truth Begins to Emerge: The Tender Offer Does Not Commence on September 13, 2023, Prompting Revance to Disclose Teoxane's Notice

66. To the surprise of the market, Crown failed to commence the Tender Offer on September 13, 2024, as required by the prior extension. Defendants did not make any public statement explaining the apparent delay, exposing to the market for the first time that Crown's Tender Offer was in some danger. In reaction, Revance shares dropped precipitously. After closing at $6.55 per share on September 13, Revance shares fell nearly 9% the following trading day, September 16, 2024, to close at just $5.97 per share.

67. Market commentators readily made the connection. A September 17, 2024 article on the investing website SeekingAlpha.com stated that Revance "[i]nvestors were concerned as Crown Labs missed a Friday deadline to start its tender offer," which caused Revance's shares to "decline…9% as investors feared that a delayed tender offer could mean that there may be no deal." The article also noted that the "absence of an explanation from the company for not launching the tender offer will be an overhang on the stock." The article was correct. The market price of Revance's stock continued to slide throughout that week as the Tender Offer did not commence and Defendants offered no explanation for the delay. By the close of trading on Friday,

25

September 20, 2024, Revance stock was trading at $5.81 per share, down more than 11% from its close on September 13, 2024.

68.    With the Tender Offer still not underway the following week, Defendants were forced to reveal more of the truth.  Before trading opened on September 23, 2024—***over five weeks after Teoxane served its Notice***—Revance filed a Form 8-K, which publicly disclosed for the first time that Teoxane had asserted a breach of contract.  As explained in the September 23 Form 8-K, way back on August 16, 2024, Revance received a "notice to remedy alleged material breaches" of the Teoxane Agreement "including breaches of the maximum levels of buffer stock and required efforts to promote and sell Teoxane products."  The Form 8-K offered no explanation for why Defendants sat on this information for over a month, but it noted that Revance had been "engaged in discussions with Teoxane regarding the notification."  Moreover, the filing confirmed that "[i]n light of the[] discussions" between Revance and Teoxane, Crown "agreed to extend" the commencement of the Tender Offer for a second time, until October 4, 2024.  Thus, the market not only learned of Teoxane's Notice but also that Crown and Revance were factoring the Teoxane dispute in assessing the Tender Offer.

69.    To calm the market's concerns that Revance would lose its RHA distribution rights or that Crown would renegotiate or terminate the Tender Offer, Defendants firmly and publicly rejected the claim that Revance had breached the Teoxane Agreement.  The September 23 Form 8-K stated that Revance "denies the alleged material breaches asserted in the notice," and to further minimize the significance of Teoxane's claims, asserted that Revance "does not believe that the asserted allegations constitute material breaches under the terms of the [Teoxane] Agreement."  Defendants pledged that Revance would "defend itself vigorously."

70.     In response to the news of the Teoxane Notice, Revance shares dropped 8% from the prior day's close of $5.81 to close at just $5.37 per share on September 23, 2024.

**H.    Crown Warns Defendants that the Tender Offer was "Dependent" on Crown's "Approval" of Any Concession with Teoxane**

71.     On October 4, 2024, the day the Tender Offer was then set to commence, Revance filed another Form 8-K, announcing that the Tender Offer had been further delayed another two weeks until October 18, 2024. The October 4 filing again reassured investors that Revance "denies the alleged material breaches" and "intends to defend itself vigorously." The October 4 filing further disclosed that Revance and Teoxane's prior amendment to the "cure period" provided just 60 days for Revance to fix any alleged problems and accordingly stated that "the cure period for alleged breaches asserted by Teoxane shall end on October 15, 2024"—prior to the new commencement date. Given that Revance adamantly denied that any material breach existed and that the cure provision would soon expire, the October 4 filing impressed upon the market that the Teoxane dispute would soon be over and that the Tender Offer would commence.

72.     However, behind the scenes, the discussions between Revance and Crown made clear that there was no swift path to the Tender Offer. By this point, Revance was not "vigorously" defending itself; instead, Defendants were considering significant concessions to Teoxane to avoid the complete termination of the Teoxane relationship. Recognizing Teoxane's leverage in the negotiations and the risk of an unfavorable deal, Crown made clear to Defendants that the Tender Offer hinged entirely on a resolution that met Crown's satisfaction. Indeed, on October 17, 2024, Crown explicitly informed Defendants that its "***ability to move forward with the Merger was dependent on successful resolution of the outstanding claims by Teoxane as well as Crown's approval of any material amendments to the [Teoxane] Agreement.***" In doing so, Crown

reinforced the real risk that the Teoxane dispute could scuttle the deal or the price at which it occurred.

73. Once again, Defendants did not disclose this highly material information. The very next day, October 18, 2024, despite the fact that the Tender Offer was now entirely dependent on the resolution of the Teoxane dispute and Crown's approval of any new deal, Revance filed another Form 8-K, that, like its predecessors, merely announced a "further exten[sion]" of the Tender Offer to October 25, 2024. The October 18 Form 8-K failed to disclose that Revance was already negotiating material changes to the Teoxane Agreement and that Crown was ready to terminate the Tender Offer if it did not approve of the amendment. Indeed, rather than admit that Revance was contemplating major concessions to avoid termination of the Teoxane Agreement, the October 18, 2024 Form 8-K repeated that Revance "intend[ed] to defend itself vigorously," that the Company "denie[d] the alleged material breaches," and assured that Teoxane's gripes did not "constitute material breaches."

74. Given the limited information publicly disclosed to date, the lack of any indication that Crown was seriously contemplating backing out of the Tender Offer, and the fact that Defendants consistently denied that Revance had materially breached the Teoxane Agreement, investors had no ability to assess the true risks facing the Tender Offer.

**I.     Over Crown's Objection, Revance Resolves the Teoxane Dispute by Entering into Agreements Harmful to Revance's Future Operations, Thereby Foreclosing the Tender Offer at the Announced Price**

75. The Tender Offer price of $6.66 per share was repudiated as of October 24, 2024 when Defendants agreed to significant and detrimental amendments to the Teoxane Agreement over Crown's objections.

76. Just one day earlier, on October 23, 2024, Teoxane had threatened to terminate the Teoxane Agreement unless Revance agreed to a series of one-sided amendments to the distribution

agreement—including increased purchase requirements—and also granted Teoxane exclusive distribution rights to Daxxify in Australia and New Zealand (the "ANZ Agreement"). Under the proposed amendments, Revance was required to purchase **over $388 million** in Teoxane products over the following four years—at least $60 million in 2025, $67.8 million in 2026, $76.7 million in 2027, $86.6 million in 2028, and $97.8 million in 2029—representing nearly **90% growth** in Teoxane sales as compared to the $52 million purchase obligation for 2024. This marked a material and adverse change from the prior agreement, which based the future purchase requirements on Revance's business forecasts and other market factors.

77.     Defendants themselves recognized that these heightened purchase requirements were devasting to Revance and threatened to bankrupt the Company. Indeed, as they would eventually admit, Defendants expected that these "***increased***" purchase obligations would have a "***material impact on Revance's future profitability and cash flow***" and would cause "***substantial doubt***" as to the Company's "***ability to continue as a going concern***." Thus, the Amended Teoxane Agreement substantially impaired the Company's future earnings potential and all but guaranteed operating losses on the future sales of the RHA Collection.

78.     As required under the Merger Agreement between Crown and Revance, and as Crown demanded in its prior communications, Defendants sought Crown's approval before entering into both the Amended Teoxane Agreement and the ANZ Agreement. Unsurprisingly, on October 24, 2024, Crown flatly refused to grant that approval. Crown made abundantly clear to Defendants that it did not consent to the Amended Teoxane Agreement specifically because it "***increased the minimum payments due Teoxane***, ***beyond projected sales level for the Teoxane products***." Accordingly, Crown expressed that the new purchase requirements significantly reduced Revance's expected profits, and as a result, the Company's overall value. It was therefore

apparent that, were Revance to enter into the Amended Teoxane Agreement, Crown would not procced with the Tender Offer at the announced price of $6.66 per share.

79.     With Crown having formally withheld its approval of the Amended Teoxane Agreement and with Defendants fully aware that the increased purchase obligations would "materially impact" Revance's "profitability and cash flow," Defendants could only have agreed to the amendment if they knew that Revance was indeed in material breach of the Teoxane Agreement and had no viable alternative.  So, despite the consequences, Defendants capitulated and executed the Amended Teoxane Agreement on October 24, 2024.  In return, Teoxane agreed to a settlement that "waived any right to terminate the [Teoxane] Agreement" based on any prior breaches.

80.     In addition to the increased purchase requirements, other terms of the Amended Teoxane Agreement were also detrimental to Revance—further underscoring that Revance would only agree to its terms were it in breach of the original agreement and desperate to avoid termination.  *First*, to track the sales under the Amended Teoxane Agreement, Revance was mandated to provide Teoxane with written monthly reports setting forth both the gross sales of Teoxane products and the corresponding number of units sold per product.  This reporting requirement would easily allow Teoxane to accurately calculate the average selling price per product and prevent Revance from manipulating its pricing and sales data with respect to RHA products.

81.     *Second*, the Amended Teoxane Agreement provided stricter controls on the buffer stock requirement.  The Amended Teoxane Agreement set forth a "Rolling 12 Month Calculation" based on the updated purchase requirements, to determine the exact level of buffer stock that Revance needed to keep on hand.  Moreover, Revance was now required to submit monthly reports

to Teoxane that set forth detailed calculations underlying the Rolling 12 Month Calculation as well as the levels of buffer stock. Importantly, the Amended Teoxane Agreement dictated that any remaining buffer stock on hand at the end of 2024 would "***not be taken into consideration***" in determining the buffer stock obligations for 2025, yet Revance was required to sell the "2024 Excess Buffer Stock" on a "first in first out" basis, meaning, any inventory on hand at the end of the year was ***in excess*** of the 2025 purchase requirement that had to be sold.

82.     *Third*, in response to Revance's rogue marketing practices, the Amended Teoxane Agreement required Revance to abide by a stricter set of "Brand Guidelines" that greatly limited how Revance could market RHA products and provided Teoxane with significantly more control over the marketing process. Under the agreement, Revance was required to review and update all its prior promotional and sales materials to ensure compliance with the Brand Guidelines and all applicable laws and regulations. The Amended Teoxane Agreement also required Revance to prominently display Teoxane's name on "any press releases and other public communications" it issued in the future. To ensure that Teoxane's Brand Guidelines were being adhered to, the Amended Teoxane Agreement established a Marketing Task Force to meet every month to discuss Revance's promotional activity. As an added layer of control, and to avoid any future marketing surprises, the Amended Teoxane Agreement required Revance to submit an "Annual Brand Plan" in June of each year. The Annual Brand Plan needed to include all expected promotional activities, participation at seminars, and product trainings. The Marketing Task Force was mandated with overseeing compliance with the Annual Brand Plan.

83.     *Fourth*, the Amended Teoxane Agreement also made changes to the medical training materials Revance provided for RHA products. Showing Teoxane's complete distrust of Revance, all medical training was now required to use Teoxane's tools and documentation as their

foundation. Like the added layer of control over the marketing efforts, all training materials needed to strictly follow the Teoxane Brand Guidelines, and Revance needed to ensure strict compliance with all laws and regulations. As with the marketing amendments, the medical training program was to be monitored by a newly formed "Medical Education Task Force" who was mandated to hold monthly meetings. In addition, Revance agreed to submit an "Annual Medical Education Plan," which would cover attendance at scientific symposia, interactions with key opinion leaders in the medical field, and development of continuing professional education materials to be provided to doctors and injectors. Similar to the Annual Brand Plan, the Annual Medical Education Plan would be overseen by the Medical Education Task Force during its monthly meetings.

84. Given all the operating changes required under the Amended Teoxane Agreement, compliance with the Amended Teoxane Agreement became much more costly for Revance. In fact, Crown told Revance that an additional reason it would not approve the Amended Teoxane Agreement was because its "operating terms" were materially "more burdensome than the prior arrangement."

85. *Fifth*, the Amended Teoxane Agreement gave Teoxane much more flexibility to terminate the contract. Rather than the (previously shortened) 60-day cure period under the Fifth Amendment, the Amended Teoxane Agreement provided only a 30-day cure period for specific breaches, including for non-payment under the contract or Revance's failure to deliver the necessary forecasts, monthly buffer stock reports, or monthly sales reports. Moreover, the Amended Teoxane Agreement clearly demarcated that failure to follow Teoxane's Brand Guidelines or a failure to prominently display Teoxane's name on publications were material breaches that warranted termination.

