# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

|  |  |
|---|---|
| IN RE REVANCE THERAPEUTICS, INC. SECURITIES LITIGATION | C.A. No. 3:25-cv-0018-EJR<br><br>District Judge Eli J. Richardson<br>Mag. Judge Jeffery S. Frensley<br><br>Leave to File Additional Pages Granted on August 22, 2025 (Doc. No. 50) |

## PLAINTIFFS' MEMORANDUM OF LAW
## IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Lead Plaintiffs The Arbitrage Fund, AltShares Merger Arbitrage ETF, AltShares Event-Driven ETF, and iMGP Alternative Strategies Fund and Chicago Capital Management, LP (collectively, "Plaintiffs") hereby oppose Defendants' Motion to Dismiss (ECF No. 51). Filed concurrently with this Memorandum of Law is a Declaration of J. Gerard Stranch, IV in Opposition to Defendants' Motion to Dismiss ("Stranch Decl.").

# TABLE OF CONTENTS

PRELIMINARY STATEMENT............................................................................................ 1

STATEMENT OF FACTS .............................................................................................. 6

    A.    By the Start of the Class Period, Revance Had Become Heavily Dependent on the Teoxane Agreement, Which Accounted for 60% of its Revenue................ 7

    B.    Defendants Falsely Tout RHA Sales and Revance's Compliance with the Teoxane Agreement While Negotiating the Sale to Crown ................................... 8

    C.    Revance Announces the Tender Offer Agreement and Claims it Is in Compliance with its Material Contracts. .............................................................. 10

    D.    As the Scheme Unravels, Defendants Continue to Mislead Investors...................11

    E.    The Truth is Revealed and Revance Stock Price Craters...................................... 13

LEGAL STANDARDS.................................................................................................... 14

ARGUMENT .................................................................................................................. 16

I.    PLAINTIFFS ADEQUATELY PLEAD ACTIONABLE MISSTATEMENTS................ 16

    A.    Defendants' Statements Touting Revance's Success Promoting and Selling RHA Fillers Under the Teoxane Agreement Leading Up to the Tender Offer Were Materially False ........................................................................................ 16

        1.    Defendants' Statements Were Affirmatively False ................................... 16

        2.    Defendants' Statements Are Actionable Half-Truths............................... 18

        3.    Defendants' Statements Did Not Concern "Soft" Information—and Even if They Did, the Statements Are Still Actionable............................ 20

        4.    Defendants' Statements Were Not Mere Puffery ..................................... 21

    B.    Revance's Statements Announcing the Tender Offer and Denying That Revance Was in Breach of the Teoxane Agreement Were Materially False ......... 22

    C.    Revance's Statements on August 28 and September 5, 2024 Were Actionable Half-Truths Because They Omitted the Notice of Breach ................. 23

    D.    Defendants' Statements Concealing the Disastrous Terms of the Amended Teoxane Agreement and Crown's Resulting Repudiation of the Tender Offer Are Materially False and Misleading.................................................................. 25

II.    PLAINTIFFS PLEAD A STRONG INFERENCE OF SCIENTER............................... 27

i

A. The Divergence Between Defendants' Statements and Their Internal Knowledge, And Defendants' Disregard of the Most Current Factual Information Before Making Statements, Support Scienter...................................29

B. The Closeness in Time Between Defendants' Misstatements and Their Later Disclosure of Inconsistent Information Strongly Supports Scienter ....................33

C. Defendants' Self-Interested Motivation Supports Scienter...................................34

D. Existence of Ancillary Disputes Charging Fraud and the Company's Quick Settlement of Those Disputes Support Scienter.....................................................35

E. Evidence of Bribery by a Top Company Official, and Disclosure of Accounting Information Such That Its Negative Implications Could Only Be Understood by Highly Sophisticated Individuals, Support Scienter...............36

F. Defendants' Proposed Inference is Not More Compelling Than the Inference of Scienter .......................................................................................36

III. PLAINTIFFS ADEQUATELY PLEAD SCHEME LIABILITY.....................................36

IV. PLAINTIFFS ADEQUATELY PLEAD LOSS CAUSATION .........................................37

CONCLUSION..................................................................................................................40

ii

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Bond v. Clover Health Invs., Corp.*,
  587 F. Supp. 3d 641 (M.D. Tenn. 2022) ..................................................... passim

*Bucks Cnty. Emps. Ret. Sys. v. Norfolk Southern Corp.*,
  775 F. Sup. 3d 1275 (N.D. Ga. 2025) ............................................................ 30

*Chamberlain v. Reddy Ice Holdings, Inc.*,
  757 F. Supp. 2d 683 (E.D. Mich. 2010) .................................................... 17, 18

*City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*,
  399 F.3d 651 (6th Cir. 2005) ................................................................... 29, 32

*City of Taylor Gen. Emps. Ret. Sys. v. Astec Indus., Inc.*,
  29 F.4th 802 (6th Cir. 2022) .................................................................... 19, 28

*Doshi v. Gen. Cable Corp.*,
  386 F. Supp. 3d 815 (E.D. Ky. 2019) ............................................................. 32

*Dougherty v. Esperion Therapeutics, Inc.*,
  905 F.3d 971 (6th Cir. 2018) ........................................................ 15, 28, 29, 34

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005) ..................................................................................... 37

*Franchi v. SmileDirectClub, Inc.*,
  633 F. Supp. 3d 1046 (M.D. Tenn. 2022) .............................................. 15, 27, 32

*Frank v. Dana Corp.*,
  646 F.3d 954 (6th Cir. 2011) .................................................................. 28, 31, 35

*Gimpel v. Hain Celestial Grp.*, Inc.,
  No. 23-7612, 2025 WL 2749562 (2d Cir. Sept. 29, 2025).................................. 19

*Godinez v. Alere Inc.,*
  272 F. Supp. 3d 201 (D. Mass. 2017) ............................................................. 34

*Grae v. Corr. Corp. of Am.*,
  No. 3:15-cv-2267, 2017 WL 6442145 (M.D. Tenn. Dec. 18, 2017)........................ passim

*Helwig v. Vencor, Inc.*,
  251 F.3d 540 (6th Cir. 2001) ............................................................... 4, 21, 24

Case 3:25-cv-00018    Document 54    Filed 10/24/25    Page 4 of 51 PageID #: 1928

*Howard v. Arconic Inc.*,
No. 2:17-cv-1057, 2021 WL 2561895 (W.D. Pa. June 23, 2021).....................................38

*Hutchins v. NBTY, Inc.*,
No. CV 10-2159 (LDW) (WDW), 2012 WL 1078823 (E.D.N.Y. Mar. 30, 2012) ...........19

*In re Able Lab'ys Sec. Litig.*,
No. 05-2681 (JAG), 2008 WL 1967509 (D.N.J. Mar. 24, 2008)......................................37

*In re Bank of Am. AIG Disclosure Sec. Litig.*,
980 F. Supp. 2d 564 (S.D.N.Y. 2013) ................................................................................23

*In re CBL & Assocs. Props., Inc. Sec. Litig.*,
No. 1:19-CV-00181-JRG-CHS, 2022 WL 1405415 (E.D. Tenn. May 3, 2022)...............18

*In re Compuware Sec. Litig.*,
301 F. Supp. 2d 672 (E.D. Mich. 2004).............................................................................20

*In re Dynagas LNG Partners LP Sec. Litig.*,
504 F. Supp. 3d 289 (S.D.N.Y. 2020) ...............................................................................25

*In re Envision Healthcare Corp. Sec. Litig.*,
No. 3:17-cv-01112, 2019 WL 6168254 (M.D. Tenn. Nov. 19, 2019)...............................32

*In re Express Scripts Holdings Co. Securities Litig.*,
773 F. App'x 9 (2d Cir. 2019) ...........................................................................................20

*In re Fed. Mogul Corp. Sec. Litig.*,
166 F. Supp. 2d 559 (E.D. Mich. 2001).............................................................................32

*In Re FirstEnergy Corp. Sec. Litig.*,
149 F.4th 587 (6th Cir. 2025)............................................................................................18

*In re FirstEnergy Corp.*,
No. 2:20-CV-4287, 2022 WL 681320 (S.D. Ohio Mar. 7, 2022) .....................................37

*In re Ford Motor Co. Securities Litig., Class Action*,
381 F.3d 563 (6th Cir. 2004).............................................................................................21

*In re Gen. Motors Co. Sec. Litig.*,
773 F. Supp. 3d 429 (E.D. Mich. 2025).......................................................................34, 38

*In re Hi-Crush Partners L.P. Sec. Litig.*,
No. 12 Civ. 8557 (CM), 2013 WL 6233561 S.D.N.Y. Dec. 2, 2013) ..............................26

*In re Humana Inc. Securities Litig.*,
No. 3:99-CV-0398-S, 2000 U.S. Dist. LEXIS 21671 (W.D. Ky. Nov. 7, 2000)..............27

*In re Sofamor Danek Group, Inc.*,
123 F.3d 394 (6th Cir. 1997) ...................................................................................... 17, 21

*In Re: Shoals Techs. Grp., Inc. Sec. Litig.*,
No. 3:24-cv-00334, 2025 WL 2795062 (M.D. Tenn. Sept. 30, 2025) ........................ 21, 37

*Indiana State District Council of Laborers & Hod Carriers Pension & Welfare Fund v.
Omnicare, Inc.*
583 F.3d 935 (6th Cir. 2009) ................................................................................ 19, 22, 38

*JRS Partners, GP v. Leech Tishman Fuscaldo & Lampl, LLC*,
615 F. Supp. 3d 750 (M.D. Tenn. 2022) ........................................................................ 15

*Levy v. Gutierrez*,
No. 14-CV-443-JL, 2017 WL 2191592 (D.N.H. May 4, 2017) ........................................ 25

*Lim v. Hightower*,
No. 24-3960, 2025 WL 2965692 (6th Cir. Oct. 21, 2025) ............................................... 24

*Lubbers v. Flagstar Bancorp. Inc.*,
162 F. Supp. 3d 571 (E.D. Mich. 2016) ......................................................................... 18

*Macquarie Infrastructure Corp. v. Moab Partners, L. P.*,
601 U.S. 257 (2024) .................................................................................................. 18, 19

*Nasyrova v. Immunomedics, Inc.*,
No. 14-1269 (SRC), 2015 WL 382846 (D.N.J. Jan. 28, 2015) .................................... 23, 24

*Newtyn Partners LP v. All. Data Sys. Corp.*,
No. 2:23-CV-1451, 2025 WL 872967 (S.D. Ohio Mar. 20, 2025) ................................... 24

*Nguyen v. Endologix, Inc.*,
962 F.3d 405 (9th Cir. 2020) ......................................................................................... 35

*Norfolk Cnty. Ret. Sys. v. Cmty. Health Sys., Inc.*,
877 F.3d 687 (6th Cir. 2017) ................................................................................ 37, 38, 39

*OFI Asset Management. v. Cooper Tire & Rubber*,
834 F.3d 481 (3d Cir. 2016) ......................................................................................... 27

*Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*,
830 F.3d 376 (6th Cir. 2016) ................................................................................ 14, 38, 40

*Padilla v. Cmty. Health Sys., Inc.*,
No. 3:19-CV-00461, 2022 WL 3452318 (M.D. Tenn. Aug. 17, 2022) ......................... 15, 19, 27

*Plagens v. Deckard*,
No. 1:20-cv-2744, 2023 WL 2711263 (N.D. Ohio Mar. 30, 2023) ................................. 29

v

*Plymouth Cnty. Ret. Sys. v. Evolent Health, Inc.*,
    No. 1:19-cv-1031, 2021 WL 1439680 (E.D. Va. Mar. 24, 2021)..................................... 34