86.     Notably, another stated reason for why Crown rejected the Amended Teoxane Agreement was the materially increased "risk that the [Teoxane] Agreement could be terminated by Teoxane prior to completion of the remaining license term."  In such a case, Revance would be left with significantly less revenue than contemplated under Crown's original Tender Offer, making the Company less valuable than previously determined.

87.     The terms of the ANZ Agreement were also harmful to Revance.  The ANZ Agreement extended through the end of 2040 (a term of 15 years), only allowed Revance to charge Teoxane a pre-set percentage above manufacturing costs as payment, and only called for a royalty to Revance in the "high single digit to mid teen[s]."  In fact, Crown was critical of the ANZ Agreement because its terms "were highly unfavorable to Revance."

### J.     The Fraud Continues: Defendants Announce a Settlement with Teoxane but Misleadingly Conceal that Crown Repudiated the Tender Offer

88.     Defendants understood that Crown's rejection of the Amended Teoxane Agreement meant the Tender Offer would not go through on the terms previously announced.  Defendants, however, did not disclose the new agreement or its devastating impact to the public.  Rather, they remained silent as Crown failed to commence the Tender Offer by the new deadline of October 25, 2024, the day after Revance entered into the Amended Teoxane Agreement.  By the end of the day, Revance's stock price closed at $4.70, down more than 11% from the prior day's closing price of $5.30.

89.     When Defendants eventually disclosed in a Form 8-K filed on October 28, 2024 that the dispute with Teoxane had been resolved, they did so in a materially misleading manner.  The filing announced that Revance had settled with Teoxane by entering into the Amended Teoxane Agreement and vaguely noted that Teoxane and Revance "agreed on minimum purchase commitments through 2029."  Notably, however, the filing did not provide any specifics regarding

the increased purchase commitments, and although the Form 8-K attached the Amended Teoxane Agreement as an exhibit, all of its financial terms were redacted. Accordingly, investors had no way of assessing what the new commitments from 2026 through 2029 were or how they compared to the prior Teoxane Agreement.

90.     Moreover—and significantly—the October 28 Form 8-K omitted any mention of Crown's stance on the Amended Teoxane Agreement and failed to disclose that Crown had repudiated the Tender Offer. To the contrary, the filing stated that Revance and Crown had agreed on October 25, 2024 to "further extend" the Tender Offer's start date to November 1, 2024, just four days after the October 28 filing, giving a false impression of progress.

91.     The market was deceived. Given the seemingly positive news that the Teoxane dispute had been resolved and the implication that Crown had welcomed the outcome, analysts were thrilled by the Company's update that the Teoxane saga was over. Indeed, Needham reported on October 28, 2024 that the Teoxane dispute had ended and that there was "***no indication of a change in the bid offer of $6.66***." Needham accordingly believed that "***there are no other hurdles for Crown Labs to proceed with their tender offer***." Mizuho similarly "***view[ed] the development positively***" and suggested that, at most, there "could be a ***small reduction*** to the $6.66 offer price." On this seemingly positive news, Revance's stock price jumped more than 25% to close at $5.90 on October 28, 2024.

92.     In the following days, Revance and Crown immediately began renegotiating the Tender Offer price at levels far below the $6.66 per share previously agreed and announced. On October 30, 2024, Crown reinforced to Revance that it was "***unwilling to commence the [Tender] Offer***" at the prior price and submitted a new term-sheet that accounted for the "***impact of Revance entering into***" the value destroying agreements with Teoxane. Crown's new offer proposed merger

consideration consisting of an upfront payment of just **$2.25 per share**, with additional consideration of $3.25 potentially available upon the satisfaction of performance metrics tied directly to Revance's future performance under the Amended Teoxane Agreement.

93. Revance's Board—including Defendant Foley—met that very day and rejected Crown's revised offer. Given the oppressive terms of the Amended Teoxane Agreement that materially impacted Revance's future profitability, Revance's Board knew the Company was unlikely to meet the performance metrics for the RHA products. Accordingly, as Defendants later admitted, the Board declined the revised offer because "the ability of stockholders to receive [the future consideration] … **was substantially uncertain**." The next day, on October 31, 2024, Revance's Board reconvened to discuss a counterproposal to Crown.

94. On November 1, 2024—the day the Tender Offer was set to commence following the supposedly positive resolution of the Teoxane dispute—Revance filed a Form 8-K announcing that the parties had agreed to "further extend" commencement of the Tender Offer until November 12, 2024. Although Crown was unambiguous in its refusal to move forward at the $6.66 offer price and the parties were already negotiating substantially lower consideration, the November 1 Form 8-K did not disclose those facts. Instead, the filing informed investors that Revance was in "ongoing discussions" with Crown and that those discussions "**could**" result in "further delays" or "modifications to [] the terms of the Merger Agreement, including offer price." At this point, however, investors had no indication that Crown had flatly rescinded the original Tender Offer due to the Amended Teoxane Agreement. Investors also lacked the ability to assess the terms of the Amended Teoxane Agreement for themselves because critical terms, including the minimum purchase commitments, were redacted.

**K. Defendants Reveal the Damaging Terms of the Amended Teoxane Agreement on November 7, 2024, Yet Continue to Suggest that the Tender Offer Was Moving Forward at the Original Price**

95. The truth was further partially revealed on November 7, 2024, after the markets closed, when Revance issued its Q3 quarterly report on Form 10-Q and filed an earnings press release on Form 8-K. The Form 10-Q publicly revealed Revance's new minimum purchase commitments and their devastating impact on the Company. Specifically, the 10-Q listed the "minimum purchase commitments [] as follows: (i) $60 million for 2025; (ii) $67.8 million for 2026; (iii) $76.7 million for 2027; (iv) $86.6 million for 2028; and (v) $97.8 million for 2029." In discussing Revance's operating capital, the Form 10-Q revealed that partially due to the "specified annual minimum purchases of the RHA® Collection of dermal fillers, *which amounts have increased following our entry in to the [Amended Teoxane Agreement]*," the Company now had "*substantial doubt about [its] ability to continue as a going concern*." Thus, the Company revealed that it agreed to the Amended Teoxane Agreement knowing it would put the Company at grave risk, and likely into bankruptcy.

96. Furthermore, the Form 10-Q revealed—without any additional details—that Crown had "*expressed dissatisfaction with [Revance's] entry into the Teoxane Agreements and the terms of such agreements*." Accordingly, the Form 10-Q warned investors that Crown may seek remedies under the Merger Agreement, "including by seeking to unilaterally terminate" the Tender Offer.

97. The market was shocked to learn of the crushing terms of the Amended Teoxane Agreement and its effects on the Company's bottom line. For example, Needham explained on November 8, 2024, that the Company's "10Q filing provide[d] additional detail to the amendment" of the Teoxane Agreement that represented a "*significant change* from the prior agreement." Needham specifically called attention to "the new min purchase commitments" which were now

36

no longer to be "determined based on projected market growth rate." According to Needham, the significant changes with the Teoxane Agreement and Crown's "dissatisfaction" with the new terms provided ample basis for "concern that the tender offer by Crown…will proceed at $6.66 or at all."

98.     The market reacted negatively to the news. Revance's stock price cratered 36% on November 8, 2024, closing at $3.70, down from its closing price of $5.78 on November 7, 2024.

99.     Remarkably, even though Revance revealed Crown's "dissatisfaction" with the Amended Teoxane Agreement, Defendants still did not reveal that Crown had unequivocally repudiated the $6.66 per share merger price. To the contrary, the November 7 press release included a section titled "Third Quarter Highlights" that represented that "***Crown will commence a tender offer to purchase all of Revance's outstanding shares of common stock, at a price of $6.66 per share, in cash***."

100.     These representations caused some prominent analysts to remain convinced that the prior offer price was still on the table. H.C. Wainwright, for example, explained on November 8, 2024, that its "***$6.60 price target for Revance***" was based on the "***acquisition price with Crown Labs***" and was "adjusted" for the risk that the "merger with Crown Laboratories might not be completed." Guggenheim similarly explained that its "fair value estimate" for Revance was "***$6.66/share***…***based on the acquisition price***."

L.     **Defendants Continue to Conceal Crown's Repudiation of the Tender Offer Price**

101.     Over the course of the following month, Defendants repeatedly announced "extensions" to the Tender Offer while failing to disclose that Crown had already repudiated the Tender Offer price and that the parties were in the midst of negotiating significantly lower merger consideration.

37

102.     Specifically, on November 8, 2024, Crown made a newly revised offer to acquire Revance for $3.00 per share—a nearly 55% discount to the earlier Tender Offer—with no contingent future payments.  Nonetheless, on November 12, 2024, Revance issued another Form 8-K, which stated that the commencement date of the Tender Offer had been extended by a week to November 19 but made no mention of the fact that Crown had not only retracted the originally agreed upon price but was now offering less than half that value.  Instead, the November 12 Form 8-K warned that either party "***could***" seek a renegotiated price, concealing the fact that Crown was already doing exactly that.

103.     The market was again misled.  On November 12, 2024, Revance's stock price rose sharply by 20%.  On the day prior to the announcement, Revance's stock price closed at $3.45, but, after Defendants' misleading Form 8-K, the price increased to above $4, to close at $4.13.

104.     The pattern of misleading statements that failed to provide investors with material information about the Tender Offer continued.   On November 18, 2024, ***Revance*** made a counteroffer to Crown for a total of just ***$3.25 per share***—showing Defendants' acceptance that the Tender Offer would not approach anything near the $6.66 merger consideration.

105.     Tellingly, in making the counteroffer, Revance's Board insisted that any revised deal with Crown absolve Revance and its officers and directors of any liability for their prior misrepresentations in the negotiations leading up to the original Merger Agreement.  Indeed, on November 14, 2024, Revance's Board expressly demanded "a full release of claims based in common law, tort, [and] fraud," that in any way arose "out of Revance's relationship with Teoxane" and related to the Tender Offer.  In other words, Defendants had lied to Crown—and the investing public—by stating that there were no breaches of the Teoxane Agreement and they wanted to avoid personal liability.  However, when Crown responded on November 15, 2024, it only offered a

"limited release of claims." In response, Revance's counsel told Crown on November 18, 2024 that "***anything less than a full waiver of claims***" by Crown against Revance or its directors and officers "***would not be acceptable to the Revance Board***."

106.    Despite negotiations of a Tender Offer ranging well below the prior offer price, Revance issued another Form 8-K the very next day, November 19, 2024, that again only warned that the parties "***could***" seek "modifications[] to the terms of the Merger Agreement, including offer price." The filing failed to disclose that Crown retracted the earlier $6.66 offer and that Defendants had already offered to accept less than half that amount. It also failed to disclose that a major point of contention in the ongoing "discussions" was Defendants' requirement that Crown waive its claims and absolve Defendants of liability.

107.    As negotiations between Crown and Revance continued, Defendants issued four additional nearly identical Form 8-Ks on November 26, November 29, December 3, and December 5, 2024, explaining that "[d]ue to the ongoing discussions between the Company and Crown" the parties were extending the Tender Offer. While the filings noted that the negotiations "***could result***" in either party "seeking remedies in accordance with, and modifications to, the terms of the Merger Agreement, including offer price," none of those filings revealed that Crown had unambiguously stated that it would not move forward at the prior price, that Revance was offering to accept merger consideration that was discounted by more than 50%, or that, as part of the negotiations, Defendants were seeking to absolve themselves from liability for their prior misrepresentations.

108.    After the November 26 and December 5, 2024 Forms 8-K were filed, Revance's stock price increased 6% and 6.5%, respectively. Notably, each increase brought Revance's share

price above $4 per share, highlighting the misleading nature of Defendants' comments and the market's ignorance of the realities between Revance and Crown.

**M.     The Full Truth is Revealed: Defendants Disclose the New Tender Offer That Values the Company at Less Than Half Crown's Prior Tender Offer**

109.    On Monday, December 9, 2024, Revance shocked investors by announcing pre-market that it had agreed to a revised Tender Offer price of just $3.10 per share—more than 53% less than the original Tender Offer price. Despite Defendants' prior claims that Revance "denie[d] the alleged material breaches" and that the Company would "defend itself vigorously," Defendants now admitted that the lower merger consideration was specifically due to "Revance receiving notice from Teoxane alleging breach" leading to the Amended Teoxane Agreement "*which revisions are expected to have a material impact on Revance's future profitability and cash flows*."

110.    In essence, Defendants told the market that the undisclosed breaches of the Teoxane Agreement meant that the Company was less than half as valuable than what was previously claimed. Indeed, the Form 8-K admitted that Revance believed the deal was in the "best interest of all [Revance] stakeholders" even though the "economics of the proposed deal have changed" because the price was fully supported by "the updated agreement with Teoxane."