*Roberti v. OSI Sys., Inc.*,
    No. CV 13-9174-MWF (VBKx), 2015 WL 1985562 (C.D. Cal. Feb. 27, 2015) ............. 34

*Sapssov v. Health Mgmt. Assocs., Inc.*,
    608 F. App'x 855 (11th Cir. 2015) .................................................................................. 39

*Stein v. U.S. Xpress Enters., Inc.*,
    No. 1:19-CV-98, 2020 WL 3584800  (E.D. Tenn. June 30, 2020) .................................. 32

*Steiner v. MedQuist Inc.*,
    No. CIV. 04-5487 (JBS), 2006 WL 2827740 (D.N.J. Sept. 29, 2006).............................. 17

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007)................................................................................................... 28, 34

*United States ex rel. SNAPP, Inc. v. Ford Motor Co.*,
    532 F.3d 496 (6th Cir. 2008) .......................................................................................... 15

*Universal Health Servs., Inc. v. United States*,
    579 U.S. 176 (2016)........................................................................................................ 18

*W. Virginia Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*,
    57 F. Supp. 3d 950 (D. Minn. 2014) ......................................................................... 26, 37

*Wiseman v. Spectrum Healthcare Res.*,
    No. 2:21-cv-02042-TLP-cgc, 2021 WL 4399718 (W.D. Tenn. Sept. 27, 2021)............... 14

*Zaluski v. United Am. Healthcare Corp.*,
    527 F.3d 564 (6th Cir. 2008) .................................................................................... 21, 22

**Statutes**

15 U.S.C. § 78j(b) .............................................................................................. 15, 18, 35

**Other Authorities**

Thomas Lee Hazen,
    *Treatise on the Law of Securities Regulation* § 12.8[4] (4th ed.2002) ............................ 29

**Regulations**

17 C.F.R. § 240.10b ........................................................................................... 16, 35, 37

## PRELIMINARY STATEMENT

This is a securities fraud case in which Defendants made a series of misrepresentations that concealed the decline of Revance, a faltering public pharmaceutical company, in order to unload it on a private buyer, Crown—damaging public investors in the process.

Leading up to the Class Period, Revance was flailing. By late 2023, its flagship product, Daxxify, had failed to generate significant revenue, leaving Revance dependent on its strategic partnership with Teoxane, a Swiss manufacturer of Resilient Hyaluronic Acid ("RHA") fillers used for cosmetic purposes. Under Revance's distribution agreement with Teoxane (the "Teoxane Agreement"), Revance had exclusive rights to sell Teoxane's RHA fillers in the U.S., provided it met certain minimum sales targets, followed strict promotion and marketing guidelines, and complied with FDA regulations. However, as the market for fillers softened in late 2023, Revance's management became increasingly desperate, slashing its sales and marketing budget to cut costs and engaging in illegal sales practices meet its required numbers under the Teoxane Agreement.

Around this time, Crown approached Revance's CEO, Defendant Foley, seeking to acquire Revance. Foley and the other Defendants viewed an acquisition by Crown as a solution to Revance's problems. But to encourage Crown to purchase the Company, Defendants needed to continue to falsely portray the Company—and the Teoxane partnership in particular—as thriving. So from the start of the Class Period in February 2024 and over the next nine months, Defendants repeatedly touted the Teoxane RHA collection as "the fastest growing filler in the market" that provided a "stable foundation" for Revance and generated "really healthy revenue"—which Defendants specifically attributed to Revance's "commercial team's ability to execute" and "the quality of the product."

The reality was starkly different. To keep Revance afloat long enough to sell it to Crown, Defendants had secretly engaged in short-term, unsustainable cost-cutting and sales-boosting

activities that violated the Teoxane Agreement, infuriating Teoxane to the point that, as was well-known within Revance, Teoxane was looking to exit the relationship. For example, Defendants quietly slashed spending on legitimate marketing activities, stripping Revance's sales and marketing department down to a handful of people in early 2024, and they produced a shoddy yearlong ad campaign for Teoxane's RHA fillers "in-house" rather than paying for professional quality work—resulting in Revance being increasingly unable to meet its sales targets under the Teoxane Agreement. At the same time, Revance tried desperately to boost RHA sales by gifting large quantities of free samples, along with a slew of unrelated luxury items, to customers as part of a kickback scheme to induce purchases—a practice that was unsustainable, illegal, and expressly prohibited by the Teoxane Agreement. As a result, Teoxane was "livid with Revance" and threatening to terminate the deal. None of this was disclosed to public investors or Crown.

The plan to sell Revance to Crown before the truth became known almost worked. On August 12, 2024, Revance announced a tender offer in which Crown would acquire Revance's stock at $6.66 per share—representing nearly a 90% premium over Revance's trading price (the "Tender Offer"). Significantly, the deal documents reflect Revance's representation and warranty that the Teoxane Agreement remained "valid and binding," and that ***"no event ha[d] occurred" or "circumstances exist[ed]" that could result in the Agreement's "termination" or "modification."*** That representation and warranty was false when made.

On August 16, 2024—***four days after Revance announced the Tender Offer***—Teoxane served Revance with a notice of material breach (the "Notice"), formalizing its complaints about Revance's failures to perform under the Teoxane Agreement. Revance privately alerted Crown about the Notice but did not tell public investors. Revance's breaches were so severe and pervasive that Revance was forced to enter into an amended agreement with Teoxane (the "Amended

2

Teoxane Agreement") on terms so onerous and adverse to Revance that, as Defendants later admitted, caused *"substantial doubt" as to Revance's "ability to continue as a going concern."* As a result, Crown slashed the Tender Offer Price by *more than half*.

Defendants concealed these material developments from investors. For example, Defendants did not publicly mention the Notice for *more than five weeks*, during which time they misleadingly announced a benign short "extension" of the Tender Offer deadline. Even when Defendants finally publicly disclosed the Notice on September 23, 2024, they falsely denied Teoxane's assertion that Revance was in breach. In fact, it was not until November 7, 2024 that Defendants finally disclosed that Revance was so severely and incurably in breach that it had been forced to make concessions that were so unfavorable to Revance that the Company might not be able to continue as a going concern. The next day, Revance's stock crashed, falling 36%.

However, even at this late stage, Defendants still did not disclose that, as a result of the Amended Teoxane Agreement, Crown had repudiated the original Tender Offer and issued a new term sheet that slashed the Tender Offer price by *more than half*. To the contrary, Defendants falsely asserted the exact opposite, claiming in Revance's November 7, 2024 press release accompanying its quarterly filing that, under the terms of the Tender Offer Agreement, "*Crown will commence [the Tender Offer] . . . at a price of $6.66 per share*," leading investors to believe the original Tender Offer agreement was in force at the original price.

The full truth did not emerge for more than another month, when on December 9, 2024, Revance announced that, due to the Notice, it had been forced to agree to a revised Tender Offer at just *$3.10 per share*—a *53% reduction* from the original offer price. Defendants further disclosed that, in exchange for the reduced Tender Offer price, they had now secured a release from Crown that absolved them from any claims of "fraud" related to their "representations"

3

regarding "the Company's relationship with Teoxane"—confirming that Defendants had misrepresented the true state of Revance's business and the Teoxane partnership to Crown, as it had to public investors. Defendants' insistence on a release from Crown was a purely self-interested act acknowledging that Defendants had misrepresented the true state of Revance's business and the Teoxane partnership to Crown, as it had to public investors. This news caused Revance's stock price to plummet again, by another 21%. In total, Revance's shares dropped nearly 60%, from their Class Period high of $6.98 on February 29, 2024 to $3.03 on December 9, 2024.

In the face of these damning allegations, Defendants argue that the alleged omissions in their quarterly earnings statements are not actionable because they had no nexus to the statements. This argument fails because it (1) ignores that Defendants affirmatively falsely attributed RHA's performance to legitimate causes, and (2) ignores that Defendants' nondisclosure of the cost cutting and illegal kickback scheme rendered their exclusively positive (and false) picture to investors about their RHA sales and the relationship with Teoxane grossly misleading. Defendants assert they had no duty to disclose an "unadjudicated breach," which they label as "soft" information, but fail to address the numerous former employees ("FEs") who confirmed that Revance was, in fact, materially breaching the Teoxane Agreement, causing Teoxane to threaten termination. These "hard" facts are confirmed by the fact that Teoxane sent a formal Notice of breach only four days after the Tender Offer was announced and the fact that Revance was forced to capitulate to the highly unfavorable Amended Teoxane Agreement shortly thereafter. Moreover, even if this were "soft information," "[t]he protections for soft information end where speech begins." *Helwig v. Vencor, Inc.*, 251 F.3d 540, 560 (6th Cir. 2001).[1] When they touted the Teoxane partnership and the results of the RHA business that depended on it, Defendants were obligated to tell the whole

---

[1] All internal quotations omitted unless otherwise noted.

truth. And Defendants ignore their affirmatively false statements that they did not breach the Teoxane Agreement.

Defendants also argue they had no obligation to disclose the Notice—but far from being "soft," the Notice represented a material, concrete negative change in Revance's critical relationship with Teoxane, and seriously jeopardized the Tender Offer. Moreover, despite Defendants' claim they had 60 days to "cure," clearly no cure was possible—if Revance could have "cured," it would have, rather than enter the Amended Teoxane Agreement that threatened Revance's viability as a going concern and halved the value of the Tender Offer. Similarly, Crown's resulting unequivocal repudiation of the Tender Offer price was also highly material "hard" information Defendants were required to disclose when they spoke about the Tender Offer. Instead, Defendants continually announced extensions of the deal that were purportedly benign, and even asserted as late as November 2024 that, under the terms of the agreement, "Crown will commence [the Tender Offer] . . . at a price of $6.66 per share." The market was unquestionably misled, as evidenced by contemporaneous analyst reports concluding, based on Defendants' misrepresentations, that the Tender Offer was fully intact and would go forward at the original price. Defendants are also wrong to suggest that they cannot be held liable for their statements because the Tender Offer price "was not guaranteed" (Mot. at 1) and because they warned that the price "could" change. Defendants knew that if Crown learned that the critical representation and warranty in the Merger Agreement that ***"no event ha[d] occurred" or "circumstances exist[ed]" that could result in the Teoxane Agreement's "termination" or "modification,"*** Crown would repudiate the Tender Offer and the price would be dramatically lowered. Yet they continued to warn that the price only "could" change—even after Crown learned about Revance's breaches, and even after Crown indeed privately repudiated the Tender Offer price.

Plaintiffs' allegations likewise give rise to a strong inference of scienter. Numerous consistent FE accounts confirm that Revance's illegal sales practices and other breaches of the Teoxane Agreement were well-known, Company-wide and "approved from the top." Teoxane's intense anger and desire to terminate due to these breaches was also directly communicated to senior management. Indeed, it defies credulity that Defendants could have been unaware of such serious breaches of the Teoxane Agreement, when that agreement was responsible for most of Revance's revenue and was a necessary component of the Crown deal. Defendants were also clearly motivated to misrepresent the true state of the Teoxane relationship because they wanted to maintain Revance's stock price and sell the company to Crown at a premium. Moreover, it is not disputed that Revance and the Individual Defendants had actual knowledge of the Notice, the highly unfavorable terms of the Amended Teoxane Agreement, and Crown's repudiation of the Tender Offer price. While Defendants assert their nonculpable explanation is more plausible because they were purportedly "transparent" with investors, any such contention is directly belied by the fact that Defendants repeatedly concealed these highly material facts from the market.