111.    The market reacted negatively to the news that the Company was significantly less valuable due to the prior undisclosed breaches and resulting Amended Teoxane Agreement. Revance's stock price dropped 21% from $3.82 on December 6, 2024 to a close at $3.03 per share on December 9, 2024. In total, over the course of the Class Period, Revance shares dropped nearly 58% from their Class Period high of $6.98 on February 29, 2024.

**N.** **Defendants Make Post-Class Period Admissions Confirming the Fraud**

112.    On December 12, 2024, Revance filed a Schedule 14D-9 (the "Information Statement") in connection with the Tender Offer that contained stunning admissions relating to the fraud. *First*, as set forth above, Defendants received Teoxane's Notice on August 16, 2024, but did not disclose the Notice for more than five weeks, until September 23, 2024. The Information Statement confirmed that Defendants fully understood the significance of the Notice and that it directly impacted and jeopardized the deal. Indeed, the Information Statement disclosed that immediately upon receipt of Teoxane's Notice, Crown and Revance "communicated regularly and Revance received Crown's input with respect to the ongoing discussions with Teoxane," including through "in-person meetings [that] included a tri-party meeting with Crown, Revance, and Teoxane."

113.    *Second*, the Information Statement revealed that Defendants knew that Crown had unequivocally repudiated the $6.66 Tender Offer price back in October, but Defendants did not reveal that extraordinarily material fact until the end of the Class Period. As noted above, on October 17, 2024, Crown told Revance that "Crown's ability to move forward with the Merger was dependent on…Crown's approval of any material amendments to the Distribution Agreement" with Teoxane. It further noted that, after reviewing the terms of the Amended Teoxane Agreement on October 24, 2024, "Crown withheld such approval." Taken together, Crown's statements made entirely clear to Defendants that, by entering into the Amended Teoxane Agreement, the Tender Offer would not move forward at the $6.66 price. The Information Statement further admitted that Crown unequivocally told Defendants on October 30, 2024 that "Crown was unwilling to commence the Offer set forth in the Original Merger Agreement" and submitted a revised offer that reflected the "impact of Revance entering into the [Amended Teoxane Agreement] and ANZ Distribution Agreement." Nonetheless, even after the clear repudiation, Defendants told the market

on November 7, 2024 that "Crown will commence a tender offer … at a price of $6.66 per share, in cash." Furthermore, Defendants failed to disclose that the Tender Offer's price had been rescinded; they instead misleadingly told the market that the Tender Offer was merely "extended" and that Crown "could" seek a modification of the "offer price."

114. *Third*, the Information Statement made clear Defendants' understanding that the Amended Teoxane Agreement was disastrous to Revance, yet Defendants had to enter into the new deal to salvage the Teoxane relationship and the Company's business. As set forth in the Information Statement, Crown withheld approval of the Amended Teoxane Agreement specifically because it "increased the minimum payments due to Teoxane, beyond projected sales levels for the Teoxane products," it "provided operating terms more burdensome than the prior arrangement," and "created risk that the [Teoxane] Agreement could be terminated by Teoxane prior to completion of the remaining license term." Thus, the Amended Teoxane Agreement was destined to result in an operating loss for Revance. Despite Defendants knowing that Crown disapproved of the new terms and would renegotiate its Tender Offer price as a result, Defendants still moved forward with the Amended Teoxane Agreement to avoid a complete contract termination by Teoxane, which was clearly justified due to the breaches.

115. *Fourth*, the Information Statement laid bare that Revance refused to enter into a new deal with Crown unless it included a full waiver of personal liability for Defendants' prior misrepresentations to Crown. Defendants confessed that in a counteroffer to Crown on November 14, 2024, Revance demanded a "full release of claims," including those for "fraud," "arising out of the Company's relationship with Teoxane." When Crown countered with only a "limited release of claims," Defendants made clear that "anything less than a full waiver of claims would not be acceptable to the Revance Board." Ultimately, Defendants only agreed to a Crown Tender Offer

that included a "full release of claims" that expressly absolved them of fraud claims levied by Crown regarding the Teoxane relationship and "any contracts between the Company and Teoxane."

### O. Former Revance Employees Confirm That Revance Was in Breach of the Teoxane Agreement and Teoxane Had Expressed Dissatisfaction with the Relationship

116.    As set forth above, Defendants' decision to enter into the Amended Teoxane Agreement—an arrangement they acknowledged would have a "material impact on Revance's future profitability and cash flow" and whose increased purchase obligations threatened the Company's ability to continue as a "going concern"—demonstrates their knowledge of a material breach of the original Teoxane Agreement. Indeed, there would have been no need to accept such a destructive deal, one that jeopardized the Crown merger and risked the Company's solvency, absent an existing breach of the original agreement.

117.    In addition, Defendants' breaches of the Teoxane Agreement and Revance's strained relationship with Teoxane was confirmed by numerous former employees ("FE")[2] of Revance who worked closely with Teoxane and sold RHA products. The FEs explained that as the Company's business was failing in early 2024, Revance resorted to improper marketing and sales tactics as a way to boost sales. These practices, including distribution of "free samples" and other "luxury goods," not only ran afoul of the Brand Guidelines and promotion parameters set forth in the Teoxane Agreement, but also violated FDA regulations governing pharmaceutical marketing and sales.

118.    In addition, with Revance burning through cash, Revance's marketing and sales departments were stripped down to bare-bones levels with only a handful of employees. This level of staffing made Revance incapable of fulfilling its commitments under the Teoxane Agreement

---

[2] Former employees are referred to herein as "FE#" and are all referenced using feminine pronouns to maintain their confidentiality.

and greatly frustrated Teoxane's management. Furthermore, Revance's 2024 ad campaign for Teoxane was a disaster that strayed from Teoxane's Brand Guidelines and undercut Teoxane's global messaging. Accordingly, as early as February 2024, Revance was in breach of the Teoxane Agreement, and based on accounts of the FEs, knew that Teoxane was contemplating an exit from the relationship, yet Defendants hid this highly relevant information and the risk it imposed on the Tender Offer from the market.

### 1. Improper Promotional Activity

119. FE 1 worked in Revance's Nashville office from January 2022 until June 2024 as the Product Manager in charge of Filler Marketing and was directly charged with overseeing the marketing for the RHA Collection. In her role, FE 1 had regular meetings with Teoxane employees, including bi-monthly meetings with Teoxane's marketing professionals and occasional meetings with Teoxane leadership. FE 1 explained that she was definitely the right person to speak to about Revance's relationship with Teoxane.

120. In late 2023, Revance hired a new Chief Commercial Officer ("CCO"), Erica Jordan, to take over the commercialization activities of both Daxxify and the RHA Collection, and Jordan filled out her team with new hires. According to FE 1, Revance's new management, including Jordan, did not have backgrounds in pharmaceutical sales and accordingly promoted very reckless marketing strategies for selling Teoxane's products and Daxxify that were "dicey" in terms of FDA regulations. The marketing violations were so egregious that they caused FE 1 to leave the Company. FE 1 explained that it was the people coming from outside the injectables industry that were making decisions she was not comfortable with from a legal perspective, and that she left because of it.

121.    Specifically, under 21 U.S.C. § 353(c)(1), it is illegal to "sell, purchase, or trade or offer to sell, purchase, or trade any drug sample" which "is not intended to be sold and is intended to promote the sale of the drug."  Accordingly, the statute and FDA regulation, 21 C.F.R. § 203.31, require that drug distributors only provide samples to healthcare providers "in response to a written request for drug samples" and that they keep detailed records about the amount and types of samples provided.  Distributors should not provide samples to providers where the samples will then be sold, and, in fact, have an obligation to report instances to the FDA where there is suspicion that there may be "diverting of drug samples." 21 C.F.R. § 203.37.  Furthermore, under the Anti-Kickback Statutes, 42 U.S.C. § 1320a-7b(b), supplying samples to doctors as a way to decrease doctors' own costs can also violate the law.  Indeed, because Daxxify was not just for aesthetic use but had therapeutic properties, Revance could not offer ***anything of value*** to doctors to induce Daxxify purchases or to maintain Daxxify pricing levels.  Thus, including free or even discounted RHA products as a way of offering back-handed discounts on Daxxify was problematic.  As FE 2 explained,[3] given that Daxxify was "therapeutic in nature," it was a "regulatory no-no" to provide "discount[s] [on] the fillers to keep the toxin price higher."

122.    Revance's new management began making improper gifts to induce medical practices to purchase products, including Teoxane's RHA Collection, a practice which, according to FE 1, was not approved by the FDA.  As FE 1 explained, after Revance held its National Sales Meeting in February 2024, Revance started "basically backing up the truck and giving out free goods."  FE 1 recalled that the free handouts included extra "free samples" of Teoxane products

---

[3]  FE 2 was Revance's former Vice President of Data-Decisioning, responsible for building and overseeing the data analytics in the aesthetics business who left the Company in January 2024. She worked out of the Nashville office and reported directly to the C-Suite.

for the physicians to sell, as well as items completely unrelated to the product, such as "gift cards, blow dryers, gym memberships, and other luxury goods."

123. The gifting of the RHA products was doubly problematic. Not only did it contravene FDA regulations prohibiting diversion of samples and anti-kickback laws, but it also meant that Revance was improperly bundling Teoxane products. As FE 1 explained, Revance was using unsanctioned "promotions" as a roundabout way of lowering the effective box price of the products. FE 1 recalled that Teoxane wanted the RHA Collection to sell for at least $250 per box, but through the free gifting, Revance was actually selling the products for $193 per box. According to FE 1, Teoxane caught on to Revance's scheme and was "very concerned about" it, explaining that Revance was selling below the agreed upon price and that "ruffled Teoxane's feathers."

124. The improper promotion of Teoxane products was confirmed by FE 3, a former Regional Sales Manager for Revance's all-important Los Angeles County region from March 2023 to November 2024. FE 3 confirmed that there was a "lot of illegal things going on regarding the sales" of RHA and Daxxify. She recalled a marketing ploy in 2024, which the Company labeled the "Big Swing," where Revance told select customers that if they bought 100 vials, Revance would give them 100 vials for free. The customers' privy to the Big Swing promotion had to be approved by Erin Stevens, the Vice President of Strategic Partnerships. FE 3 explained that free samples can legally be provided for doctors to practice injections and for use on their own staff, but providing too many free samples meant the doctors were just using the free vials as regular inventory to sell to patients. FE 3 explained that this was a basic cost of goods reduction because there was no way the doctors could have used that many samples under the agreement.

125. FE 3 felt this program was "100% illegal" as it was a violation of the FDA regulations against diversion of drug samples and against the rules prohibiting "quid pro quo" for

pharmaceutical purchases. FE 3 had previously worked for large pharmaceutical companies that provided samples but felt the free sample handouts by Revance was far from what she had experienced in the past. Accordingly, FE 3 reported this practice to Revance's Human Resources Department and its Chief Legal Counsel.

126. Revance's "shady business practices" of providing too many free samples was widespread. FE 3 explained that any Revance employee from manager up had the ability to view the Company's sales metrics on the internal "PowerBI" tool that tracked sales per product by region. FE 3 recounted that in the spring of 2024 her Los Angeles County region hit just 70% of its expected RHA sales figures and that the highest performing regions were only hovering around the 75% level. FE 3 reached out to the manager of the better-performing region in Northern California, Lisa Jabuka, to get tips on how to improve sales in LA County. During the call, FE 3 learned that Northern California was providing outsized numbers of free samples of products, including RHA filler, to assist in making sales. FE 3 recalled asking the Northern California manager if this was a normal practice and being told that it was. It dawned on FE 3 that Northern California was padding sales by giving out free RHA and free Daxxi as promotions. Whenever FE 3 questioned the practice of providing free samples, she received text messages from her boss saying these sales tactics were approved from the top.

127. Reporting the free sample problem to HR did not help. Indeed, FE 3 recalled one instance where one of the sales representatives in her region needed more "RHA Samples" to distribute to customers for legitimate purposes. After FE 3 reached out to the Vice President of Sales, Robert Jones, to obtain more samples, Jones proactively responded via text message instructing her not to "worry about accounting for the samples." FE 3 understood that this was

done to hide the true number of samples being provided to practices and to avoid detection by auditors who checked for compliance with FDA sample rules.

128.    Former employees confirm that these practices were prevalent and repeated. FE 3 explained that getting RHA samples to distribute was so "easy peasy" that Revance "ended up giving the doctors so many samples, we never made any money." This was problematic because there was no one monitoring the samples being provided to the sales team or how many free samples were going to practices, all of which violated FDA reporting regulations for samples. FE 1 confirmed that Revance was giving away so many free products that it significantly affected sales. This practice of inducing sales through providing excess free samples to customers continued at least through May 2024.