For all of these reasons and those set forth below, Defendants' Motion should be denied.

## STATEMENT OF FACTS

The following illustration shows visually the timeline described in this section and the corresponding price of Revance stock. It is reproduced in larger format at Appendix A.

6



Figure: Revance 2024 Stock Price

## A. By the Start of the Class Period, Revance Had Become Heavily Dependent on the Teoxane Agreement, Which Accounted for 60% of its Revenue

Revance is a pharmaceutical company whose shares began trading on the NASDAQ in December 2014. ¶ 33. At that time, Revance was focused on developing its lead drug candidate, a Botox alternative called "Daxxify." ¶ 33. In January 2020, to complement its Daxxify business, Revance entered into the Teoxane Agreement, which gave Revance the right to sell and distribute Teoxane's line of RHA fillers in the United States. ¶ 34. The Teoxane Agreement required Revance to: (i) purchase minimum annual volumes of RHA fillers; (ii) maintain specified buffer stock levels; (iii) spend defined amounts on marketing and promotion; (iv) comply with FDA regulations and anti-kickback laws; and (v) comply with Teoxane's brand guidelines. ¶¶ 34-37.

Revance's sales of Teoxane's RHA filler initially thrived, but Daxxify flopped. Its launch was delayed by nearly two years by COVID-19, and, when ultimately launched, it did not provide the expected advantages over Botox and thus could not support a pricing premium. ¶ 39.

Meanwhile, Revance's other anticipated revenue stream, a technology platform for the industry, failed, forcing Revance to take $147 million worth of goodwill impairments in 2023. ¶ 39. Thus, by late 2023, and throughout the Class Period, Revance's partnership with Teoxane was its lifeblood, providing over 60% of the Company's revenue. ¶ 38, 40. Even Revance's crucial RHA filler business faced challenges, however, as the filler market softened in 2024. ¶ 152.

**B.      Defendants Falsely Tout RHA Sales and Revance's Compliance with the Teoxane Agreement While Negotiating the Sale to Crown**

At the same time Revance's business was struggling, in November 2023, Revance's CEO, Defendant Foley, was approached by Crown about a possible acquisition of Revance. Stranch Decl. Ex. 1 at 27-28. Revance privately engaged in negotiations with Crown over the following nine months (*id*.), culminating in the August 12, 2024 announcement that Crown would launch a tender offer to acquire Revance for $6.66 per share. ¶¶ 6, 52, 201.

While those negotiations were ongoing, and unbeknownst to Crown and public investors, Revance was continually materially breaching the Teoxane Agreement. To cut costs after the failure of Daxxify, Revance had slashed the RHA marketing department "down to a handful of people" by early 2024. ¶¶ 129-144. Revance also cut costs by using an underqualified in-house marketing team that violated Teoxane's brand guidelines by, among other things, designing a highly ineffective black-and-white ad campaign for 2024. ¶ 130. As a result, and unbeknownst to investors, Revance "missed [its] RHA numbers" and therefore did not live up to its end of the agreement with Teoxane. ¶¶ 17, 155, 158. By the spring of 2024, RHA sales were significantly underperforming at only 70% to 75% of the required benchmarks. ¶ 155. In a desperate effort to artificially prop up sales, Revance flooded physicians with free samples, along with unrelated goods such as gym memberships, blow dryers, and luxury items to induce purchases, masking what were effectively deep discounts. ¶¶ 17, 124, 150, 154. Revance started "basically backing up

the truck and giving away free goods" in violation of 21 C.F.R. § 203.37 and even began giving away 100 free vials for every 100 bought, effectively halving the per-vial price, in a promotion Revance dubbed the "Big Swing." ¶¶ 121-124. These practices were widespread and orchestrated by Company management, as confirmed by Revance's former employees. ¶¶ 119-128. Revance employees were told not to "worry about accounting for the samples" and that these tactics "were approved from the top." ¶ 126-27. This practice of inducing sales through excess free samples continued at least through May 2024. ¶ 128.

According to multiple, consistent confidential witness accounts, Revance's improper sales practices and other failures with respect to the Teoxane Agreement strained Revance's relationship with Teoxane to the breaking point. By February 2024, Teoxane was "frustrated, "very very upset," indeed, "livid" with Revance, and had threatened to terminate the Teoxane Agreement. ¶¶ 130-137. Teoxane expressed these views at monthly meetings with Revance, which included Revance's CCO, where it was discussed that Revance was consistently missing, or just barely meeting their numbers, and that there was no way Revance would make its numbers for 2024. ¶¶ 138-142. Teoxane insisted on dramatically shortening Revance's cure period as a result, from 90 days to 60 days, and the Teoxane Agreement was amended accordingly on July 29, 2024, a development that was not disclosed to investors until October 4, 2024. ¶ 60.

Defying reality, Defendants told investors a very different story in connection with quarterly earnings releases on February 28, May 9, and August 8, 2024. For example:

- On February 28, 2024, Revance claimed that the "RHA Collection continues to be the fastest-growing filler by market share out of the six brands on the U.S. market," Foley stated that "the RHA collection is still the fastest-growing HA filler in the U.S.," and Schilke's claimed Revance's success selling Teoxane products was "driven by deeper and broader account penetration" (¶ 148);

9

- On May 9, 2024, Revance stated that RHA sales were so strong they "took share against the backdrop of a soft filler market," which Defendants specifically attributed to "the quality of the product" and the "differentiated performance profile of the RHA portfolio combined with our commercial team's ability to execute." Foley further stated that "we believe when we go in or are able to win business, we win it not on price, but we win it based on quality of the product" (¶¶ 152-53); and

- On August 8, 2024, Revance stated that "RHA Collection continued to outpace the competition," and Foley stated that the RHA Collection "experienced healthy growth"—and, in response to an analyst question about the RHA filler market, Foley asserted that it "drove really healthy revenue" (¶ 160).

Analysts relied on Revance's misstatements. Barclays, Piper Sandler, and William Blair issued positive reports, highlighting RHA sales strength and Revance's supposed ability to meet its Teoxane obligations. ¶¶ 42, 46-7. Significantly, Defendants did ***not*** mention that the sales were obtained through illegal and unsustainable hidden discounts and kickbacks, and instead falsely credited Revance's "commercial team's ability to execute" and "the quality of the product." ¶¶ 147-53. Nor did they disclose Teoxane was "livid" about Revance's marketing and other failures to perform its contractual duties, such that Teoxane had threatened to end the relationship. ¶ 155.

## C. Revance Announces the Tender Offer Agreement and Claims it Is in Compliance with its Material Contracts.

On August 12, 2024, Revance announced the Tender Offer with Crown, under which Crown would acquire Revance through a tender offer at $6.66 per share. ¶ 52. The deal valued Revance at $924 million—nearly double its market capitalization—and represented a nearly 90% premium over the market price prior to the announcement. *Id*. Revance filed a Form 8-K incorporating and attaching the Merger Agreement and stating that "INVESTORS AND SECURITIES HOLDERS" should review the "DOCUMENTS RELATING TO THE TENDER OFFER AND THE MERGER THAT ARE FILED WITH THE SEC CAREFULLY AND IN THEIR ENTIRETY" (capitalization in original). ¶ 53. Significantly, the incorporated Merger Agreement represented not only that Revance was not in breach of the Teoxane Agreement, but

that "[*n]o event has occurred or circumstances that exist that, with notice or lapse of time or both, would constitute such a breach or default*" under that Agreement. ¶¶ 54-5.

In response, Revance's stock price shot up more than 85% to over $6.50, effectively matching the deal price. ¶ 56; Appendix A hereto; Peterson Decl. Ex. BB (ECF No. 53-4).

**D.      As the Scheme Unravels, Defendants Continue to Mislead Investors**

On August 16, 2024—*a mere four days after the Tender Offer was announced*—Teoxane privately sent Revance the Notice, informing Revance that it was in material breach of the Teoxane Agreement. ¶ 7. The Notice formally alleged that Revance had failed to: (i) expend required marketing resources; (ii) comply with promotional guidelines and obligations; and (iii) had too much RHA inventory on hand due to poor sales. ¶ 61. Under terms added to the Teoxane Agreement two weeks prior, the Notice triggered the truncated 60-day cure period, meaning that Teoxane could terminate on October 15, 2024 if Revance did not cure. *Id*.

Significantly, Revance did not disclose the Notice to investors—and would not do so for *more than five weeks*. ¶ 68. Instead, on August 28, 2024, Revance filed a Form 8-K announcing that Crown's deadline to commence the Tender Offer had been extended—*without mentioning any issues with Teoxane*. ¶ 169. Indeed, it was not until *September 23, 2024* that Defendants disclosed the Notice—and even then, Revance failed to disclose that Crown had stated that it would not proceed with the Tender Offer unless it approved any resolution with Teoxane. ¶¶ 88-94, 99, 101-108, 113, 186, 191, 193, 198, 209. In fact, Defendants said nothing about any adverse impact on the Tender Offer and instead stated that Revance "denie[d] the alleged material breaches" and "intend[ed] to defend itself vigorously"—statements it repeated in updates dated October 4 and October 18, 2024. ¶¶ 68-69, 71, 73, 173. Yet, at the same time, precisely because of Defendants' repeated breaches of the Teoxane Agreement, Defendants were secretly negotiating a new agreement with Teoxane that contained terms existentially harmful to Revance's business. Stranch

Decl. Ex. 1 at 30-31, Ex. 2.

On October 24, 2024, Revance and Teoxane entered into the Amended Teoxane Agreement. That agreement included highly unfavorable terms to Revance, including a $388 million purchase obligation over the next four years—a 90% growth assumption—and materially increased operating costs. ¶¶ 10, 76. The terms of the deal were so onerous that they put Revance's very survival at risk, and in turn, Crown refused to approve the amendment. However, Revance's breaches of the Teoxane Agreement were so significant that Revance had no choice but to agree to the amendment, causing Crown to repudiate the Tender Offer. ¶¶ 78-79.

Remarkably, Defendants concealed these facts from investors. Four days later, on October 28, 2024, Revance filed a Form 8-K disclosing that it had amended the Teoxane Agreement and attaching a copy of the agreement to the filing—but tellingly redacted the highly unfavorable terms, which Defendants themselves later admitted put Revance on the brink of bankruptcy. ¶¶ 77, 89. Defendants also concealed the fact that Crown had refused to approve the amendment and repudiated the Tender Offer price on that basis. ¶¶ 78-79. Instead, Defendants told investors the Teoxane dispute was "resolved" and that the deadline to commence the Tender Offer was extended to November 1, just four days away. ¶¶ 89, 183-193. Analysts responded positively, assuming the Tender Offer was intact, and reporting that there was **"*no indication of a change in the bid offer of $6.66*"**—in response, Revance's stock price spiked more than 25%. ¶ 91.

Two days later, on October 30, 2024, Crown confirmed it would not commence the Tender Offer at $6.66 and sent Revance a revised term sheet that offered a mere $2.25 per share due to the "impact of" the Amended Teoxane Agreement. ¶¶ 14, 92, 198. Despite this development, on November 1, 2024, the day the Tender Offer was supposed to commence, Defendants filed a Form 8-K that merely stated that the parties had agreed to again extend the Tender Offer commencement

12

to November 12 and that ongoing discussions only "*could* result in . . . [Revance] or [Crown] seeking remedies in accordance with, and modifications to, the terms of the Merger Agreement, including offer price"—*without disclosing that this had already occurred*. ¶¶ 187-188.