### 2. Violations of Brand Guidelines

129.    Other Revance marketing and sales practices also violated the Teoxane Agreement. FE 1 noted that in early 2024 Jordan hired a public relations firm to start direct-to-consumer marketing. According to FE 1, the outside firm was used as a way to avoid Revance's legal department's oversight because the outside firm was pushing out messaging that would never have been approved by Revance's legal team. Management was "going around our legal department" and was not going through the proper channels with compliance and legal to "get those things approved." The messaging being disseminated by the PR firm, according to FE 1, did not cohere with the global Brand Guidelines that Teoxane had for its products. FE 1 not only internally flagged promotional discrepancies many times when the messaging was not in compliance with the Brand Guidelines, but she also spoke with Teoxane directly about the branding discrepancies. FE 1 recounted that Teoxane was unhappy that Revance strayed away from the global branding, and accordingly, Teoxane wanted to take control over its products within the United States.

48

130.    FE 4, Revance's former Associate Director of Media and Production from August 2021 until July 2024, confirmed FE 1's report that Teoxane had indicated that it was looking to terminate the Teoxane Agreement by February 2024 due to Revance's rogue branding that failed to comply with the Branding Guidelines.  According to FE 4, whose job responsibilities involved overseeing Revance's media production, video and photography shooting, and video editing, Revance would kick off each year with a comprehensive branding campaign for both Daxxify and RHA products.  The start-of-year branding expenditures were significant, as the Company would spend over a million dollars in shooting creative photos and videos that Revance would roll out over the course of the year.  In 2024, Revance decided for the first time that the creative media for the RHA Collection would be done in-house rather than through professional production companies.  Over FE 4's advice, Revance executives demanded that the RHA media for 2024 be in "black and white" instead of in color.  Both of these decisions—to handle the photo and video shoots in-house and to shoot them in black and white—came directly from the members of Revance's C-suite who did not first seek Teoxane's approval.  However, as FE 4 explained, it made no sense for aesthetic ads to be in black and white as that "didn't showcase the colors and the branding Teoxane used."  Teoxane was "very very upset Revance wasn't using their branded product colors" and was re-evaluating its relationship with Revance.  "Black and white for facial aesthetics hides and conceals flesh tones, bringing out facial imperfections."  As FE 4 put it, "Here is a product that you want to see color and flesh tones… Aesthetically, Revance did everything wrong with a cosmetic marketing campaign."

131.    According to FE 4, Revance never asked Teoxane to authorize this ad campaign or whether this unconventional advertising aligned with its Brand Guidelines.  In fact, once Teoxane got wind of the advertisements in February 2024, "Teoxane was livid with Revance" because the

United States marketing strayed so far from its global branding efforts. Indeed, it was well known within the Company that Teoxane was "really upset" and threatening to end the Teoxane Agreement due to the fiasco. FE 4 recalled that Revance's upper management was frantically asking whether color could be retrofitted into the pictures and videos to salvage the campaign, as the Company simply lacked the funds to produce an entire new ad campaign from scratch.

### 3. Bare-Bones Marketing and Sales Teams Could Not Hit RHA Sales Figures

132. FE 4 explained that the marketing mishap was indicative of worsening problems on Revance's RHA team. In October and November 2023, Revance was burning through cash because Daxxify sales were so poor, causing the Company to lay off most of its marketing department. When Jordan was replaced as the CCO, she also slashed jobs left and right. Indeed, FE 4's team of 11 was cut to just FE 4 and one other employee. When the Company continued to burn through its funds, Revance made even more major cuts between February and May 2024, which left Revance with just a skeletal marketing team. According to FE 4, it was well known within Revance that the dwindling marketing and sales team greatly frustrated Teoxane.

133. The fact that Teoxane was perturbed by Revance's bare-bones marketing and sales teams was confirmed by Revance's former Vice President of Data-Decisioning, FE 2. FE 2 explained that the Company underwent significant personnel reductions in both the sales and marketing teams starting with the appointment of Jordan as CCO and continuing through early 2024 when FE 2 departed.

134. The former Vice President explained that, even though Revance was required under the Teoxane Agreement to spend significant amounts marketing and promoting RHA fillers, Revance's entire marketing department was reduced "down to a handful of people," the digital division was cut down to just "an intern," and the creative department was reduced to "just a few people." Worse yet, FE 2 revealed that the employee directly in charge of "manag[ing] the Teoxane

relationship" left the Company as well. In fact, according to the former Vice President, Revance's "internal organization no longer included **_anybody_** to do **_any_** marketing on behalf of RHA" anymore. Thus, FE 2 explained there was simply no "internal investment anymore in marketing, digital, or creative" and this was "not hard for Teoxane to see."

135.    In addition to the marketing team, FE 2 explained that Revance's sales team also vanished. After growing to more than 150 sales representatives in 2023, the sales headcount dwindled steadily with Revance not "replacing for attrition." Revance then laid off salespeople in late 2023 and early 2024, or as the former Vice President put it, "the sales team ha[d] been pulled back fairly substantially." According to FE 2 this left Revance with only "50 people" in sales who "weren't even experienced" at selling aesthetic products. Accordingly, the sales team responsible for Teoxane's prior success was no longer at the Company in 2024.

136.    To make matters worse, the salespeople who remained at Revance were incapable of training new customers on how to properly administer Teoxane's products to patients. The inability to properly train new customers was a major concern for Teoxane because, according to FE 2, "Teoxane [was] continuing to want to see growth and share grabs in the U.S., [but] that requires continued training." Thus, FE 2 observed that "with the cash burn, with the pullback in the size of the sales force, there's going to be some friction there as to whether they can fully commit to providing the love that Teoxane wanted."

137.    The report of FE 4 and FE 2 was further confirmed by a former Vice President, Creative Studio and Design, FE 5, who worked at Revance from August 2021 until March 2024 and was responsible for overseeing marketing and customer education within the United States.[4]

---

[4] FE 5 was first interviewed by AlphaSense Expert Insights on October 11, 2024, and her interview was published on the AlphaSense platform on October 18, 2024. AlphaSense is a prominent,

FE 5 worked with the head of marketing for RHA filler at Teoxane and therefore had a strong understanding of the relationship between Teoxane and Revance. According to FE 5—who was in charge of "all of the creative strategy and creative execution of all of the sales enablement tools, consumer tools, digital tools, sales, national sales meeting, production videos, photography, etc.,"—Revance's "complete turnaround and upheaval of the entire marketing department" by early 2024 made Teoxane "very frustrated."

138.    As FE 5 explained, after Erica Jordan's appointment, the "entire marketing team from the filler side" left Revance in the "spring" of 2024. Revance's long-term marketing team who grew the RHA sales did not like Jordan, especially because she had "no experience in medical aesthetics" and did not know what marketing for controlled substances entailed. In addition to the marketing team, FE 5 explained that "four or five" of Revance's "regional managers left [in 2024] as well." Thus, "there was *not a single* [employee] originally on the RHA filler team," that was still "on the filler team by the middle of [2024]." According to FE 5, "with changing over all of the head of sales and many sales leaders and all of marketing to people that don't have experience in the category," it was apparent to everyone, including Teoxane, that there was no way that Revance "can make their number[s]" for the year.

139.    Moreover, FE 5 explained that while Revance's sales team had historically focused on selling RHA fillers, in part because Daxxify was not launched until mid-2023, the new CCO's team was set on pushing Daxxify over RHA because it provided better margins for Revance. Thus, even when faced with pressure from Teoxane to shift sales focus to RHA products, CCO Jordan

subscription-based professional market intelligence platform used principally by hedge funds, market research firms and financial institutions that provides, among other things, exclusive access to a proprietary database of one-on-one interviews with experts and former employees of publicly traded companies across various industries.

52

refused because Revance "make[s] [its] money on Daxxi" and "because of the cost of Teoxane['s product] to Revance," meant the Company didn't "make that much money" from RHA sales. Accordingly, throughout this timeframe, Teoxane regularly complained that Revance "didn't sell enough," and its "marketing was bad."

140.    FE 5 reported that Revance knew of Teoxane's position because the companies held monthly meetings attended by high-level employees, including Revance's head of marketing, head of brand, and representatives from the finance department. FE 5 explained that Teoxane was well aware of the complete overturn within Revance's ranks because "the people in the meetings" from Revance's side were constantly changing and "the faces they would see month after month all of sudden disappeared." The meetings covered Revance's marketing efforts for RHA fillers, and CCO Jordan was "focused a lot on promos and promotions and dropping" prices, which incensed Teoxane.

141.    At the monthly meetings, Teoxane and Revance set out monthly and quarterly targets, which ultimately went toward the annual requirements of the Teoxane Agreement, and the monthly meetings usually focused on these shorter-term figures. In addition, the two companies "would monitor [the inventory] level at every one of those monthly meetings." According to FE 5, there were multiple instances in late 2023 and early 2024 where Revance's monthly sales targets "were either not met or they were just barely met" which caused Teoxane to be overtly "very frustrated" on calls where FE 5 was in attendance.

142.    Revance's inability to meet its monthly Teoxane targets was confirmed by FE 3 who presided over Los Angeles County. FE 3 explained that Los Angeles County was considered a key market by Revance and a "cosmetic capital based on the Beverly Hills doctors." FE 3 recalled that in 2024, her team was only reaching 70% of their RHA sales numbers and when she

looked on PowerBI, the best performing regions were only reaching around 75% of their expected RHA sales figures. As she explained, Revance didn't live up to its end of the agreement with Teoxane, and the Company "had missed our RHA numbers." Accordingly, FE 3 heard on multiple occasions from her bosses—Sharon Dixon, the regional sales director, and Erin Stevens, the Vice President of Strategic Partnerships—that Teoxane's CEO Valerie Taupin was upset Revance was not "making [its] numbers" as RHA sales were down.

143. FE 5 recalled that due to Revance's inability to adequately sell RHA products, Teoxane had been "complaining about" Revance's performance "for some period of time." However, Revance would placate Teoxane claiming "'Well, just give us a quarter, we're going to change our marketing strategies,' or 'We're going to do this,' or 'We're going to do that,'" but they wouldn't change the emphasis," as Revance wanted its salespeople to continue to push Daxxify which yielded more profit per sale to Revance. Indeed, FE 3 recounted that even after Erin Stevens informed her that Teoxane was unhappy with the RHA sales, Stevens instructed "if you had to choose between Daxxi and Teoxane," in instances where customers could only budget certain products, "push Daxxi."

144. In short, according to FE 5, Teoxane was upset with Revance throughout 2024 because Revance was not hitting its monthly numbers and because Teoxane lacked "faith in the marketing team." Despite Teoxane's clear and open dissatisfaction with Revance, the Company made no changes but instead sought to quickly unload the problems on Crown via the merger.

## VI. FALSE AND MISLEADING STATEMENTS

145. During the Class Period, Defendants made materially false and misleading statements and omitted material facts, in violation of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder. Throughout the Class Period, Defendants' SEC filings, press releases, and analyst and investor presentations included material misstatements and

omissions concerning Revance's financial and operational condition, which included, among other misrepresentations, statements concerning the sale of Teoxane products, compliance with the Teoxane Agreement, the timing and price of the Crown Tender Offer, and the associated risks surrounding the Tender Offer.

146.    As discussed above and in more detail below, Defendants' representations were materially false and misleading when made and omitted material facts either required to be disclosed or necessary to make the statements not misleading.  These material misstatements and omissions had the effect of creating an unrealistically positive assessment of Revance's operational status and the Tender Offer.  In truth, Defendants had falsely presented to investors a materially misleading portrayal of the Company and the Tender Offer.

## A.    False And Misleading Statements Before the Tender Offer Was Announced

147.    On February 28 2024, Revance issued a press release, which it filed with the SEC on Form 8-K ("February 28 Press Release") and was signed by Defendant Schilke.  The Company also held an earnings call that day.

148.    The February 28 Press Release quoted Defendant Foley as stating that the Company was on the precipice of a "blockbuster opportunity in aesthetics," in part because of the sales of RHA fillers.  Specifically, the February 28 Press Release claimed the "***RHA Collection continues to be the fastest-growing filler by market share out of the six brands on the U.S. market***."  During the earnings call, Defendant Foley repeated that "Three years into launch, the RHA Collection ***is still the fastest-growing HA filler in the U.S.***, sitting at about 10% market share."  On the call, Defendant Schilke explained that the success with selling Teoxane products was "***driven by deeper and broader accounts penetration***."

149.    In response to a question about competition within the filler industry, Foley explained that the "***the nice thing about the Teoxane partnership is that we were able to bring in***

*the market sort of the latest innovation in filler technology, but one that has years and years of experience*.  And so we feel very good about—if you look at how RHA and Teoxane has performed internationally in a very competitive market, how they've been able to continue *to take share and to grow it*."