On November 7, 2024, Revance filed its Form 10-Q, which revealed for the first time that the previously undisclosed terms of the Amended Teoxane Agreement were so unfavorable that they caused "substantial doubt" as to the Company's "ability to continue as a going concern." ¶¶ 77, 95-97. Revance's stock price fell precipitously, by 36%, from $5.78 per share to $3.70 per share. ¶ 98. However, even then, Defendants *still* said nothing about Crown's unequivocal repudiation of the Tender Offer. Indeed, Defendants represented the opposite, stating in a section titled "Third Quarter Highlights" that, under the terms of the agreement, "*Crown will commence a tender offer*…*at a price of $6.66 per share, in cash*." ¶¶ 13, 14, 95, 99, 113, 189-91. Thereafter, Defendants announced several "extensions" of the Tender Offer warning only that Crown "*could*" seek a price modification—concealing the fact that Crown had already done just that. ¶¶ 13, 14, 95, 99, 113, 189-91. These announcements continued even as Crown and Revance were negotiating in a range that was—*at the high end*—less than half the $6.66 previously agreed price. ¶ 104. The last such announcement, which contained the same generic warning, came on December 5, 2024, two days before Revance and Crown formally entered into a revised Tender Offer agreement. ¶ 192; Ex 1 at 31.

### E.     The Truth is Revealed and Revance Stock Price Craters

The full truth emerged on December 9, 2024 when Revance announced that it had agreed to a revised Tender Offer at just *$3.10 per share—a reduction of over 53% from the original offer price*. ¶¶ 16, 109. Significantly, Defendants admitted that the reduced valuation was directly attributable to the Notice, which resulted in the Amended Teoxane Agreement that was "*expected to have a material impact on Revance's future profitability and cash flows*." ¶¶ 16, 109, 210.

Defendants also disclosed that, in exchange for the reduced purchase price, Defendants obtained a release from Crown for Revance's directors and officers—including both Individual Defendants—from any claims of "fraud" relating to the "representations" regarding "the Company's relationship with Teoxane." ¶¶ 16, 115. On this news, Revance's stock dropped an additional 21%, from a close of $3.82 on December 6, 2024 to a close of $3.03 per share on December 9, 2024. ¶¶ 16, 19, 111.

In total, Revance shares dropped nearly 60% from their Class Period high of $6.98 on February 29, 2024 to just $3.03 on December 9, 2024 (the first trading day after the Class Period), causing significant financial harm to Lead Plaintiffs and other investors. ¶¶ 16, 19, 111. The Tender Offer ultimately closed on February 6, 2025 at $3.65 per share. Peterson Decl. Ex. Z.[2] Defendants Foley and Schilke, as shareholders of Revance, cashed out their stock of Revance Stock and their restricted stock units in the Tender Offer, receiving approximately $4.45 million and $800,000, respectively. Stranch Decl. Ex. 3, Ex. 4.

### LEGAL STANDARDS

When deciding a motion to dismiss, courts are to "construe the complaint in the light most favorable to the plaintiff, accept all well-pleaded factual allegations as true, and examine whether the complaint contains sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 830 F.3d 376, 382-83 (6th Cir. 2016) ("*OPERS*"). A motion to dismiss is "based on the pleadings only" as plaintiffs "need not introduce any 'evidence' at the pleading stage." *Wiseman v. Spectrum Healthcare Res.*, 2021 WL 4399718, at *3 (W.D. Tenn. Sept. 27, 2021).

---

[2] Defendants have reached beyond the allegations (which stop at December 12, 2024) and submitted subsequent SEC filings, including Revance's February 6, 2024 Form 8-K announcing completion of the Tender Offer. Peterson Decl. ECF No. 53, Exs. X-Z. Plaintiffs ask that the Court in fairness consider SEC filings from this period submitted by Plaintiffs in response.

Where, as here, Plaintiffs allege fraud under Section 10(b) of the Exchange Act, Rule 9(b) of the Federal Rules of Civil Procedure requires that a plaintiff "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Dougherty v. Esperion Therapeutics, Inc.*, 905 F.3d 971, 978 (6th Cir. 2018). As the Sixth Circuit has explained, however, Rule 9(b) "should not be read to defeat the general policy of 'simplicity and flexibility' in pleadings contemplated by the Federal Rules." *Bond v. Clover Health Invs., Corp.*, 587 F. Supp. 3d 641, 664 (M.D. Tenn. 2022) (citing *United States ex rel. SNAPP, Inc. v. Ford Motor Co.*, 532 F.3d 496, 504 (6th Cir. 2008). "So long as a [plaintiff] pleads sufficient detail—in terms of time, place and content, the nature of a defendant's fraudulent scheme, and the injury resulting from the fraud—to allow the defendant to prepare a responsive pleading, the requirements of Rule 9(b) will generally be met." *Id*.

Additionally, the PSLRA "requires that a plaintiff's complaint (1) specify each statement alleged to have been misleading along with the reason(s) why the statement is misleading, and (2) state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Franchi v. SmileDirectClub, Inc.*, 633 F. Supp. 3d 1046, 1063 (M.D. Tenn. 2022) (Richardson, J.); *Padilla v. Cmty. Health Sys., Inc.*, 2022 WL 3452318, at *15 (M.D. Tenn. Aug. 17, 2022) (Richardson, J.) (same). The moving party "bears the burden of explaining—with whatever degree of thoroughness is required under the circumstances—why dismissal is appropriate for failure to state a claim." *Id*.[3]

---

[3] This Court set forth the applicable legal standards accurately and in depth in *Franchi* and *Padilla*, and also in *JRS Partners, GP v. Leech Tishman Fuscaldo & Lampl, LLC*, 615 F. Supp. 3d 750, 760 (M.D. Tenn. 2022), which Defendants cite but where the facts are inapposite to the present case.

## I.  PLAINTIFFS ADEQUATELY PLEAD ACTIONABLE MISSTATEMENTS

Rule 10b-5(b) makes it unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). As set forth below, Defendants: (i) falsely touted the success of Revance's RHA filler business and performance under the Teoxane Agreement leading up to the Tender Offer, when in reality Revance was in material breach of that Agreement; (ii) falsely claimed Defendants were in full compliance with the Teoxane Agreement while concealing the Notice from investors for weeks; and (iii) falsely represented that the Tender Offer remained on track at the original offer price while concealing the materially adverse terms of the Amended Teoxane Agreement and Crown's resulting repudiation of the $6.66 Tender Offer price in favor of a price that was less than half that.

### A.  Defendants' Statements Touting Revance's Success Promoting and Selling RHA Fillers Under the Teoxane Agreement Leading Up to the Tender Offer Were Materially False

#### 1.  Defendants' Statements Were Affirmatively False

Leading up to the Tender Offer, Defendants repeatedly assured the market that the Teoxane partnership was thriving, asserting that the RHA business was the "fastest-growing HA filler in the U.S" and a "tailwind for [Revance]," providing a "stable foundation" of "really healthy revenue." ¶¶ 44-51. Defendants attributed this success to legitimate factors, including "deeper and broader account penetration" due to Revance's "commercial team's ability to execute," and the "quality of the product." ¶¶ 44, 47, 153, 156-57. These statements were materially false. In reality, and as numerous FEs stated, Revance was in material breach of the Teoxane Agreement due to Revance's improper promotion and marketing and its increasing failure to meet sales targets. Further, the sales that the Company was achieving were not attributable to legitimate factors but

rather to Revance flooding medical practices with free samples and other luxury items, masking deep discounts and violating FDA regulations and anti-kickback laws. ¶¶ 121-23. As a result, Teoxane was "livid with Revance" and on the verge of terminating the Teoxane Agreement. ¶131.

Defendants assert these statements were not false because the historical financial data they reported about RHA sales was accurate (Mot. at 12), but this misses the mark. The Complaint does not allege these statements were false because the financial data was incorrect, but rather because Defendants' statements implied RHA growth was "heathy," "stable," and sustainable, and purportedly attributable to legitimate factors, when in reality the opposite was true: the RHA sales were driven by the free sample scheme.[4] For example, Foley attributed Revance's success selling RHA to its "commercial team's ability to execute" and stated "we believe when we go in or able to win business, we win it not on price, but we win it based on the quality of the product." ¶¶ 152-56. But, as Foley knew and as numerous high-ranking FEs confirmed, Revance **was** winning business "on price" through masked discounts in the form of hundreds of free "samples" and gifts illegally provided in "quid pro quo." ¶¶ 17, 125, 156-57. Defendants ignore these allegations.

As courts in this circuit and elsewhere have recognized, "[a] statement regarding financial performance, **even when accurate**, is still misleading under the securities laws if the speaker attributes the performance to the wrong source." *Chamberlain v. Reddy Ice Holdings, Inc.*, 757 F. Supp. 2d 683, 708–09 (E.D. Mich. 2010) (emphasis added). For example, the court in *Chamberlain* declined to dismiss a Section 10(b) claim where the defendant "deceived the investing public by stating in multiple public disclosures that its financial success was due to lawful competition, when

---

[4] *Sofamor* has been persuasively distinguished on a similar basis. *Steiner v. MedQuist Inc.*, 2006 WL 2827740, at *15 (D.N.J. Sept. 29, 2006) (*Sofamor* is "not inconsistent [ ] with the proposition that Section 10(b) liability can arise when defendants know that statements putting the source of the company's revenue at issue are false or misleading, even though the financials themselves are otherwise accurate.")

in fact [its] success was the result of [ ] anticompetitive behavior." *Id.* at 693; *see In re CBL &*

*Assocs. Props., Inc. Sec. Litig.*, 2022 WL 1405415, at \*10 (E.D. Tenn. May 3, 2022)

("[defendant]'s Form 10-Ks and Form 10-Qs contain material misrepresentations because

[defendant]'s reported revenues are partly attributable to the wrong source, i.e., a fraudulent

scheme rather than its legitimate business practices."); *Clover Health*, 587 F. Supp. 3d at 669

(statement that product quality drove growth actionable where growth was attributable in part to

an undisclosed illegal kickback scheme).[5]

### 2.     Defendants' Statements Are Actionable Half-Truths

Defendants' statements are also actionable as misleading half-truths. As the Supreme Court

has explained, "[h]alf-truths [ ] are 'representations that state the truth only so far as it goes, while

omitting critical qualifying information'"—and such statements are actionable under Section

10(b). *Macquarie Infrastructure Corp. v. Moab Partners, L. P.*, 601 U.S. 257, 258, 263 (2024)

quoting *Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 188 (2016).

Defendants violated Section 10(b) here by touting Revance's strong RHA sales under the

Teoxane Agreement while omitting that, in reality, those sales were obtained through

unsustainable and illegal means that violated both the Teoxane Agreement and FDA regulations.