150.    The statements in Paragraphs 148 and 149 were false and misleading and omitted material facts when made.  The statements failed to reveal that the RHA Collection was only the "fastest growing filler" in the U.S. market and Revance was only able to "take share and to grow it" because of improper sales and marketing practices that ran afoul of FDA regulations and breached the Teoxane Agreement.  FE 1 and FE 3 confirmed that Revance was handing out free RHA products and samples via the "Big Swing" promotion that was not only "100% illegal" as it violated FDA regulations but also drove down the effective price of Teoxane products and "ruffled Teoxane's feathers."  Thus, Teoxane's sales were based on improper sales practices and not "deeper and broader penetration" in the market.

151.    Furthermore, the statements were false because, rather than having a solid "Teoxane relationship," Revance had breached the Teoxane agreement through its improper marketing practices.  In addition, Teoxane was "livid with Revance" and was looking to end the partnership because Revance had strayed from Teoxane's global branding efforts in 2024 through its "black and white" campaign and had also reduced its sales and marketing team to a skeletal crew incapable of abiding by the terms of the Teoxane Agreement, as reported by FE 2, FE 4, and FE 5.

152.    On May 9 2024, Revance issued a press release discussing the results of Q1 2024, which it filed with the SEC on Form 8-K ("May 9 Press Release") and was signed by Defendant Schilke.  The Company also held an earnings call that day.  The May 9 Press Release highlighted that "the RHA Collection also took share against the backdrop of a soft filler market."  During the

56

earnings call, Foley expounded regarding the RHA sales explaining that "***we continued to grow our filler market share and ended Q1 with a 9.8% share, up from 9.1% in Q4***." Foley claimed the success with Teoxane's products was due to Revance's excellent execution under the Teoxane Agreement, explaining "Underpinning our ongoing market share gains and traction in the filler market is the quality and differentiated performance profile of the RHA portfolio ***combined with our commercial team's ability to execute***."

153.    In response to an analyst's question about what underscored Revance's "belief that [it] could meaningly grow beyond 2023 RHA sales," Foley proclaimed that even though the filler market was slow across the industry, Revance "***actually had pretty healthy share growth even with, again, an outsized focus on DAXXIFY. So I think we're continuing to take share based on the quality of the product***." Foley also reiterated that mid-way through the quarter, "***we like what we're seeing in April***" in terms of RHA sales and that any slowdown in the filler industry in Q1 "***seems to be abating as we move into Q2***" such that "***it does feel like things are returning a little bit to normal***."

154.    The statements in Paragraphs 152 and 153 were materially false and misleading and omitted highly material facts when made because Teoxane's market share growth was not due to Revance's "commercial team's ability to execute" or the "quality" of Teoxane's products but rather to improper marketing and sales practices that violated FDA regulations and the terms of the Teoxane Agreement. FE 1 and FE 3 confirmed that Revance was handing out free RHA products and samples via the "Big Swing" promotion that was not only "100% illegal" as it violated FDA regulations but also drove down the effective price of Teoxane products and "ruffled Teoxane's feathers." Thus, the Company did not have "healthy share growth," as the growth was based on improper and unsustainable conduct.

155.    Furthermore, by this time, the Company had already learned that Teoxane was "livid with Revance" over the "black and white" campaign that strayed from Teoxane's global branding and was expressing serious concern with the skeletal marketing and sales departments that had diminished to a handful of marketers and only 50 untrained sales people, as explained by FE 2, FE 4, and FE 5.  Moreover, Revance was only hitting 70% to 75% of the expected RHA sales in the spring of 2024 and Teoxane was upset Revance was not "making [its] numbers." Indeed, the Company was already in breach of the Teoxane Agreement as less than three months later Teoxane sent its Notice asserting a breach which ultimately led to Defendants agreeing to the extraordinarily harmful Amended Teoxane Agreement to salvage the business.  Accordingly, Defendants could not have liked what they were "seeing in April" as they knew of the risk that Teoxane would imminently assert a breach of the Teoxane Agreement.

156.    During the May 9, 2024 call, Foley also touted the Company's relationship with Teoxane and that RHA sales growth was due to entirely appropriate means, including "the quality of the product."  Specifically, Foley exclaimed that the "Teoxane franchise is very well known, highly regarded. … And as a result, the performance attributes, ***we believe when we go in or able to win business, we win it not on price, but we win it based on the quality of the product.***"

157.    The statements in Paragraph 156 were false and misleading and omitted highly material facts when made, because Revance was not winning business based on the "quality of the product" but on marketing and sales practices that violated FDA regulations and the terms of the Teoxane Agreement.  Indeed, contrary to the claim that Revance did not win RHA business "on price," the distribution of free RHA samples was a was a basic cost of goods reduction for the doctors and Revance "ended up giving the doctors so many samples, we never made any money."

158.    Furthermore, it was misleading for Defendants to promote the relationship with the "Teoxane franchise" when, in reality, Revance had already breached the Teoxane Agreement. Indeed, Teoxane was "livid with Revance" for its 2024 campaign that defied Teoxane's global branding, causing Teoxane to threaten to pull out of the Teoxane Agreement. Revance had reduced its sales and marketing team to a skeletal crew incapable of abiding by the terms of the Teoxane Agreement, as reported by FE 2, FE 4, and FE 5. And, Teoxane was upset that Revance did not live up to its end of the agreement with Teoxane because Revance had "missed [its] RHA numbers," as it was only hitting 70% to 75% of the expected RHA sales in the spring of 2024.

159.    On August 8, 2024, Revance issued a press release discussing the results of Q2 2024, which it filed with the SEC on Form 8-K ("August 8 Press Release") and was signed by Defendant Schilke. The Company also held an earnings call that day.

160.    The August 8 Press Release proclaimed that the "RHA Collection *continued to outpace the competition against the backdrop of a soft filler market*." During the earnings call, Defendant Foley explained that the "*RHA Collection also experienced healthy growth*" and that the Teoxane Agreement provided the Company a "*stable foundation*." Specifically, Foley touted that the "*differentiated performance profile of the RHA portfolio, combined with our commercial team's ability to execute, provides a stable foundation for our ongoing growth initiatives*." Foley later stated during the call that Revance had "a *very good foundation of RHA*," and that the Company felt "*good about … the metrics we're putting up*." Accordingly, Foley stressed that the Company "*saw good healthy growth across the portfolio of the RHA product line*." Foley later doubled down on the "health" of the RHA filler growth by crowing that even during a "softer filler market, the first half of the year and certainly in Q2, *we drove really healthy revenue*."

161.    The statements in Paragraph 160 were materially false and misleading and omitted highly material facts when made.  Rather than have a "stable foundation" with Teoxane's products stemming from the "commercial team's ability to execute," the exact opposite was true: Revance was in breach of the Teoxane Agreement because its commercial team had violated FDA regulations and participated in improper marketing and sales activities that breached Teoxane's Brand Guidelines.  Indeed, just eight days later Defendants were explicitly told by Teoxane that Revance failed to properly "promote and sell Teoxane products" and breached the Teoxane Agreement by exceeding the "maximum levels of buffer stock."  Contrary to the claim that Revance saw "good healthy growth" and "healthy revenue" from RHA sales, Revance was in fact "giving the doctors so many samples, we never made any money."

162.    Furthermore, Revance's supposedly "good foundation of RHA" was actually on extremely shaky grounds.  Unbeknownst to investors, Revance and Teoxane had already entered into the Fifth Amendment which made it easier for Teoxane to cancel the agreement and, just eight days after this statement, Teoxane sent its Notice faulting Revance's "required efforts to promote and sell Teoxane products."  Furthermore, Teoxane had been "livid with Revance" for its 2024 "black and white" campaign that flouted Teoxane's global branding efforts and was unhappy with the Company because Revance had reduced its sales and marketing team to a skeletal crew incapable of abiding by the terms of the Teoxane Agreement, as reported by FE 2, FE 4, and FE 5.  In addition, Revance was only hitting 70% to 75% of the expected RHA sales in the spring of 2024 causing Teoxane to be upset that Revance was not "making [its] numbers."

**B.    False and Misleading Statements During the Pendency of the Tender Offer and Before Teoxane's Notice was Disclosed**

163.    On August 12, 2024, Revance filed a Form 8-K ("August 12 Form 8-K"), signed by Defendant Schilke, which attached the Merger Agreement between Revance and Crown which

was executed by Defendant Foley. The August Form 8-K also attached a press release pertaining to the Tender Offer.

164. Section 5.12(b) of Merger Agreement not only disclaimed that the Company was in "breach of or default" on any of Revance's major contracts, including the Teoxane Agreement, but that "[n]o event has occurred or circumstances that exist" that could possibly allow for any "termination or modification" of the agreement by Teoxane:

> Each Material Contract (other than any Material Contract that has expired in accordance with its terms) *is valid and binding on the Company* or each such Subsidiary of the Company that is a party thereto and is in full force and effect and enforceable in accordance with its terms, subject to the Enforceability Limitations, …. *None of the Company, each of its Subsidiaries party thereto or, to the Knowledge of the Company, any other party thereto is in breach of or default pursuant to any such Material Contract*, except where such breach or default has not had, and would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect. *No event has occurred or circumstances that exist that, with notice or lapse of time or both, would constitute such a breach or default pursuant to any Material Contract, or permit the termination or modification thereof or permit the acceleration or maturity of performance thereof, by the Company Group, or, to the Knowledge of the Company, any other party thereto,* except for such breaches and defaults that have not had, and would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect.

165. The statements in Paragraph 164 were materially false and misleading and omitted highly material facts when made. Contrary to the representations, Revance was in fact in breach of the Teoxane Agreement and knew of "circumstances that exist" that "would constitute" a breach of the Teoxane Agreement that allowed Teoxane to terminate or modify its terms. Indeed, Teoxane sent its Notice *just four days after this statement*, which faulted Revance's "required efforts to promote and sell Teoxane products" and asserted a breach based on the heightened inventory levels caused by the lack of sales. Defendants were not surprised by the Notice; Revance had been in breach of the Teoxane Agreement because its commercial team had violated FDA regulations and participated in improper marketing and sales activities. FE 1 and FE 3 confirmed that Revance

61

was handing out free RHA products and samples via the "Big Swing" promotion that was not only "100% illegal" as it violated FDA regulations but also drove down the effective price of Teoxane products and "ruffled Teoxane's feathers." Furthermore, despite these illicit strategies, Revance was only hitting 70% to 75% of the expected RHA sales in the spring of 2024 and Teoxane was upset Revance was not "making [its] numbers." In addition, Revance was advertising Teoxane products in ways that strayed away from the global branding demanded by Teoxane and therefore went against Teoxane's Brand Guidelines. Teoxane was "livid with Revance" for its 2024 "black and white" campaign that flouted Teoxane's global branding efforts and was also unhappy with the Company because Revance had reduced its sales and marketing team to a skeletal crew incapable of abiding by the terms of the Teoxane Agreement, as reported by FE 2, FE 4, and FE 5.

166. That Revance agreed to completely one-sided terms in the Amended Teoxane Agreement that were expected to have a "material impact on Revance's future profitability and cash flow," and entered into the Amended Teoxane Agreement despite Crown's express disapproval thereof, further confirms that Revance was, in fact, in breach of the Teoxane Agreement and feared that Teoxane would validly terminate the agreement.

167. Despite knowing of the undisclosed breaches of the Teoxane Agreement and the very real risk that the underlying dispute would erupt and effect the Tender Offer, the Form 8-K and the Press Release announcing the merger misleadingly claimed that "***Crown will commence a tender offer to acquire all outstanding shares of Revance's common stock at $6.66 per share***," that the Tender Offer would "***commence no later than August 30, 2024***," and that the "***transaction is expected to close by year end***."

168. The statements in Paragraph 167 were materially false and misleading and omitted highly material facts when made. It was materially false to represent that "Crown will commence

a tender offer" at $6.66 per share on the quick timeline Defendants represented. At the time of these statements, Revance was in breach of the Teoxane Agreement because of the Company's improper sales and marketing practices that constituted FDA violations. Moreover, despite these illicit strategies, Revance was only hitting 70% to 75% of the expected RHA sales in the spring of 2024 and Teoxane was upset Revance was not "making [its] numbers." Furthermore, Defendants knew that Teoxane was "livid with Revance" and was ready to assert a breach of the Teoxane Agreement at any moment due to the dwindling of the marketing and sales personnel and the disastrous 2024 "black and white" campaign that strayed from Teoxane's global branding efforts. Thus, it was highly misleading to represent that the Tender Offer would commence in just two weeks and would "close by year end" when, in truth, Defendants knew of serious undisclosed risks that the Tender Offer would be delayed or renegotiated once Teoxane asserted the breach or Crown otherwise recognized Revance's prior misrepresentations that would materially devalue Revance.