*See In Re FirstEnergy Corp. Sec. Litig.*, 149 F.4th 587, 617 (6th Cir. 2025) (statements "classic

half-truths" because "while it was 'true' that HB6 had been approved by the Ohio legislature,"

FirstEnergy "failed to disclose the critical qualifying information about the illegal political

---

[5] For these reasons, Defendants are wrong to argue that there is no "nexus" between their statements about Revance's sales of RHA fillers and the purported reasons driving those sales, on the one hand, and the omitted facts that the sales were in truth driven by an illegal kickback scheme on the other—nor were these statements "opinions." Rather, Defendants affirmatively represented to investors that the RHA filler success was due to specific legitimate reasons when it was in fact due in large part to the free sample scheme. Mot. at 14-15. Defendants' citation to *Lubbers v. Flagstar Bancorp. Inc.*, 162 F. Supp. 3d 571, 574 (E.D. Mich. 2016) is therefore inapposite.

contributions it made in order to get HB6 passed"); *Gimpel v. Hain Celestial Grp.*, Inc., 2025 WL 2749562, at *9 (2d Cir. Sept. 29, 2025) (reporting strong sales revenue without disclosing channel stuffing scheme was "misleading because investors would want to know that revenue is not being driven by increased demand but by sales tactics that will likely prove unsustainable"); *Padilla*, 2022 WL 3452318, at *23 (performance metrics misleadingly "omitted that there were growing problems with [company's] aged receivables").[6]

Similarly, courts routinely find that positive statements touting a company's key relationship, like the Teoxane relationship here, are actionable when the speaker omits qualifying information about serious problems with that relationship. *City of Taylor Gen. Emps. Ret. Sys. v. Astec Indus., Inc.*, 29 F.4th 802, 812 (6th Cir. 2022) (falsity alleged where "[d]efendants painted a rosy picture of [company]'s performance . . . without providing a fair disclosure of the financial consequences of the plants' failure to meet contractual obligations"); *Grae v. Corr. Corp. of Am.*, 2017 WL 6442145, at *17 (M.D. Tenn. Dec. 18, 2017) ("[f]ailing to acknowledge and disclose the dire status of its relationship with a client as large and important as the BOP [] is not 'speak[ing] fully and truthfully on th[e] subject' of its client relationships"); *Hutchins v. NBTY, Inc.*, 2012 WL 1078823, at *5–6 (E.D.N.Y. Mar. 30, 2012) ("It is plausible that a reasonable investor would view NBTY's *potential* loss of Wal-Mart's business—or retaining it at lower prices—significant to an investment decision under the circumstances").[7]

---

[6] Defendants quote *Indiana State District Council of Laborers & Hod Carriers Pension & Welfare Fund v. Omnicare, Inc.* ("*ISDC*") out of context (Mot. at 13-14) to suggest that illegal activity need not be disclosed despite statements indicating the company complied with law. But the court in *ISDC* indicated that such statements would be actionable if, as alleged here, the defendants actually knew the statements were false when made. *ISDC*, 583 F.3d 935, 947 (6th Cir. 2009).

[7] To be clear, Plaintiffs do not allege that Defendants are liable for any "pure omissions." "A pure omission occurs when a speaker says nothing, in circumstances that do not give any particular meaning to that silence." *Macquarie*, 601 U.S. at 263. That is not what took place here.

19

*In re Compuware Securities Litig.*, 301 F. Supp. 2d 672, 682, 689 (E.D. Mich. 2004), is on point. There, the Eastern District of Michigan held statements about a corporate defendant's relationship with its key strategic partner, including that it placed the defendant's business on a "solid foundation" were actionable because they omitted that the relationship was deteriorating. The court explained, "Defendants' choice to disclose anything about that relationship in its press releases and SEC filings mandated full disclosure concerning the benefits, as well as the impediments, to realizing the full potential of that relationship." *Id*. at 682. Here, Defendants repeatedly touted the arrangement with Teoxane while failing to disclose that Revance was in material breach of the Teoxane Agreement and Teoxane was looking to exit the relationship.[8]

### 3. Defendants' Statements Did Not Concern "Soft" Information—and Even if They Did, the Statements Are Still Actionable

Defendants argue that Revance's "alleged contractual breaches" are "soft" information and therefore inactionable (Mot. at 13), but this argument fails for two reasons. *First*, Defendants ignore that the Complaint alleges that Revance **was actually in breach** of the Teoxane Agreement—and that this "hard" reality was confirmed by numerous high-ranking FEs from Revance locations across the country, which Defendants do not challenge. Revance's breaches were further confirmed by Teoxane's Notice, sent only four days after Revance announced the Tender Offer, and by Revance's capitulation to the Amended Teoxane Agreement, with Revance being forced to accept terms so unfavorable they threatened Revance's viability and halved the value of the Tender Offer. Clearly, if Defendants truly believed they were not in breach of the Teoxane Agreement, or could "cure" the breaches alleged, they would not have agreed to an

---

[8] Defendants' reliance on out-of-circuit *In re Express Scripts Holdings Co. Securities Litig.*, 773 F. App'x 9, 13 (2d Cir. 2019) is misplaced. There, the defendants had disclosed that the customer contract at issue was under negotiation and might not be renewed, providing context and critical qualifying information to the positive statements about the relationship with the customer.

amendment that had such a material, destructive impact on the Company's financial condition.[9]

*Second*, it is well-settled in the Sixth Circuit that even with respect to "soft" information, a company "cannot duck liability by pointing to the 'soft' nature of the information it volunteered"— indeed, "the protections for soft information end where speech begins." *Helwig*, 251 F.3d at 560. Accordingly, by choosing to tout Revance's performance under the Teoxane Agreement, Defendants were obligated to tell the whole truth.

### 4. Defendants' Statements Were Not Mere Puffery

Defendants' assertion that these statements were immaterial puffery fails. Given how vital the Teoxane Agreement was to Revance's business, Defendants' statements about the health of that relationship cannot be deemed mere puffery. At the pleading stage, statements may be held immaterial only if they were "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their unimportance." *Helwig*, 251 F.3d at 563. Defendants rely on *In re Ford Motor Co. Securities Litig., Class Action*, 381 F.3d 563 (6th Cir. 2004), but that case is inapposite. Mot. at 12-13.[10] The statements the court called puffery in *Ford* were vague praise of Ford's product and reputation—for example, "at Ford, quality comes first" and "we aim to the quality leader." Likewise, the statements in *ISDC*, also cited by Defendants, did "nothing

---

[9] Defendants' reliance on *In re Sofamor Danek Group, Inc.*, 123 F.3d 394, 400 (6th Cir. 1997) and *Zaluski v. United Am. Healthcare Corp.*, 527 F.3d 564, 574 (6th Cir. 2008) is misplaced. As the Sixth Circuit clarified in *Helwig*, the "soft" information in *Sofamor* was the defendants' *opinion* about the significance of a *public* FDA warning letter, the economic effect of *disclosed* hospital premiums, and the legality of its *non-secret* funding of a non-profit organization. Similarly, in *Zaluski*, "while the [illegal payment itself] could arguably have been a piece of hard information that was subject to disclosure, the potential consequences of these payments are the type of predictions and soft information that do not give rise to a duty of disclosure." Unlike *Sofamor* and *Zaluski*, Defendants here omitted Revance's illegal practices and resulting breaches themselves.

[10] The Court need not determine whether each alleged misstatement is "puffery"; as long as at least some are actionable, the motion may be denied. *See In Re: Shoals Techs. Grp., Inc. Sec. Litig.*, 2025 WL 2795062, at *9 (M.D. Tenn. Sept. 30, 2025).

21

more than vaguely predict positive future results." *ISDC*, 583 F.3d at 944. In contrast, here, Defendants' misstatements concerned Revance's current sales data, growth, and market share under the critical Teoxane Agreement, which was responsible for over half the Company's revenue—exactly the type of objective information on which investors ordinarily rely. *Grae*, 2017 WL 6442145, at *14 (not puffery where defendant "did peg its claims to something concrete"). Indeed, professional analysts expressly relied on Defendants' discussion of the RHA filler business in making investment recommendations and setting price targets. ¶¶ 42, 46-49 ("RHA remains a star," the fillers' "relative stability . . . reflects the strength of the portfolio" and management "already seeing positive sights thus far in 2Q.").[11]

**B. Revance's Statements Announcing the Tender Offer and Denying That Revance Was in Breach of the Teoxane Agreement Were Materially False**

Revance's representation upon announcing the Tender Offer on August 12, 2024—that "[n]o event has occurred or circumstances that exist that, with notice or lapse of time or both, would constitute such a breach or default pursuant to any Material Contract"—was false because Revance ***was*** in material breach of the Teoxane Agreement, in numerous ways. Defendants rely on the fact that Revance did not receive the Notice until four days after they made this statement (Mot. at 16), but, in reality, the fact that Teoxane served the Notice immediately after Defendants' staunch assertion of their compliance with the Teoxane Agreement is in fact compelling evidence that Revance's material breaches existed at the time Defendants' statements were made.

On this point, Defendants strangely cite the discussion in *ISDC*, 583 F.3d 935, 943 (6th Cir. 2009), regarding the PSLRA's safe harbor for forward-looking statements to argue that Plaintiffs must plead actual knowledge of falsity. Mot. at 16. But Defendants do not argue that

---

[11] Defendants read far too much into *Zaluski*, 527 F.3d 564, which treated the description of a brands as "viable" as puffery that did not require disclosure of illegal payments to a senator.

their representations about their ***current*** compliance with the Teoxane Agreement were forward-looking—nor could they. Nor does it help Defendants that they generically warned that the timing of the Tender Offer might change or that it might not occur. Mot. at 16. The Complaint alleges not that Defendants did not disclose generally that the Tender Offer might not close but that they lied about Revance's compliance with the Teoxane Agreement, thereby concealing the specific, material risk that Revance's breaches would derail it. ¶ 168.

Later in time, Revance's Forms 8-K filed on September 23, October 4, and October 18, 2024, falsely denying that Revance was in breach of the Teoxane Agreement, are similarly misleading. Revance's denials are belied by the detailed allegations of the Complaint regarding Revance's pervasive and severe material breaches, supported by numerous FEs. And they are further belied by Revance's entry into the devastating Amended Teoxane Agreement on October 28, 2024—shortly after their denials—and Revance's acceptance of the dramatic reduction in the Tender Offer price by more than half.[12]

**C.** **Revance's Statements on August 28 and September 5, 2024 Were Actionable Half-Truths Because They Omitted the Notice of Breach**

Revance spoke to investors ***twice*** after receiving the Notice without disclosing it: in an August 28, 2024 Form 8-K, telling investors that Revance and Crown "agreed to extend the date by which [Crown] is obligated to commence the tender offer . . . from August 30, 2024 to September 13, 2024"; and in a September 5, 2024 publicly filed memo from Foley to Revance

---

[12] Defendants cite *In re Bank of America AIG Disclosure Securities Litig.*, 980 F. Supp. 2d 564, 577 (S.D.N.Y. 2013) to argue their generic warnings that the Tender Offer might be further delayed or not close render these statements inactionable. Mot. at 18. But that case turned on the separate disclosure of the dispute before the alleged misleading statement. Here, there is no suggestion that the Notice was publicly known. Defendants also cite the inapposite *Nasyrova v. Immunomedics, Inc.*, 2015 WL 382846 (D.N.J. Jan. 28, 2015), in which the plaintiffs did not allege that any statement was rendered misleading by the defendants' nondisclosure. *Id*. at *6.

employees discussing the integration efforts between Revance and Crown. These statements indicated that the Tender Offer was proceeding without issue while omitting any mention of the Notice or the tri-party discussions among Revance, Crown, **and Teoxane**.