169. On August 28, 2024, two days before shareholders expected the Tender Offer to commence, Revance filed a Form 8-K ("August 28 Form 8-K"), signed by Defendant Schilke, announcing that Crown's deadline to commence the Offer had been "extend[ed]" to September 13, 2024. The August 28 Form 8-K stated simply:

> Revance Therapeutics, Inc. (the "Company" or "Revance") and Crown Laboratories, Inc. ("Parent," and together with Reba Merger Sub, Inc., the "Buyer Parties") agreed to extend the date by which Reba Merger Sub, Inc. ("Merger Sub") is obligated to commence the tender offer for all of the outstanding shares of common stock of the Company … from August 30, 2024 to September 13, 2024 or such other date as may be agreed to between the Company and Parent.

170. The August 28 Form 8-K was materially false and misleading because it failed to disclose the highly material fact that Revance had been informed by Teoxane on August 16, 2024 that it was in material breach of the Teoxane Agreement. Thus, the Tender Offer was not merely

63

"extend[ed]" for benign reasons, rather the Tender Offer was actually imperiled because Teoxane submitted its Notice nearly two weeks prior, and Crown, Revance, and Teoxane had been negotiating a resolution since that time.  In fact, on the very day that the August 28, 2024 Form 8-K was filed, the parties were conducting tri-party meetings to resolve the dispute.  As Defendants admitted in the Information Statement, it was "in light of [these] ongoing communications with Teoxane… [that] Crown agreed to the extend the date by which" to commence the Tender Offer.  Furthermore, the statements in the August 28 Form 8-K were misleading because they claimed the Tender Offer would commence in just two-weeks, on "September 13, 2024," when Defendants knew that Revance was in serious breach of the Teoxane Agreement, including through its poor sales of RHA products that were only 70% to 75% of expected sales, marketing and sales practices that violated FDA regulations, marketing campaigns that drastically strayed from Teoxane's global branding efforts, and the dwindling of the marketing and sales personnel who were incapable of complying with the obligations of the contract.  Accordingly, Defendants understood that the resolution of the Teoxane dispute would take a considerable amount of time—well beyond two weeks—and would result in drastically different terms under the distribution agreement.  Defendants therefore also recognized, but did not disclose, the risk that the asserted breaches could derail the Tender Offer, or, at a minimum, the price at which Crown would move forward.  Remarkably, the August 28 Form 8-K did not even mention Teoxane's Notice and therefore robbed investors of the ability to assess whether the Tender Offer would go through on the purportedly quick timeline.

171.    On September 5, 2024, Revance filed a Schedule 14D-9 with the SEC that attached a memo sent by Defendant Foley to Revance employees.  In the memo, Defendant Foley provided "an update on important work" that was being done in connection with the upcoming

merger with Crown. Foley did not disclose Teoxane's Notice or the fact that Crown and Revance had been desperately negotiating with Teoxane to resolve the dispute but rather merely noted that Revance had established an "Integration Management Office" and an "***integration working team has been established***, which includes Revance and Crown leaders responsible for both planning and leading the successful integration of our two companies." The memo went on to claim that "***[s]everal meetings between Revance and Crown leaders have taken place and are continuing, to foster collaboration, teamwork and engagement across our teams***."

172. The statements in Paragraph 171 were materially false and misleading and omitted material information. While there were "several meetings between Revance and Crown leaders," Defendants' statements concealed that important tri-party meetings were actually being held with Teoxane in an attempt to resolve the undisclosed Notice Teoxane submitted nearly a month prior. Furthermore, it was misleading to explain that an "Integration Management Office" had been established without also disclosing the significant risk that the Tender Offer would be cancelled, significantly delayed, or completely renegotiated, due to the undisclosed breaches of the Teoxane Agreement, Teoxane's Notice, and Revance's ongoing attempts to resolve the Teoxane dispute.

C.     **False and Misleading Statements After Teoxane's Notice Was Disclosed**

173. On September 23, 2024, Revance filed a Form 8-K ("September 23 Form 8-K") with the SEC that was signed by Defendant Schilke. The September 23 Form 8-K revealed that Revance had received the Teoxane Notice back on August 16, 2024. However, it also stated that the "***Company denies the alleged material breaches asserted in the notice, does not believe that the asserted allegations constitute material breaches under the terms of the Distribution Agreement and intends to defend itself vigorously***."

174. The statements in Paragraph 173 were materially false and misleading and omitted material information when made. It was misleading for the Defendants to "deny" the "material

breaches" of the Teoxane Agreement and claim Revance "intends to defend itself vigorously" when the opposite was true: Defendants knew Revance was in breach of the Teoxane Agreement and was willing to accept extraordinarily harmful one-sided terms to appease Teoxane. Indeed, Revance's commercial team had violated FDA regulations and participated in improper marketing and sales activities that were not only "100% illegal" as they violated FDA regulations but also drove down the effective price of Teoxane products and "ruffled Teoxane's feathers." Moreover, despite these illicit strategies, Revance was only hitting 70% to 75% of the expected RHA sales in the spring of 2024 and therefore did not live up to its end of the agreement with Teoxane. Furthermore, Revance breached the Teoxane Agreement by moving forward with its 2024 "black and white" campaign that flouted Teoxane's global branding efforts, causing Teoxane to be "livid with Revance." In addition, Revance reduced its sales and marketing team to a skeletal crew incapable of abiding by the terms of the Teoxane Agreement, as reported by FE 2, FE 4, and FE 5, constituting a breach.

175. Furthermore, rather than "defend itself vigorously," Revance entered into the Amended Teoxane Agreement despite Defendants' recognition that it would have a "material impact on Revance's future profitability and cash flow." That Revance agreed to the completely one-sided terms in the Amended Teoxane Agreement and entered into the amendment despite Crown's express disapproval thereof, further confirms that Revance was, in fact, in breach of the Teoxane Agreement and feared that Teoxane would validly terminate the agreement.

176. The September 23 Form 8-K further proclaimed that "in light of" the discussions between Revance and Teoxane, Crown and Revance "agreed to extend the date by which [Crown] is obligated to commence the tender offer…to October 4, 2024." While making no disclosures of Crown's active involvement in Revance's ongoing negotiations with Teoxane, the September 23

Form 8-K explained that the "ongoing discussions with Teoxane…could result in delays in the consummation of the offer or in the Company or [Crown] seeking remedies in accordance with the terms of the Merger Agreement."

177.    The statements in Paragraph 176 were false and misleading and omitted material facts when made.  The statements downplayed Crown's active involvement in the negotiations with Teoxane.  Indeed, Crown and Revance did not merely "agree to extend" the commencement of the Tender Offer, but Crown was actively involved in the negotiations of the Teoxane dispute, including through tri-party meetings in Switzerland.  Crown's involvement was material because it indicated that the Tender Offer would be significantly impacted by the ongoing Teoxane discussions.  Moreover, it was misleading to claim that the Tender Offer would move forward on the purported new timeline, when Defendants knew that Revance was in serious breach of the Teoxane Agreement and that resolution of the Teoxane dispute would take a considerable amount of time and would lead to drastically different terms under the distribution agreement.  Defendants therefore appreciated, but did not disclose, the substantial risk that the asserted breach and the resolution thereof could derail the Tender Offer entirely, or, at a minimum, the price at which Crown would move forward.

178.    On October 4, 2024, Revance filed a Form 8-K ("October 4 Form 8-K") with the SEC and signed by Defendant Schilke that once again announced that Crown and Revance "agreed" to "further extend the date by which [Crown] is obligated to commence the tender offer…to October 18, 2024."  The October 4 Form 8-K repeated Defendants' statements regarding the Teoxane Noice that "*[t]he Company denies the alleged material breaches asserted in the notice, does not believe that the asserted allegations constitute material breaches under the terms of the Distribution Agreement and intends to defend itself vigorously*."

179. The statements denying the alleged breaches of the Teoxane Agreement are false and misleading for the same reasons set forth in Paragraphs 174 and 175. The statements about the delay of the Tender Offer were false and misleading and omitted material information for the same reasons set forth in Paragraph 177.

180. On October 18, 2024, Revance filed a Form 8-K, signed by Defendant Schilke, with the SEC that repeated that "The Company denies the alleged material breaches asserted in the notice, does not believe that the asserted allegations constitute material breaches under the terms of the Distribution Agreement and intends to defend itself vigorously." These statements were materially misleading for the reasons set forth in Paragraphs 174 and 175.

181. The October 18, 2024 Form 8-K also stated that Crown and Revance "agreed" to "further extend the date by which [Crown] is obligated to commence the tender offer…to October 25, 2024" and explained that the ongoing discussion between Revance and Teoxane "***could*** result in further delays to the to the commencement or consummation of the Offer, or in the Company or [Crown] seeking remedies in accordance with, and modifications to, the terms of the Merger Agreement."

182. The statements in Paragraph 181 were false and misleading and omitted material information when made. Indeed, it was misleading to state that Crown and Revance merely "agree[d]" to "further extend" the Tender Offer and that the ongoing Teoxane negotiations "could" lead to a "further delays," without disclosing the material information that the prior day—October 17, 2024—Crown unequivocally told Revance that "Crown's ability to move forward with the Merger was dependent on successful resolution of the outstanding claims by Teoxane as well as Crown's approval of any material amendments to the Distribution Agreement." Defendants' statements also failed to disclose that they had already concluded that Revance was not going to

68

"vigorously" defend itself, as Revance was in material breach of the Teoxane Agreement and that therefore Revance's only way out of the predicament was through "material amendments" to the Teoxane Agreement that would in turn affect Revance's value and ultimately the Tender Offer. Thus, the Teoxane dispute was certain to cause delays and, at minimum, price modifications to the Tender Offer, yet Defendants stated that such outcomes were mere possibilities that "could" occur.

### D. False and Misleading Statements After the Teoxane Dispute Was Resolved

183. On October 28, 2024, Revance filed a Form 8-K with SEC ("October 28 Form 8-K"), signed by Defendant Schilke. The October 28 Form 8-K disclosed that Revance and Teoxane settled and had entered a Settlement and Release Agreement, the Amended Teoxane Agreement, and the ANZ Agreement, thereby resolving the Teoxane dispute. Notably, the October 28 Form 8-K described that under the Amended Teoxane Agreement, Revance and Teoxane "***agreed on minimum purchase commitments through 2029***" but did not disclose what those purchase requirements were. Although the October 28 Form 8-K attached a copy of the Amended Teoxane Agreement as an exhibit, Defendants redacted the amounts of the minimum purchase requirements, leaving them inaccessible to investors.

184. Furthermore, the October 28 Form 8-K proclaimed that the "[d]ue to the ongoing discussions between the Company and Crown in light of the Company's entry into the Teoxane Agreements," Revance and Crown "***agreed…to further extend the date*** by which [Crown] is obligated to commence the tender offer…to ***November 1, 2024***," *i.e.* just four days after the filing. The October 28 Form 8-K further explained that the "ongoing discussions…***could*** result in further delays to the commencement or consummation of the Offer, or in the Company or [Crown] seeking remedies in accordance with, and modifications to, the terms of the Merger Agreement, including offer price."

69

185.     The statements in Paragraphs 183 and 184 were materially false and misleading and omitted material facts when made.  It was misleading for Defendants to claim that Revance voluntarily "agreed on minimum purchase commitments" in the Amended Teoxane Agreement, when in reality, due to their prior breach of the Teoxane Agreement, Defendants were forced to accept oppressive purchase commitments which Defendants expected would have a "material impact on Revance's future profitability and cash flow" and imperil Revance's future as a "going concern."  By portraying the purchase commitments as voluntarily agreed to by Revance while simultaneously redacting the figures from investors, Defendants' statements failed to disclose that these commitments were devastating to Revance and instead misleadingly indicated that the Amended Teoxane Agreement was not harmful.  Moreover, the statements failed to disclose Crown's express position that the minimum purchase commitments "increased the minimum payments due to Teoxane, beyond projected sales levels for the Teoxane products."  Without this critical information, investors were left with the mistaken belief that Crown accepted the terms of the Amended Teoxane Agreement and was willing to proceed with the prior Tender Offer, when the opposite was true.

186.     It was also misleading to suggest that Crown merely agreed to "further extend" the Tender Offer or that the offer would commence in just four days' time while concealing the fact that Crown had already repudiated the Tender Offer price.  Indeed, by this time, Crown already told Revance that the Tender Offer was "dependent on…Crown's approval of any material amendments to the [Teoxane] Agreement" and Crown had explicitly "withheld such approval" with respect to the Amended Teoxane Agreement.  Thus, Defendants knew that the Tender Offer would not commence at the $6.66 offer price, if at all.  It was therefore misleading for Defendants to downplay the serious risks facing the Tender Offer and state that the merger price "could"

70

change. By hiding the fact that Crown had repudiated the earlier Tender Offer while simultaneously claiming the Tender Offer would commence in just four days, Defendants left investors with a wholly inaccurate picture of the hurdles facing the Tender Offer.