Defendants assert there was no duty to disclose the Notice by arguing again that it was "soft" information because no breach had been adjudicated (Mot. at 17), but this argument fails.[13] *First*, the Notice was itself a highly material adverse development: it marked a significant negative change in Revance's critical relationship with Teoxane and seriously jeopardized the Tender Offer. And as the Sixth Circuit has held, even on an "emerging issue," a company cannot "offer a patchwork of honesty and omission," and "cannot duck liability by pointing to the 'soft' nature of the information it volunteered." *Helwig*, 251 F.3d at 560, 562. By choosing to update investors about the status of the Tender Offer, Defendants were required to disclose that Teoxane had sent Revance a formal Notice of material breach, contradicting a key representation and warranty supporting the Crown deal and calling into question Revance's primary revenue source. Indeed, this development was such a serious threat to the Tender Offer that it immediately triggered urgent discussions between Revance, Crown, and Teoxane and resulted in Crown not only repudiating

---

[13] Defendants' citations to *Newtyn Partners LP v. Alliance Data Systems Corp.*, 2025 WL 872967, at *14 (S.D. Ohio Mar. 20, 2025) and *Nasyrova*, 2015 WL 382846, at *5-8 are of no avail. Those cases did not involve an undisclosed ominous cause of an event Defendants publicly claimed was routine (as the ominous Notice caused the apparently routine extensions here). Unpublished *Lim v. Hightower*, 2025 WL 2965692 (6th Cir. Oct. 21, 2025) also does not help Defendants here. There, the defendant company **asserted** a breach while it negotiated a **more favorable** contract with its partner, demonstrating the defendant's control of the outcome and that assertion of breach was a ("soft") negotiating tactic. In stark contrast to *Hightower*, here—while Revance spoke glowingly to the public about the Teoxane relationship—the reality was that Teoxane (not the company) sent a Notice of breach, and the revisions to the contract that Teoxane required placed Revance at risk as a going concern. Defendants cite the SEC's Form 8-K instructions (Mot. at 18 n.10), but those instructions give the disclosure requirements when a company is otherwise **silent** and have no bearing on what must be disclosed to make statements the company chooses to make not misleading.

the Tender Offer price but valuing Revance at **_less than half_** the original Tender Offer value.

*Second*, Defendants' assertion that the Notice was of no moment because they had 60 days to "cure" is nonsense. Whether or not cure was possible, the cold, hard fact that Defendants had received the Notice was a material fact necessary to make the statements made, in light of the circumstances, not misleading. Moreover, the reasonable inference is that Defendants could **_not_** have "cured" the breaches because they entered into the heavily one-sided Amended Teoxane Agreement instead of curing and then accepted Crown's revised Tender Offer at less than half the price of the original offer.

> **D.** **Defendants' Statements Concealing the Disastrous Terms of the Amended Teoxane Agreement and Crown's Resulting Repudiation of the Tender Offer Are Materially False and Misleading**

Revance's October 28, 2024 announcement—that it had "resolved" its contractual dispute with Teoxane by entering into the Amended Teoxane Agreement and that Crown's Tender Offer was extended yet again—was false for two reasons. *First*, the announcement of the Amended Teoxane Agreement omitted that the new terms were so unfavorable that Revance might be unable to continue as a going concern. *See In re Dynagas LNG Partners LP Sec. Litig.*, 504 F. Supp. 3d 289, 311-314 (S.D.N.Y. 2020) (statements that charter contracts with strategic partner had been extended actionable where they omitted that the terms were less favorable than prior contracts); *Levy v. Gutierrez*, 2017 WL 2191592, at *3, *7, *13, *20 (D.N.H. May 4, 2017) (redaction of oppressive contractual terms in public filing actionable omission where defendants separately touted the contract). *Second*, the statement that Revance and Crown had agreed to extend the commencement of the Tender Offer was misleading because it omitted the material fact that Crown had refused to approve the Amended Teoxane Agreement and was unwilling to proceed at the agreed upon Tender Offer price as a result, which conflicted with what a reasonable investor would take from the statement. ¶¶ 88-94, 110.

25

Moreover, even after Crown sent Revance revised terms confirming its repudiation and valuation of the Company at *less than half* the price that was in the original Tender Offer, Revance *continued* to report merely that Crown's deadline to commence the Tender Offer had been extended.[14] In one of those filings, Revance went so far as to affirmatively misrepresent to investors that "[u]nder the terms of the agreement . . . *Crown will commence a tender offer* . . . *at a price of $6.66 per share*," without disclosing that Crown had since repudiated that agreement. Such statements are actionable as they completely misrepresented the true state of affairs. *See In re Hi-Crush Partners L.P. Sec. Litig.*, 2013 WL 6233561, at *9, *13-14 (S.D.N.Y. Dec. 2, 2013) (literally true statements about contract actionable because they omitted that the counterparty had repudiated the contract, even though the repudiation in that case was invalid); *W. Virginia Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*, 57 F. Supp. 3d 950, 971 (D. Minn. 2014) (CEO's statement that his company was "continuing to work with the FDA to figure out kind of where they are on [a new drug application]" actionable because, while literally true, it omitted that FDA had told company it would not approve the new drug at that time.).

Finally, even after Revance privately agreed on November 18, 2024 to reduce the Tender Offer price to less than half of the originally agreed price, Revance misleadingly told investors five more times merely that the deadline had been extended.[15] Defendants are wrong to argue that their warnings in their updates that "[Revance]'s ongoing discussions with [Crown] *could* result" in a modified Tender Offer absolve them of securities fraud liability. Mot. at 19-20. As this Court and others have rightly recognized, "[d]efendants cannot be immunized by risk disclosures 'where the risk allegedly disclosed has already occurred' but such actual occurrence has not been

---

[14] Revance's Updates on November 1, 7, and 12 were actionably misleading for the same reasons.

[15] November 19, November 26, November 29, December 3, and December 5. ¶ 192.

disclosed." *Franchi*, 633 F. Supp. 3d at 1075; *Grae*, 2017 WL 6442145, at \*17 (warnings ineffective where plaintiff's claims were "premised not on a failure to predict" but on a "failure to give a full and truthful contemporaneous representation" of the current status of the business and customer relationships). Here, at the time of the updates, Crown had already demanded dramatic modifications to the offer price and—as of the last six updates—***Revance had already acquiesced*** to a ***more-than 50% price reduction***. In any event, the adequacy of a defendant's risk disclosure is appropriately tested on a developed record at a later stage of the litigation. *Padilla*, 2022 WL 3452318, at \*21 ("[w]hether Defendants provided 'fulsome, meaningful' cautionary language is clearly an issue in dispute between the parties, and is not fit for determination at this juncture.").

Defendants rely heavily on *OFI Asset Management v. Cooper Tire & Rubber*, 834 F.3d 481 (3d Cir. 2016), which also involved an undisclosed demand from a merger counterparty to reduce the price of a previously announced merger. But, in *Cooper Tire*, the public statement omitting this fact was a factually accurate announcement of the result of the shareholder vote a few days after the demand. Here, Revance repeatedly stated that the Tender Offer was set to commence imminently without mentioning that Crown had demanded, and Revance had agreed, to a substantially lower price, and even repeated deal terms that had already been repudiated.[16]

## II.    PLAINTIFFS PLEAD A STRONG INFERENCE OF SCIENTER

The Supreme Court has directed courts "*not to scrutinize each allegation in isolation* but

---

[16] Defendants cite unpublished *In re Humana Inc. Securities Litig.*, 2000 U.S. Dist. LEXIS 21671 (W.D. Ky. Nov. 7, 2000) to argue contract negotiations need not be disclosed. That case merely held (1) there was no affirmative duty to speak "unless they made an affirmative statement which would have been misleading without that information"; and (2) the outcome of the negotiations in that case had not become as certain as "hard facts." Here, (1) Revance repeatedly spoke about the Tender Offer, reporting the agreed price of $6.66 per share and that commencement was imminent; and (2) having privately conceded they would accept $3.25 per share, it was as certain as "hard facts" that the price would be far lower than $6.66.

to assess all the allegations *holistically*." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 326 (2007). That is, courts must consider "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual *allegation*, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 323; *see Frank v. Dana Corp.*, 646 F.3d 954, 961 (6th Cir. 2011) ("Our former method of reviewing each allegation individually before reviewing them holistically risks losing the forest for the trees."). "[T]he court must simply consider all possible inferences and determine whether 'the inference of scienter [is] at least as strong as any opposing inference.'" *Grae*, 2017 WL 6442145, at *21 (quoting *Tellabs*, 551 U.S. at 326).

As part of the "holistic" analysis, courts in the Sixth Circuit "consult a non-exhaustive list of considerations known as the *Helwig* factors." *Astec*, 29 F.4th at 813. These factors include (1) divergence between internal reports and external statements; (2) closeness in time of an allegedly fraudulent statement and the later disclosure of inconsistent information; (3) disregard of the most current factual information; (4) the self-interested motivation of defendants in the form of saving their salaries or jobs; (5) evidence of bribery; (6) the existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that lawsuit; (7) disclosure of accounting information in such a way that its negative implications could only be understood by highly sophisticated individuals; (8) suspicious insider trading; and (9) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock. Defendants' contention that Plaintiffs "attempt to allege *only one* of the nine factors" is wrong. As set forth below, *seven of the nine Helwig* factors are satisfied here, and in any event, the "*Helwig* Factors are an analytical tool for courts, not a pleading requirement," and not all the *Helwig* factors are relevant to every alleged fraud. *See Clover Health*, 587 F. Supp. 3d at 676; *see also Esperion*, 905 F.3d at 981 (scienter based on three *Helwig* factors); *Plagens v. Deckard*, 2023 WL 2711263, at

*28 (N.D. Ohio Mar. 30, 2023) (scienter based on two *Helwig* factors).

### A. The Divergence Between Defendants' Statements and Their Internal Knowledge, And Defendants' Disregard of the Most Current Factual Information Before Making Statements, Support Scienter

The *Helwig* factor for analyzing the "divergence" between Defendants' statements and their internal knowledge (Factor 1)—and the factor regarding Defendants' disregard of the most current factual information before making inconsistent statements (Factor 3)—are considered "key" to "finding scienter" and are often analyzed together. *Esperion*, 905 F.3d at 981.

These two factors are satisfied here. Plaintiffs amply plead that information contradicting Revance's Defendants' touting of the Teoxane partnership, and their denials of breach, was well known to employees throughout the Company, including at the highest levels. Such knowledge is imputed to the corporation. *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 688 (6th Cir. 2005) ("knowledge of a corporate officer or agent acting within the scope of [his] authority is attributable to the corporation.") (quoting Thomas Lee Hazen, *Treatise on the Law of Securities Regulation* § 12.8[4], at 444 (4th ed.2002) (alteration in *City of Monroe*).

Indeed, knowledge of Revance's numerous breaches of the Teoxane Agreement—including its improper sales practices and masked off-book discounts that violated FDA regulations—was so widespread at Revance that it has been verified by numerous FEs, who were themselves aware of the practices and confirmed others were too. ¶¶ 119-128. For example, FE 1, Revance's Project Manager in charge of filler marketing, confirmed that management not only knew of the improper gifts, but actually made them. ¶ 122. FE 2, herself a Vice President who reported to the C-Suite, was similarly aware of problematic "back-handed discounts." ¶ 121. And FE 3 explained that an egregious part of the free sample scheme was so official that it had a name (the "Big Swing") and a process in which large giveaways were approved by a Vice President. ¶ 124. FE-3 even reported the scheme to the HR Department and Chief Legal Counsel. ¶ 125.

Similarly, numerous high-ranking FEs reported that Teoxane was acutely aware of Revance's breaches, and made its displeasure known to Revance's most senior officers. Those FEs described how Teoxane was so "very upset," "very frustrated," and indeed "livid with Revance" that it was looking to terminate the Teoxane Agreement. ¶¶ 130, 131. Indeed, FE-3 confirmed that Revance was unable to make its numbers under the Teoxane Agreement and that the Company's Vice President of Strategic Partnerships told her multiple times that Teoxane's CEO was upset about this. ¶ 142. FE 2, a Revance Vice President, likewise confirmed that Teoxane was "perturbed" by Revance's failure to perform under the agreement. ¶ 135. Another Vice President, FE 5, confirmed that Teoxane communicated its displeasure with Revance's improper marketing and its failure to meet its sales targets in multiple monthly meetings attended by Revance's Chief Commercial Officer. ¶ 140-141. And the poor actual sales numbers were generally available to all employees above the title of manager, in the PowerBi system. ¶ 202.