187. On November 1, 2024, Revance filed a Form 8-K with the SEC ("November 1 Form 8-K"), signed by Defendant Schilke. As before, the November 1, 2024 Form 8-K stated that Revance and Crown "agreed…to further extend" the commencement of the Tender Offer," and explained that the "ongoing discussions" between Crown and Revance "*could* result in further delays to the commencement or consummation of the Offer, or in the Company or [Crown] seeking remedies in accordance with, and modifications to, the terms of the Merger Agreement, including offer price."

188. The statements in Paragraph 187 were false and misleading and omitted material information when made. By this time, Crown had told Revance that the Tender Offer was fully "dependent on…Crown's approval of any material amendments to the [Teoxane] Agreement" and had explicitly "withheld such approval." Moreover, on October 30, 2024—just two days earlier—Crown unambiguously told Defendants that "Crown was unwilling to commence the Offer set forth in the Original Merger Agreement" and provided a revised offer that reflected the "impact of Revance entering into the [Amended Teoxane Agreement] and ANZ Distribution Agreement." Given Crown's statements, Defendants knew that the Tender Offer would not commence at the $6.66 offer price, if at all. Therefore, it was misleading for Defendants to downplay the serious risks facing the Tender Offer and state that the merger price "could" change when, at that point, a lower merger price was the only possibility that the Tender Offer would move forward.

189. On November 7, 2024, Revance filed a Form 8-K ("November 7 Form 8-K") with the SEC, signed by Defendant Schilke, and a quarterly report filed on Form 10-Q ("November 7

71

Form 10-Q"), signed by Defendants Schilke and Foley. The November 7 Form 8-K included a press release announcing Revance's results for the third quarter of 2024. In the press release, Defendants updated investors on the pending Crown Tender Offer by misleadingly stating that the Tender Offer was "Delay[ed]" but that it "will commence" at the stated "price of $6.66 per share":

> **Crown Laboratories and Revance Announce Entry Into Merger Agreement and Delay of Tender Offer Commencement.** During the quarter, Revance and Crown Laboratories, Inc ("Crown") announced that they had entered into a merger agreement pursuant to which the companies would seek to merge the two complementary organizations. Under the terms of the agreement, which was unanimously approved by Revance's Board of Directors, ***Crown will commence a tender offer to purchase all of Revance's outstanding shares of common stock, at a price of $6.66 per share, in cash***. As a result of discussions between the Company and Teoxane SA ("Teoxane") regarding an alleged breach of the Exclusive Distribution Agreement for the distribution of the RHA® Collection of dermal fillers in the U.S. (the "U.S. Distribution Agreement"), the parties extended the date by which the tender offer must be commenced. Revance and Crown ***agreed to extend the tender offer commencement date to November 12, 2024*** or another date mutually agreed to between the parties.

190.    The November 7 Form 10-Q similarly described the "Pending Merger" as in force and requiring Crown "to purchase all of our outstanding shares of common stock … ***at a price of $6.66 per Share, in cash***." The November 7 Form 10-Q also repeated the statement that Crown and Revance "agreed to extend the Offer commencement date to November 12, 2024." Although the Form 10-Q revealed Crown's dissatisfaction with the Teoxane Agreements, it merely warned that Crown "***may*** assert claims related to the Merger Agreement or take other action in connection with the Company's entry into the Teoxane Agreements, including by seeking to unilaterally terminate the Merger Agreement or to otherwise reach a settlement."

191.    The statements in Paragraphs 189 and 190 were materially false and misleading and omitted material facts when made. Contrary to Defendants' assertions, Crown was clear that it would not commence a tender offer "at a price of $6.66 per share." In fact, on October 30, 2024, just the week before the November 7 Form 8-K, Crown unambiguously told Defendants that

"Crown was unwilling to commence the Offer" at that price and instead provided a new term-sheet that accounted for the "impact of Revance entering into" the Amended Teoxane Agreement. Thus, it was misleading to assert that Crown "may" take action in light of the Amended Teoxane Agreement when that was exactly what Crown had already done. Moreover, it was misleading to suggest that the parties merely "agreed to extend the tender offer commencement date" when, in reality, Crown had repudiated the prior Tender Offer and had already provided a new term sheet.

192. In six separate Forms 8-K signed by Defendant Schilke and filed with the SEC on November 12, November 19, November 26, November 29, December 3, and December 5, 2024, Revance made the exact same claim that Revance and Crown had "agreed…to further extend" the commencement of the Tender Offer and that the "ongoing discussions…*could* result in further delays to the commencement or consummation of the Offer, or in the Company or [Crown] seeking remedies in accordance with, and modifications to, the terms of the Merger Agreement, including offer price."

193. The statements in the six Forms 8-K noted in Paragraph 192 were false and misleading and omitted material information when made. Rather than a mere possibility of a change in the Tender Offer price, Crown had already repudiated the prior $6.66 price per share and submitted a new term sheet that accounted for the "impact of Revance entering into" the Amended Teoxane Agreement. In fact, by November 18, 2024, Revance made a counteroffer to Crown for a payment of just $3.25 per share—acknowledging privately that the change in price was inevitable and not something that just "could" happen. Each of these filings were misleading for the additional reason that they failed to disclose a major delay in the Tender Offer and a key negotiating point was Revance's insistence that Crown provide a complete waiver of any and all claims Crown had against Revance stemming from the original Merger Agreement, including "fraud." Indeed,

Defendants admitted that throughout these negotiations Revance demanded that "anything less than a full waiver of claims" by Crown against Revance or its directors and officers "would not be acceptable to the Revance Board."

## VII.    ADDITIONAL ALLEGATIONS OF SCIENTER

194.    As alleged herein, numerous facts give rise to a strong inference that Defendants knew, or recklessly disregarded, that the public statements and omissions about Revance's sales of RHA products, its compliance with the Teoxane Agreement, the resolution of the Teoxane dispute, and the viability of the Tender Offer were materially false and misleading when made.

195.    *First¸* the Teoxane Agreement and sales of RHA were critical to Revance's revenue and viability.  Indeed, RHA kept Revance afloat while the Daxxify sales faltered and was critical to the Company's ability to generate revenue.  Heading into 2024, Defendants relied on RHA sales to contribute the majority of Revance's total revenues of "at least $280 million," making Teoxane products Revance's largest revenue driver.  Accordingly, Revance's senior management carefully monitored the Company's compliance with the Teoxane Agreement and the sales of the RHA products, as would be expected of people in their positions.  Furthermore, as the leaders of Revance, Defendants would have known about Teoxane's Notice, the negotiations surrounding the Amended Teoxane Agreement, and Crown's rejection thereof, as these all affected Revance's largest revenue source and the Company's viability.

196.    *Second*, the circumstances surrounding Defendants' entry into the Amended Teoxane Agreement—including Crown's rejection thereof—is highly indicative of scienter. Defendants themselves admitted that the new obligations under the Amended Teoxane Agreement were expected to have a "material impact on Revance's future profitability and cash flow" and that, specifically, the "annual minimum purchases…which amounts have increased following our entry in to the" Amended Teoxane Agreement caused "substantial doubt" as to Revance's ability

to continue as a "going concern." Furthermore, Crown summarily rejected the Amended Teoxane Agreement because it "increased the minimum payments due Teoxane, beyond projected sales level for the Teoxane products." That Defendants nevertheless entered into the Amended Teoxane Agreement and knowingly put the Company at immediate risk of collapse supports scienter. Making matters worse, despite these realizations, Defendants did not disclose the terms of the Amended Teoxane Agreement or Crown's rejection thereof for weeks and instead claimed that the Tender Offer would commence shortly.

197. *Third*, scienter for the underlying fraud is evidenced by Defendants' insistence on a broad waiver of fraud claims relating to Revance's representations about the Teoxane Agreement in the revised Merger Agreement. Indeed, Defendants rejected a "limited release of claims" during negotiations with Crown and adamantly demanded that "anything less than a full waiver of claims would not be acceptable." Thus, Defendants knew they had made misrepresentations in the underlying Merger Agreement,the very same agreement they urged investors to review "carefully" and "in its entirety," and refused to enter into a new deal until they secured a release for themselves—even if that meant less consideration for shareholders.

198. *Fourth*, Defendants undeniably knew Crown had repudiated the $6.66 Tender Offer price yet failed to make that fact known to investors. On October 17, Crown made clear to Defendants that the Tender Offer was "dependent" on Crown's approval of any changes to the Teoxane Agreement; then, on October 24, Crown "withheld such approval." Furthermore, on October 30, Crown unambiguously stated it was "unwilling to commence" the Tender Offer at the prior price and submitted a revised offer for just $2.25 in upfront consideration. By November 18, Defendants were already counteroffering at merely $3.25. Despite the fact that the Tender Offer's public price was a non-starter, Defendants misleadingly told investors that "Crown will commence

a tender offer…at a price of $6.66 per share, in cash" and only warned that Crown merely "could" seek a price modification.

199.    *Fifth*, Teoxane and Revance held monthly meetings to review the marketing, sales, and inventory levels of RHA products.   During these meetings, Teoxane expressed extreme frustration with Revance's skeletal marketing and sales teams and was unhappy that Revance was no longer investing in selling RHA products.   Furthermore, because of these meetings, Revance had to disclose to Teoxane that every single employee who made the prior sales of RHA successful were no longer with the Company, that the marketing team had been slashed to just a handful of people, and that the team of 150 salespeople had dwindled down to just 50.   Indeed, Revance's "complete turnaround and upheaval of the entire marketing department" by early 2024 made Teoxane "very frustrated" because it was obvious that Revance would "not make their numbers" for the year.   By spring 2024, FE 3 heard from both the regional sales director and the Vice President of Strategic Partnerships that Teoxane's CEO was particularly upset that Revance was not "making [its] numbers" for RHA.

200.    *Sixth,* the FE allegations show that the improper marketing efforts which breached the Teoxane Agreement were approved and implemented by the highest levels of Revance management.   Indeed, it was CCO Jordan who implemented very reckless marketing strategies that involved giving out free goods, according to FE 1.   In fact, the FEs explained that they raised the improper activities to Revance's HR and legal departments and that the imperative to provide an abundance of free samples as a promotion were approved from the top.   Moreover, Defendants undoubtedly knew that Teoxane was "livid with Revance" due to the unauthorized "black and white" campaign because it was the C-suite who was asking whether the situation could be salvaged after Teoxane threatened to pull out of the Teoxane Agreement.

201.    *Seventh*, Defendants were motivated to hide the underlying breaches of the Teoxane Agreement so as to secure the Tender Offer price of $6.66 per share.  That price reflected an almost 90% premium over Revance's trading value and the Tender Offer was timed to launch just two weeks after its announcement, making a swift transaction critical.  By rushing the sale, Defendants aimed to shift the risk and consequences of the undisclosed breaches onto Crown, insulating themselves from liability.  But once Teoxane asserted the breach and Crown uncovered the truth, the Company's value was slashed by half.

202.    *Eighth*, Defendants had access to internal reports showing that Revance was not selling sufficient RHA products.  Revance used PowerBI to track its sales across the Country, which was updated in real time.  All employees above the title of "manager"—including the Individual Defendants—could access PowerBI.  In the spring of 2024, Revance's regions were tracking well below its expected RHA sales, with the highest producing regions merely reaching 75% of its expected sales.

203.    *Ninth*, scienter for statements between August 16, 2024 and September 23, 2024, including the "update" regarding the integration efforts and the unexplained "extension" of the Tender Offer, is readily apparent because Defendants had already received the Teoxane Notice by that point yet kept it entirely secret from the market.

**VIII.    LOSS CAUSATION**

204.    As detailed herein, during the Class Period Defendants deceived the market for Revance stock by:  (i) falsely describing its business prospects, including its revenue and market share for RHA; (ii) falsely describing its compliance with its agreement with its strategic partner, Teoxane; (iii) falsely describing its resolution of its dispute with Teoxane; and (iv) omitting that the resolution of the Teoxane dispute undermined the Tender Offer and even caused Revance to question its ability to continue as a going concern.

205.    Defendants' deceptive course of conduct artificially inflated the price of Revance stock during the Class Period, increasing the price at which Lead Plaintiffs and the Class purchased Revance securities.  Defendants' false and misleading statements regarding Revance caused the stock to trade at artificially inflated prices throughout the Class Period.  When Defendants' prior misrepresentations and fraudulent conduct were partially disclosed during the Class Period and became apparent to the market, the price of Revance securitie declined significantly as the prior artificial inflation incrementally came out of the price of the stock.