Thus, Revance, through its high-ranking employees—including the CCO and multiple Vice Presidents and Regional Managers—knew that Revance was engaged in improper practices to inflate sales of RHA which were orchestrated from "the top," that Teoxane believed Revance was in breach of the Teoxane Agreement in numerous ways, and that Teoxane was looking to exit the relationship. *See Bucks Cnty. Emps. Ret. Sys. v. Norfolk Southern Corp.*, 775 F. Sup. 3d 1275, 1293 (N.D. Ga. 2025) (scienter where FEs reported conduct that was "systematic, coordinated, and all-encompassing" that "it must have originated with senior [] officials").

Defendants' suggestion that CEO Foley and CFO Schilke were blithely unaware of these Company-wide, critical issues defies credulity. The Teoxane Agreement was by far Revance's most important business relationship, as it accounted for 60% of the Company's revenue. Moreover, as FEs confirmed, a 150-person marketing team was wiped out (¶ 135), so many free

samples were given away that Revance was "never ma[king] any money" on RHA (¶ 161), samples and gifts were not accounted for to avoid alerting auditors (¶ 127), management was "going around legal" (¶ 129), and approval came "from the top." (¶ 126). Teoxane's intense displeasure was known to the CCO and multiple managers and Vice Presidents, including those directly reporting to the C-Suite. Teoxane's own CEO was upset with Revance's performance (¶ 142), yet, Defendants suggest that a legion of high-level Revance personnel somehow kept this information from their own CEO and CFO, and Teoxane's CEO supposedly did not discuss the issue with her counterpart at Revance (Foley), despite the importance of the partnership. Indeed, the notion the Individual Defendants were unaware of the significant issues with the Teoxane Agreement is belied by the fact that Foley and Schilke knew that, due to Revance's breaches, Revance had already been forced to amend the Teoxane Agreement in July of 2024 to dramatically shorten Revance's cure period—Foley even personally signed the amendment two weeks before he touted the RHA filler business and the "stable foundation" it provided.

*Frank v. Dana Corp.*, 646 F.3d 954 (6th Cir. 2011) is instructive. There, the CEO and CFO made public quarterly earnings statements that "painted a publicly rosy picture [while] some divisions of [the company] were wilting." *Id*. at 957. Although the CEO and CFO offered a plausible explanation for their misstatements (failed accounting systems), the Sixth Circuit reversed the district court's dismissal for lack of scienter, holding that it was "difficult to grasp the thought that [CEO] and [CFO] really had no idea that [their company] was on the road to bankruptcy." *Id*. at 962. Likewise, Foley and Schilke painted a rosy picture of Revance's performance while Revance was in crisis, hurtling toward bankruptcy, and needing a transaction (the Tender Offer) to rescue it. As in *Dana Corp.*, it is difficult to grasp how Foley and Schilke did not know about such a desperate situation in their own company, or the illegal sales and

marketing practices being instituted Company-wide in a stopgap effort to forestall the collapse.

In addition, in the Sixth Circuit, "high-level executives can be presumed to be aware of matters central to their business's operation." *Franchi*, 633 F. Supp. 3d at 1085. Here, sales of RHA filler and the relationship with Teoxane were unquestionably central to Revance's operations and absolutely critical to the success of the Tender Offer. *Grae*, 2017 WL 6442145, at *21 (M.D. Tenn. Dec. 18, 2017) ("any reasonable and competent executive would have paid attention to the very issues that [the company] has identified" because they were "absolutely central to [the company's] continued success"); *In re Envision Healthcare Corp. Sec. Litig.*, 2019 WL 6168254, at *22 (M.D. Tenn. Nov. 19, 2019) (scienter where improprieties occurred within operating segment responsible for "vast majority" of revenue); *City of* Monroe, 399 F.3d at 688 (scienter where "the divergence of internal and external statements" was "with respect to clearly material information going to one of [the company's] major flagship brands").[17]

And Defendants do not suggest that they did not each have actual knowledge of the facts omitted from Revance's updates about the status of the Tender Offer, nor can they. Revance received the Notice on August 16, 2024, spurring Defendants to vigorously address it in tri-party talks—yet Defendants failed to breathe a word of this highly material development to investors until five weeks later. And the later negotiations with both Teoxane and Crown, including the

---

[17] Defendants' citation to *In re Federal Mogul Corp. Securities Litigation*, 166 F. Supp. 2d 559, 564 (E.D. Mich. 2001) is inapt. That case involved "particular problems at particular plants" omitted from general statements about the company's health. *Id*. Here, the omitted information involved an endemic and widespread practice regarding a key product and the collapse of a critical strategic relationship. The undisclosed issue in *Stein v. U.S. Xpress Enterprises, Inc.*, 2020 WL 3584800, at *36, *39 (E.D. Tenn. June 30, 2020), on which Defendants also rely, affected just 1.7% of the company's drivers and related to 10% of its business (*id*. at *39), whereas the RHA filler business was 60% of Revance's business and substantially all of the salespeople sold it (¶¶ 34, 143). *Doshi v. General Cable Corp.*, 386 F. Supp. 3d 815, 820 (E.D. Ky. 2019) is also different because it involved issues at foreign subsidiaries.

Amended Teoxane Agreement that threatened Revance's viability as a going concern and resulted in Revance's undisclosed concession to accept less than half of the previously agreed price, directly involved Foley and other senior executives, as disclosed later in Revance's public filings—additional highly material information that Defendants concealed. Stranch Decl. Ex. 1 at 30-31.

Thus, rather than claim lack of actual knowledge, Defendants assert that they were "transparent" about these events—an assertion directly belied by their own actions, as well as by the market's reaction when the truth was eventually disclosed. Mot. at 30-31. Indeed, Defendants offer no non-fraudulent reason why they omitted the fact of the Notice in their August 28 and September 5 filings; why they announced the Amended Teoxane Agreement without disclosing that its terms were so deleterious to Revance that Crown had rejected it and Revance faced bankruptcy as a result; or why they repeated the $6.66 per share Tender Offer price without mentioning Crown had repudiated the price and demanded a much lower price. These failures establish that, at the very least, Defendants were highly reckless.

### B. The Closeness in Time Between Defendants' Misstatements and Their Later Disclosure of Inconsistent Information Strongly Supports Scienter

Several of Defendants' corrective disclosures came soon after their misleading statements (Factor 2). For example: (i) Revance's receipt of the Notice only *four days* after publicly claiming it was not in breach of the Teoxane Agreement or aware of any circumstances that could lead to breach; (ii) Revance's disclosure of the Amended Teoxane Agreement only two months after staunchly asserting it had not breached the Teoxane Agreement—and only one week before it would admit that this amendment was so disastrous for Revance that it threatened its viability as a going concern; (iii) Revance's reaffirmance that Crown was moving forward with the $6.66 price only one month before Revance would reveal that Crown had unequivocally repudiated that price

and reduced it by more than half; and (iv) Revance's last misleading update on the Tender Offer on December 5, only one trading day before disclosing the Tender Offer price had been halved.

Such a "short turnaround" in each of these instances "mak[es] it less likely that the corporation did not know that its statement[s] w[ere] misleading." *Esperion*, 905 F.3d at 981; *see Plymouth Cnty. Ret. Sys. v. Evolent Health, Inc.*, 2021 WL 1439680, at *36 (E.D. Va. Mar. 24, 2021) (four-month proximity supported strong inference of scienter); *Roberti v. OSI Sys., Inc.*, 2015 WL 1985562, at *11 (C.D. Cal. Feb. 27, 2015) (six month gap supported scienter). Moreover, Defendants' pattern of repeatedly concealing obviously material information from investors numerous times during the Class Period itself supports a strong inference of scienter. *In re Gen. Motors Co. Sec. Litig.*, 773 F. Supp. 3d 429, 457 (E.D. Mich. 2025) (repeated attempts to "cover up the truth" and "its implications for the core of Cruise's business and GM's growth" strongly supported scienter).

### C.      Defendants' Self-Interested Motivation Supports Scienter

The allegations in the Complaint amply show why it was in Defendants' self-interest to offload the failing Revance to Crown (Factor 4). Indeed, the Company was in dire straits, and Defendants were desperate to facilitate the private sale to Crown in order to keep their salaries and jobs with Revance—providing Defendants with a compelling reason to conceal Revance's troubles with Teoxane, as the Teoxane Agreement was unquestionably critical to the Crown deal.[18] *Godinez v. Alere Inc.,* 272 F. Supp. 3d 201, 217 (D. Mass. 2017) (ongoing negotiations with potential acquirer "which could have been scuttled by disclosure" of omitted facts supported a strong

---

[18] Defendants argue that they had no motive to mislead investors about the status of the Tender Offer. But, although allegations of motive will support an inference of scienter, they are not required. *Tellabs*, 551 U.S. at 310 ("The absence of a motive allegation, however, is not fatal for allegations must be considered collectively.").

inference of scienter);[19] Significantly, the Individual Defendants would have benefitted handsomely from Revance's inflated stock price had the scheme worked—while Foley and Schilke received approximately $4.5 million and $800,000, respectively, in the Tender Offer, they would have received almost twice that amount under the initial $6.66 Tender Offer price. Stranch Decl. Ex. 3, Ex. 4.[20]

### D. Existence of Ancillary Disputes Charging Fraud and the Company's Quick Settlement of Those Disputes Support Scienter

While Revance's disputes with Crown and Teoxane never escalated to litigation, that was only because Revance settled both disputes quickly, on highly unfavorable terms (Factor 6). With respect to Teoxane, Teoxane sent the Notice to Revance in August 2024—only two months later, Revance entered into the Amended Teoxane Agreement, which was so unfavorable it threatened its viability as a going concern and essentially confirmed that Revance had materially breached the Teoxane Agreement. With respect to Crown, Crown repudiated the Tender Offer by no later than October 2024, with Defendants announcing only two months later that the issue had been swiftly resolved—by halving the Tender Offer price and, critically, with Revance obtaining a "full release" of "fraud" claims from Crown. Such facts are probative of scienter.

---

[19] Defendants' citation to *Nguyen v. Endologix, Inc.*, 962 F.3d 405 (9th Cir. 2020) for the proposition that Plaintiffs' theory lacks a "basis in logic" (Mot. at 24-25) is undercut by the opinion's qualification that it would be different if the Complaint alleged defendants were trying to "sell[ ] the company at a premium" (*Endologix*, 962 F.3d at 415), as is alleged here.

[20] Defendants suggest that their intent to defraud Crown into purchasing Revance stock is irrelevant to a lawsuit brought by members of the public who purchased Revance stock on the open market in reliance on the same misstatements (Mot. at 24), but nothing in Section 10(b) or Rule 10b-5 requires the defendant intend to defraud the particular buyers ultimately injured. *See Dana Corp.*, 646 F.3d 954 (omitting negative financial information from filings for to obtain bank loan probative of scienter in suit brought by stock purchasers).