206.    *First*, in the five trading days following the expiration of the September 13, 2024 deadline to commence the Tender Offer, the market price of Revance common stock declined 11%, from $6.55 to $5.81 per share.  The Tender Offer's failure to commence and Defendants' silence as to whether there was an agreed upon delay signified to the market that something was amiss with the Tender Offer.

207.    *Second*, on September 23, 2024, Revance's stock price declined 8%, from $5.81 to $5.37 per share after Defendants disclosed that Teoxane had issued its Notice on August 14, 2024, that the prior postponement of the Tender Offer was caused by the Notice and the continuing discussions with Teoxane to resolve the matter and that the Tender Offer was further delayed.  This disclosure partially revealed the truth, including that the Crown Tender Offer was at risk and that Revance's prior statements touting its RHA sales and its compliance with the Teoxane Agreement were inaccurate.  Defendants, however, continued to conceal the full truth including by denying that there was a breach of the Teoxane Agreement and by hiding Crown's direct involvement in the negotiations with Teoxane.

208.    *Third*, on October 25, 2024, the Tender Offer again failed to commence despite its new deadline, causing Revance's stock price to decline 11% to close at $4.70 that day, down from

$5.30 the day prior. Even though Defendants had already entered into the Amended Teoxane Agreement at that point, they failed to make that information public. Defendants' failure to explain the cause of the further delay in the Crown Tender Offer informed the market that the Teoxane dispute was more significant than what was previously disclosed.

209. *Fourth,* on November 8, 2024, Revance's stock price declined 36%, from $5.78 to $3.70 per share, after Defendants disclosed that Crown "expressed dissatisfaction with [Revance's] entry into the Teoxane Agreements and the terms of such agreements" and disclosed the significant amounts of the "minimum purchase commitments" under the Amended Teoxane Agreement. Furthermore, Revance revealed that due in part to the "specified annual minimum purchases of the RHA Collection of dermal fillers, ***which amounts have increased following our entry in to the*** [Amended Teoxane Agreement]" the Company had "substantial doubt about [its] ability to continue as a going concern." Through these disclosures, investors learned that Revance's statements that it complied with the Teoxane Agreement and that there was no material breach thereof were materially false, as it necessitated entry into the harsh Amended Teoxane Agreement. Furthermore, investors learned that the prior extensions of the Tender Offer were not for benign reasons but rather were due to Crown's disapproval of the Amended Teoxane Agreement. Despite these disclosures, Defendants continued to withhold the full truth by continuing to tout the Tender Offer and by concealing Crown's repudiation of the $6.66 per share offer.

210. *Finally*, on December 9, 2024, the first trading day after Defendants announced the new Tender Offer price, Revance's stock price declined from $3.88 to $3.04 per share, a decline of approximately 21%. Defendants admitted that the lower merger consideration was specifically due to "Revance receiving notice from Teoxane alleging breach" leading to the Amended Teoxane

Agreement "which revisions are expected to have a material impact on Revance's future profitability and cash flows."

211. As a result of their transactions in Revance securities during the Class Period, Lead Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws. The declines in the price of Revance stock after the corrective disclosures alleged herein were a direct result of the nature and extent of Defendants' fraudulent misrepresentations about Revance being revealed to investors and the market. The timing and magnitude of the price declines in Revance stock negate any inference that the losses suffered by Lead Plaintiffs and the other Class members were caused by changed market conditions, macroeconomic or industry factors, or company-specific facts unrelated to Defendants' fraudulent conduct.

## IX. INAPPLICABILITY OF STATUTORY SAFE HARBOR

212. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements alleged in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain statements alleged to be false may be characterized as forward-looking, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Further, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by a director or officer of the Company who knew that the statement was false when made.

## X. CLASS ACTION ALLEGATIONS

213. Lead Plaintiffs bring this action on their own behalf and as a class action, pursuant to Rule 23(a) and b(3) of the Federal Rules of Civil Procedure, on behalf of all purchases of Revance securities during the period of February 29, 2024 through December 6, 2024, inclusive (the Class). Excluded from the Class are Defendants, Crown, Teoxane, the officers and directors of Revance, Crown, or Teoxane at all relevant times, members of their immediate families, and their legal representatives, heirs, successors or assigns, and any person, firm, trust, corporation, or other entity related to, or affiliated with, any of the Defendants, Crown, or Teoxane.

214. This action is properly maintainable as a class action.

215. The Class is so numerous that joinder of all members is impracticable. According to the August 12, 2024 Form TO, there were 104,180,524 shares of Revance common stock issued and outstanding as of August 8, 2024. Upon information and belief, there are hundreds or thousands of members of the Class.

216. There are questions of law and fact that are common to the Class, including, among others:

(a) Whether Defendants violated Section 10(b) of the Exchange Act and/or Rule 10b-5 promulgated thereunder;

(b) Whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(c) Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

(d) Whether Defendants' conduct caused the members of the Class to sustain damages; and

(e) The extent of damage sustained by Class members and the appropriate measure of damages.

81

217. Lead Plaintiffs' claims are typical of those of the Class because Lead Plaintiffs and the Class have been damaged by Defendants' wrongful conduct.

218. Lead Plaintiffs will adequately protect the interests of the Class and have retained counsel experienced in class action securities litigation. Lead Plaintiffs have no interests that conflict with those of the Class. All members of the Class have suffered the same harm.

219. The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications for individual members of the Class and of establishing incompatible standards of conduct for the parties opposing the Class. Conflicting adjudications for individual members of the Class might be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests. Therefore, a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

220. The questions of law and fact common to the members of the Class predominate over any questions affecting only its individual members, such that a class action is superior to any other available method for fairly and efficiently adjudicating the controversy.

XI.     **PRESUMPTION OF RELIANCE**

221. Lead Plaintiffs and the Class are entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated in part upon material omissions of fact that Defendants had a duty to disclose. Because this action involves Defendants' failure to disclose information regarding the existence, nature, extent and implications for the Tender Offer of Revance's contractual dispute with Teoxane, among other things, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material such that a reasonable investor might have considered them important in making investment decisions. Given

the importance of Defendants' material misstatements and omissions of material facts set forth above, that requirement is satisfied here.

222. In the alternative, Lead Plaintiffs and the Class are entitled to a presumption of reliance on Defendants' material misrepresentations and omissions of material facts pursuant to the fraud-on-the market doctrine because, at all relevant times, the market for Revance common stock was open, efficient, and well developed for the following reasons, among others:

(a) Revance was listed and actively traded on the NASDAQ, a highly efficient market;

(b) As a regulated issuer, Revance filed periodic public reports with the SEC and/or the NASDAQ;

(c) The price of Revance common stock reacted to announcements about the Company, including announcements about the Tender Offer during the Class Period;

(d) Revance regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(e) Revance was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

223. As a result of the foregoing, the market for Revance securities promptly digested current information regarding Revance from publicly available sources and reflected such information in the price of Revance securities. Under these circumstances, all purchasers of Revance securities during the Class Period suffered similar injury through their purchases of Revance securities at artificially inflated prices, and a presumption of reliance applies.

## COUNT I
### Against All Defendants for Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder

224.    Lead Plaintiffs repeat and re-allege all allegations contained above as if fully set forth herein.

225.    During the Class Period, Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiffs and other Class members, as alleged herein; and (ii) cause Lead Plaintiffs and other members of the Class to purchase Revance securities at artificially inflated prices.

226.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material facts and/or omitted material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the sellers of the Company's securities in an effort to maintain artificially high market prices for Revance common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

227.    Defendants, individually and in concert, directly, and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal material information concerning the existence, nature, extent, and implications for the Tender Offer of Revance's contractual dispute with Teoxane, among other things.

228.    During the Class Period, Defendants made the false statements specified above, which they knew or recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

84

229.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to misrepresent Revance's existence, nature, extent, and implications for the Tender Offer of Revance's contractual dispute with Teoxane, among other things.

230.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases of the Company's securities during the Class Period.

231.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II
### Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act

232.    Lead Plaintiffs repeat and re-allege all allegations contained above as if fully set forth herein.

233.    This Count is asserted on behalf of all members of the Class against the Individual Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a).

234.    Defendants Foley and Schilke were and acted as controlling persons of Revance within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions with the Company, participation in and/or awareness of the Company's operations, and/or intimate knowledge of the Company's actual performance and negotiations regarding the Teoxane dispute and the Crown Tender Offer, Defendants Foley and Schilke had the power to influence and control, and did actually influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Lead Plaintiffs contend are materially false or misleading.  Defendants Foley and Schilke were

85
Case 3:25-cv-00018    Document 48    Filed 06/18/25    Page 89 of 93 PageID #: 720

provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Lead Plaintiffs to be materially false or misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

235.    As senior corporate officers and/or directors of the Company, and as more fully described above, Defendants Foley and Schilke had direct involvement in the day-to-day operations of the Company. Defendants Foley and Schilke signed the Company's SEC filings and contracts during the Class Period and were directly involved in providing false information and certifying and approving the false statements disseminated by Revance during the Class Period. As a result of the foregoing, Defendants Foley and Schilke, as a group and individually, were controlling persons of Revance within the meaning of Section 20(a) of the Exchange Act.

236.    As set forth above, Revance violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by its acts and omissions as alleged in this Complaint.

237.    By virtue of their controlling positions of Revance and as a result of their own aforementioned conduct, Defendants Foley and Schilke are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as Revance is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Lead Plaintiffs and the other members of the Class who purchased or otherwise acquired Revance securities. Moreover, as detailed above, each of the Individual Defendants culpably participated in the material misstatements and omissions alleged herein.

238.    As a direct and proximate result of the Individual Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Revance securities during the Class Period.

## XII.      PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for judgment and relief:

A.     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.     Determining that Revance violated Section 10(b) of the Exchange Act, as well as Rule 10b-5 promulgated thereunder;

C.     Awarding damages in favor of Lead Plaintiffs and the Class against all Defendants, jointly and severally, for all damages sustained due to Defendants' wrongdoing, in an amount to be proven at trial, including prejudgment interest thereon;

D.     Directing Defendants to account to Lead Plaintiffs and the Class for all damages suffered as a result of their wrongdoing;

E.     Awarding Lead Plaintiffs pre- and post-judgment interest and the costs of this action, including reasonable allowance for Lead Plaintiffs' attorneys' and experts' fees; and

F.     Granting such other and further relief as this Court may deem just and proper.

## XIII.     JURY DEMAND

239.    Lead Plaintiffs respectfully demand a trial by jury on all issues so triable.

Dated: June 18, 2025                         Respectfully submitted,

**STRANCH, JENNINGS & GARVEY PLLC**

By: */s/ J. Gerard Stranch, IV*
J. Gerard Stranch, IV (BPR 23045)
The Freedom Center
223 Rosa L. Parks Avenue
Suite 200
Nashville, TN 37203
Tel.: (615) 254-8801
gstranch@stranchlaw.com

*Liaison Counsel for Lead Plaintiffs and the Putative Class*

**ENTWISTLE & CAPPUCCI LLP**
Vincent R. Cappucci (*pro hac vice*)
Robert N. Cappucci (*pro hac vice*)
Brendan J. Brodeur (*pro hac vice*)
230 Park Avenue, 3rd Floor

87

New York, NY 10169
Tel.: (212) 894-7200
Fax: (212) 894-7272
vcappucci@entwistle-law.com
rcappucci@entwistle-law.com
bbrodeur@entwistle-law.com

-and-

**ENTWISTLE & CAPPUCCI LLP**
Andrew J. Entwistle (*pro hac vice*)
Callie Crispin (*pro hac vice*)
500 West 2nd Street, Suite 1900
Austin, TX 78701
Tel.: (512) 710-5960
Fax: (212) 894-7278
aentwistle@entwistle-law.com
ccrispin@entwistle-law.com

**SAXENA WHITE P.A.**
Steven B. Singer (*pro hac vice* forthcoming)
David J. Schwartz (*pro hac vice* forthcoming)
10 Bank Street, Suite 882
White Plains, NY 10606
Tel.: (914) 437-8551
Fax: (888) 631-3611
ssinger@saxenawhite.com
dschwartz@saxenawhite.com

Lester R. Hooker (*pro hac vice* forthcoming)
Jonathan D. Lamet (*pro hac vice* forthcoming)
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Tel.: (561) 374-3399
Fax: (561) 394-3382
lhooker@saxenawhite.com
jlamet@saxenawhite.com

*Counsel for Lead Plaintiffs and the Putative Class*

88

## CERTIFICATE OF SERVICE

I hereby certify that on May 22, 2025, I electronically filed a copy of the foregoing Consolidated Complaint with the Clerk of the District Court using the CM/ECF system, which will send notification of such filing to all parties registered with the Court's electronic filing system.

/s/ J. Gerard Stranch, IV

J. Gerard Stranch, IV