35

### E. Evidence of Bribery by a Top Company Official, and Disclosure of Accounting Information Such That Its Negative Implications Could Only Be Understood by Highly Sophisticated Individuals, Support Scienter

Bribery (Factor 5) was central to Defendants' scheme: doctors were given hundreds of free samples, gift cards, and other luxury goods off-book to induce them to buy RHA fillers, so that Revance could artificially pad its sales figures in clear violation of FDA regulations and anti-kickback laws. Moreover, high-ranking FEs confirmed that this was a Company-wide scheme, to the extent that it was internally dubbed the "Big Swing," and that it was orchestrated from "the top." The illegality of Defendants' scheme, which involved the routine violation of federal anti-kickback provisions and permeated the entire Company, strongly supports scienter. Additionally, to conceal the scheme, Defendants deliberately failed to account for the free samples and gifts that Revance gave to doctors and failed to reveal to investors that Revance's strong RHA sales were induced by these unaccounted-for gifts. Such devious practices are in fact *worse* than the conduct envisioned by *Helwig* Factor 7, where accurate accounting was presented in a convoluted way.

### F. Defendants' Proposed Inference is Not More Compelling Than the Inference of Scienter

Defendants do not offer an explanation of non-fraudulent intent that is more compelling than the inference of scienter. They suggest that they were "legitimately optimistic about the performance of the RHA Collection in the three quarters leading up to the merger announcement." Mot. at 31. But they fail to explain why, if that were so, they engaged in an illegal kickback scheme to pad sales—nor do they explain why, if they thought they had not breached the Teoxane Agreement, they agreed to an amendment so disastrous it plunged them toward bankruptcy and halved the price Crown paid, six days after their last staunch public denial of breach.

## III. PLAINTIFFS ADEQUATELY PLEAD SCHEME LIABILITY

Plaintiffs adequately plead that Defendants engaged in a fraudulent scheme in violation of

Rule 10b-5(a) and (c), independent of their misstatements.[21] Specifically, Defendants fraudulently inflated Revance's sales and revenue by illegally inducing purchases through free samples that were intended for resale and other gifts. Such unlawful activity underpinning stock prices is actionable under Rule 10b-5(c). *In re FirstEnergy Corp.*, 2022 WL 681320, at *13 (S.D. Ohio Mar. 7, 2022) (scheme "to corrupt legislators and regulators" through bribery, etc. adequately pled in tandem with liability for related misstatements). *See Medtronic*, 57 F. Supp. 3d at 981 (scheme liability where pharmaceutical company covertly paid physician authors of efficacy studies); *In re Able Lab'ys Sec. Litig.*, 2008 WL 1967509, at *21 (D.N.J. Mar. 24, 2008) (scheme liability where defendant "falsif[ied] test results, tamper[ed] with computer data, forge[d] records ... [and] fabricated in house test data to meet FDA standards.").

## IV.  PLAINTIFFS ADEQUATELY PLEAD LOSS CAUSATION

Alleging loss causation in the Sixth Circuit is "not meant to impose a great burden upon a plaintiff." *Norfolk Cnty. Ret. Sys. v. Cmty. Health Sys., Inc.*, 877 F.3d 687, 695 (6th Cir. 2017) (citing *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005)). A plaintiff need only "provide a defendant with ***some*** indication of the loss and the causal connection that the plaintiff has in mind." *Dura*, 544 U.S. at 347. Moreover, loss causation "is not subject to the heightened pleading standards of Rule 9 or the PSLRA, but instead the notice pleading standard of Rule 8." *Shoals*, 2025 WL 2795062, at *12. In the Sixth Circuit, loss causation is alleged by identifying ***either*** a "corrective disclosure" that reveals the falsity of Defendants' prior statements, ***or*** through "materialization of the risk," which occurs when "negative investor inferences" from a specific event or disclosure "caused the loss and were a foreseeable materialization of the risk concealed

---

[21] Subpart (a) makes it unlawful "[t]o employ any device, scheme, or artifice to defraud" and subpart (c) prohibits "any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."

by the fraudulent statement." *OPERS*, 830 F.3d at 385.

The allegations here easily satisfy this low pleading standard. The relevant truth emerged gradually through five corrective disclosures revealing the Revance–Teoxane relationship had been severely damaged by Revance's material breaches, putting the Tender Offer in serious jeopardy and ultimately resulting in a dramatically reduced price.

Defendants argue that two of these corrective disclosures—on September 13 and October 24, 2024—are not corrective because they "only signified to the market that something was amiss" and did not reveal that any fraud had occurred (Mot. at 32), but this argument misses the mark. The Tender Offer's failure to commence on September 13, 2024, and again on October 24, 2024, were *partial* disclosures representing a materialization of the undisclosed risk that Revance had breached the Teoxane Agreement and seriously jeopardized the Tender Offer. ¶¶ 60-61; *Howard v. Arconic Inc.*, 2021 WL 2561895, at *17 (W.D. Pa. June 23, 2021) ("devastating fire" and not a company disclosure was a materialization of risk for concealing downgraded safety certifications).[22] Indeed, market commentators immediately recognized that the "missed deadline" caused the stock price drop, as "investors feared that a delayed tender offer could mean that there may be no deal." ¶ 67; *Gen. Motors*, 773 F. Supp. 3d at 456 (causation where "the media connected the price drop to [the] revelation"); *Clover Health*, 587 F. Supp. 3d at 679 (loss causation includes where "the truth comes to light" through "the real-world materialization of a risk that had been concealed"). That both events were accompanied by immediate negative market reactions confirms loss causation. *See Norfolk*, 877 F.3d at 696 ("the speed at which [company]'s share price dropped" supports causation); *OPERS*, 830 F.3d at 388 (similar).

---

[22] *ISDC*, 583 F.3d at 945 is not on point as there, the Complaint itself "expressly attribut[ed] the decline in share price" to revelations unassociated with the misstatements.

Defendants next argue that Plaintiffs failed to plead "what specific fraud" the remaining three corrective disclosures revealed to the market (Mot. at 32), but this is plainly incorrect. Defendants argue that their September 23, 2025 disclosure of Teoxane's Notice was not corrective because it only revealed "allegations" and not that "Revance actually breached the Teoxane Agreement" (Mot. at 31), but this argument fails for multiple reasons.

*First*, as set forth above, the Notice was itself highly material information, as it marked a significant negative change in Revance's relationship with Teoxane that seriously jeopardized the Tender Offer—thus correcting Defendants' prior statements touting the Teoxane partnership and giving the false impression that the Tender Offer was proceeding without issue. *Second*, Defendants' prior statements went beyond denying an actual breach—Defendants affirmatively asserted that ***"no circumstances exist[ed]" that could even lead to a "modification" of the contract***. ¶ 55. Teoxane's Notice revealed the unequivocal falsity of these statements. *See Clover Health*, 587 F. Supp. 3d at 680 (where defendant "claims that something important—like an investigation—does not exist, and then a later report or event reveals that that very thing did exist, it is, of course, a corrective disclosure"). *Third*, the Sixth Circuit has held that "allegations" are sufficient for loss causation when paired with later admissions that the alleged conduct occurred. *Norfolk,* 877 F.3d at 696 (loss causation based on a complaint filed by a merger counter-party and defendants' later admission to the "truth of the core allegations").[23] Here, numerous FE accounts and Defendants' admission that Revance was forced into an amendment that threatened Revance's viability and halved the Tender Offer's price confirms that the Teoxane Agreement was, in fact, breached. ¶¶ 95-97, 109, 113-115.

___

[23] *Norfolk* distinguished *Sapssov v. Health Management Associates, Inc.*, 608 F. App'x 855 (11th Cir. 2015) relied on by Defendants (Mot. at 33), because the corrective disclosure in *Sapssov* summarized a previously filed complaint, so "was not new information." *Norfolk*, 877 F. 3d at 697.

39

Tellingly, Defendants completely fail to address Defendants' November 7, 2024 corrective disclosure revealing that the terms of the Amended Teoxane Agreement were so ruinous to the Company that they threatened Revance's viability, causing an immediate precipitous 36% stock price decline. Indeed, this revelation unquestionably corrected Defendants' prior statements touting the health of the Teoxane partnership and asserting Revance's full compliance with the Teoxane Agreement. *See* Mot. at 32; ¶¶ 95-96.

 Defendants' final argument—that the December 9, 2024 announcement of the $3.10 new Tender Offer price was purportedly "old news" because Revance had hypothetically warned that that the Tender Offer price "could be modified" (Mot. at 33)—is directly contrary to Sixth Circuit law. In *OPERS*, the defendants similarly argued that because they previously warned the company was increasing its participation in the "nontraditional mortgage market," the disclosure that it actually had "substantial involvement" in low credit mortgages was not new. *OPERS*, 830 F. 3d at 386. However, the court held these prior warnings "mean[t] little" because the risk had already materialized, and investors were thus left with an inaccurate "picture of [the] risk exposure." *Id.*

So too here. Prior to December 8, 2024, Defendants never disclosed that Crown had unequivocally repudiated Tender Offer price as of October 24, 2024, or that it now valued Revance at less than half the value under the original Tender Offer. In fact, Defendants did the opposite: they claimed as late as November 7, 2024 that the Tender Offer "will commence…at a price of $6.66 per share," a claim believed by analysts. ¶¶ 99-100. Indeed, upon Defendants' disclosure of the new Tender Offer price, Revance's stock price plummeted by another 21%—a significant drop that confirmed this was unquestionably "new news" to the market.

## CONCLUSION

For the reasons stated herein, Plaintiffs respectfully request that the Court deny the Motion. If the Motion is granted for any reason, Plaintiffs respectfully request leave to amend.

Dated: October 24, 2025

Respectfully submitted,

**STRANCH, JENNINGS & GARVEY PLLC**

By: */s/ J. Gerard Stranch, IV*
J. Gerard Stranch, IV (BPR 23045)
The Freedom Center
223 Rosa L. Parks Avenue
Suite 200
Nashville, TN 37203
Tel.: (615) 254-8801
gstranch@stranchlaw.com

*Liaison Counsel for Lead Plaintiffs and the Putative Class*

**ENTWISTLE & CAPPUCCI LLP**
Vincent R. Cappucci (*pro hac vice*)
Robert N. Cappucci (*pro hac vice*)
Brendan J. Brodeur (*pro hac vice*)
230 Park Avenue, 3rd Floor
New York, NY 10169
Tel.: (212) 894-7200
Fax: (212) 894-7272
vcappucci@entwistle-law.com
rcappucci@entwistle-law.com
bbrodeur@entwistle-law.com

-and-

**ENTWISTLE & CAPPUCCI LLP**
Andrew J. Entwistle (*pro hac vice*)
Callie Crispin (*pro hac vice*)
500 West 2nd Street, Suite 1900
Austin, TX 78701
Tel.: (512) 710-5960
Fax: (212) 894-7278
aentwistle@entwistle-law.com
ccrispin@entwistle-law.com

**SAXENA WHITE P.A.**
Steven B. Singer (*pro hac vice* forthcoming)
David J. Schwartz (*pro hac vice* forthcoming)
10 Bank Street, Suite 882
White Plains, NY 10606
Tel.: (914) 437-8551

41

Fax: (888) 631-3611
ssinger@saxenawhite.com
dschwartz@saxenawhite.com

Lester R. Hooker (*pro hac vice* forthcoming)
Jonathan D. Lamet (*pro hac vice* forthcoming)
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Tel.: (561) 374-3399
Fax: (561) 394-3382
lhooker@saxenawhite.com
jlamet@saxenawhite.com

*Counsel for Lead Plaintiffs and the Putative Class*

42

## CERTIFICATE OF SERVICE

I hereby certify that on October 24, 2025, I electronically filed a copy of the foregoing Consolidated Complaint with the Clerk of the District Court using the CM/ECF system, which will send notification of such filing to all parties registered with the Court's electronic filing system.

/s/ J. Gerard Stranch, IV
J. Gerard Stranch, IV

43

